**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZACK STEINER, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>UIPATH, INC., DANIEL DINES, ROBERT ENSLIN, and ASHIM GUPTA,<br><br>                    Defendants. | Case No. 1:24-cv-4702<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Zack Steiner ("Steiner" or "Plaintiff"), by and through his counsel, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by UiPath, Inc. ("UiPath" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of UiPath conferences with investors and analysts; (iii) press releases and media reports issued and disseminated by the Company; (iv) analyst reports concerning UiPath; and (v) other public information and data regarding the Company.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a class action on behalf of all persons and entities who purchased or acquired UiPath securities between December 1, 2023 and the close of trading on May 29, 2024 inclusive (the "Class Period"). Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) UiPath; (ii) the Company's Chief Executive Officer ("CEO") Daniel Dines ("Dines"); the

Company's former CEO Robert Enslin ("Enslin"); and (iii) the Company's Chief Financial Officer ("CFO") Ashim Gupta ("Gupta").

2.      Founded in 2005, UiPath is a New York, New York based business automation software company.  Since its founding, the Company provided robotic process automation ("RPA") tools to its public and private sector customers to automate repetitive business tasks typically performed by humans.  With the evolution of artificial intelligence ("AI") technology in recent years, UiPath has sought to enhance its business automation offerings with AI-powered products that work in conjunction with its RPA tools.

3.      On September 27, 2022, after a period of stagnant growth and declining demand for its RPA products, UiPath announced a turnaround strategy.  The turnaround strategy included rebranding UiPath as an AI-powered Business Automation Platform and overhauling the Company's go-to-market sales strategy.  The sales strategy overhaul included several facets, such as: (1) prioritizing selling UiPath's platform of products as opposed to allowing its customers to pick and choose single product offerings; and (2) increasing sales resources dedicated to the Company's largest customers and focusing sales efforts on its customers' C-suites.

4.      This case concerns Defendants' misrepresentations regarding the success of UiPath's turnaround strategy.  During the Class Period, Defendants stated that UiPath's Business Automation Platform "enables us to close larger, more strategic deals" and that its AI-powered products "set[] us apart from the competition."  Regarding its overhauled go-to-market strategy, Defendants represented that the Company was "executing against that strategy, and we're seeing [the] results in the deal quality and the customer quality," asserted that "our strategic investments in innovations and our go-to-market ecosystem positions us well for continued momentum," and

insisted that "there's no doubt there's [been] better execution" since the implementation of the turnaround strategy.

5.     In truth, UiPath's turnaround strategy had failed.  Fruitless investments and inconsistent execution plagued the Company's overhauled go-to-market strategy.  Additionally, far from a competitive strength, UiPath's AI-powered Business Automation Platform caused "confusion" among customers and was not able to be adequately scaled.  As a result, UiPath experienced significant difficulties closing and/or expanding large multiyear deals.

6.     The Class Period begins on December 1, 2023, the day after UiPath issued a press release, after market hours, announcing its 3Q 24 financial results.  In that press release, the Company reported strong quarterly results, including revenue of $326 million, a 24% increase year-over-year, which Defendants largely attributed to the execution of the turnaround strategy.

7.     Investors were impressed by the results and the apparent success of the turnaround strategy.  The price of UiPath stock increased nearly 27% on the news, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023.

8.     Next, on March 13, 2024, UiPath reported "[r]ecord quarterly revenue of $405 million" for 4Q 24, a 31% increase year-over-year, and that it achieved its "first quarter of GAAP profitability as a public company."  The Company also announced FY 25 revenue guidance in the range of $1.555 billion to $1.560 billion.  Once again, Defendants attributed UiPath's apparent success to the successful execution of its turnaround strategy.

9.     Just two and a half months later, on May 29, 2024, UiPath announced the sudden departure of Defendant Enslin as CEO and the reappointment of Defendant Dines as CEO.  On the same day, UiPath announced disappointing 1Q 25 financial results and significantly cut its FY 25 revenue guidance by 10%, or $150 million, to a range of $1.405 billion to $1.410 billion.  UiPath

attributed the poor results and guidance to several factors, including "contract execution challenges on large deals," an inadequate "execution strategy to scale" the Company's AI-powered growth products "to reach their full potential," and that "investments we have made to reaccelerate growth have fallen short of our expectations, [and] made us less agile in responding to customer needs."

10.     Defendant Dines indicated that the turnaround strategy was a failure.  He stated, "[a]s we look to the future, we are laser focused on enhancing our execution . . . , driving higher efficiency across sales . . . and driving a deeper and more execution-oriented strategy for our [AI-powered] growth products."  Dines also stated, "[w]e are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach" and "we plan to go back to our roots, building a truly customer-centric organization."  Additionally, Dines stated, "AI is creating a little bit of confusion with our customers" and rather than closing deals, the customers are continuing to "evaluat[e] what kind of tasks are better suitable to automate the AI" and "what tasks are better with using our platform."

11.     On this news, the price of UiPath stock declined $6.23 per share, or more than 34%, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because UiPath's headquarters is located within this District and Defendants

conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff is Zack Steiner.  Plaintiff purchased UiPath securities during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

17.     Defendant UiPath is a Delaware corporation with its corporate headquarters and principal place of business in New York, New York.  UiPath's stock trades on the NYSE under the ticker symbol "PATH."

18.     Defendant Dines is UiPath's CEO.  He founded UiPath in 2005.  Dines served as sole CEO of UiPath until May 15, 2022.  On May 16, 2022, he assumed the role of co-CEO alongside Defendant Enslin.  On July 10, 2023, UiPath announced Dines would resign as co-CEO effective January 31, 2024, and assume the role of UiPath's Chief Innovation Officer.  Dines served as UiPath's Chief Innovation Officer until May 31, 2024.  UiPath reappointed Dines as sole CEO on June 1, 2024.

19.     Defendant Enslin is UiPath's former CEO.  On May 16, 2022, UiPath appointed Enslin co-CEO alongside Dines.  From January 31, 2024 until May 31, 2024, Enslin served as sole CEO of UiPath.

20.     Defendant Gupta is, and was at all relevant times, UiPath's CFO.

21.     Defendants Dines, Enslin, and Gupta are collectively referred to herein as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

22.     The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     UiPath provides business automation software, specifically a set of RPA and AI capabilities that allow its customers to discover and develop opportunities for automation and automate tasks using a digital workforce that seamlessly collaborates with humans.   UiPath's products let its customers automate a range of tasks traditionally performed by humans such as logging into applications, extracting information from documents, moving folders, filling in forms, reading emails, and updating information fields and databases.   Historically, UiPath focused on providing RPA tools for business automation, but with the recent evolution of AI, the Company has attempted to enhance its business automation offerings with AI-powered tools.

24.     After a period of stagnating growth and declining demand for its RPA products, during UiPath's September 27, 2022 Investor Day conference call, the Company announced a turnaround strategy designed to accelerate growth.  The turnaround strategy included rebranding UiPath as an AI-powered Business Automation Platform and overhauling the Company's go-to-market sales strategy.

25.     UiPath's rebranding signaled a significant shift in strategy that placed AI at the forefront of the Company's business automation offerings.  One of the key AI-powered tools UiPath provides on its platform is intelligent document processing ("IDP"), which uses AI-based technologies to scan, read, and organize information in documents.  UiPath often refers to its AI-powered tools, such as IDP, as its "growth products."

26.     The new go-to-market sales strategy included adopting a new platform sales model that prioritized selling a large suite of the Company's products.  Under this new platform sales model, UiPath announced it would move away from offering individual products to its customers, to offering access to its platform of products through new pricing tiers.  This new model gave customers access to a swath of the Company's products for one price to incentivize customers to purchase multiple Company products.

27.     The go-to-market overhaul also included an initiative to tailor UiPath's sales strategy to its various customers.  These efforts included the creation of three customer segments based on customer size—Enterprise, Corporate/Mid-Market, and Small and Medium Businesses— to allow for better aligned and more efficient sales strategies for each of the customer types.  During the Investor Day, UiPath's Chief Business Officer Chris Weber said the new sales strategy would "focus a higher density of resources" on enterprise customers "who represent the highest propensity" to drive sales growth, including by focusing sales efforts on companies' C-suites.

Weber also announced that UiPath would "double down on the verticals that have the highest propensity and give us the best chance to accelerate growth" and "structure our sales teams around these verticals," specifically, banking, financial services, health care, public sector, and manufacturing.

28.     During the September 27, 2022 Investor Day, Weber also discussed the Company's new "NorthStar" value-based selling tool.  According to Weber, "what it allows us to do is we use external data from [firms] like McKinsey that will say by industry and by department, what is the total potential automation capability" of a particular customer to inform UiPath's sales representatives' conversations with customers.  Then, during UiPath's December 1, 2022 3Q 23 Earnings Call, Defendant Enslin explained that NorthStar is a "prescriptive and predictive model [that] helps our sales reps position the value of automation to customers through an engagement framework that defines economic value, the execution road map and best practices.  It is a great tool to clearly position the differentiated long-term benefits of automation delivered through our platform capabilities."

**Materially False and Misleading Statements Issued During the Class Period**

29.     The Class Period begins on December 1, 2023.  After the market close on the prior day, November 30, 2023, UiPath issued a press release announcing strong 3Q 24 financial results, including revenue of $326 million, a 24% year-over-year increase, which the Company attributed to the successful execution of its turnaround strategy.  In the press release, Defendant Enslin touted "the team's execution and the transformational results we deliver," while Defendant Gupta stated that "[g]iven the strength of our business model we expect to balance growth and profitability, while investing in the business to position UiPath for long-term success."

30.     The press release also quoted Defendant Dines as stating, "[o]ur unwavering commitment to understanding the needs of our customers is key to our success.  In our most recent platform release, 2023.10, we delivered scores of new capabilities that seamlessly translate the potential of AI into tangible action, accelerate productivity, spark innovation, and drive business outcomes for our customers."

31.     Also on November 30, 2023, after the close of trading, UiPath held its earnings call to discuss its 3Q 24 financial results.  On that call, Defendant Enslin further touted the success of the turnaround strategy, stating:

> Our third quarter results underscore the compelling value our end-to-end automation platform delivers for our customers and the strength of our business model . . . As many of you know, at the beginning of this fiscal year, we pivoted our go-to-market resources towards organizations that have a meaningful runway to invest in enterprise automation over the long term.  This investment has significantly increased our presence in the C-suite and helped raise our profile with partners of all sizes.

32.     On the call, Enslin also told investors that UiPath's AI-powered platform and growth products helped drive the success of the turnaround strategy, along with the Company's NorthStar model:

> [W]e feel really good about how our teams are adopting all the changes that we've made and how they're connecting with customers and the relationships we're having with customers.  The expansion is really, in many ways, driven through our growth products.  With all the AI communication that's happening in the market, it allows us to have meaningful conversations with customers.  They see why the platform is relevant.  And then, as I said earlier on, we've been driving NorthStar quite a bit in showing where customers can really look at processes and tasks and understand how to drive value with the automation platform. . . . We believe that AI-powered automation is really helping digital transformation with our customer base and our larger customers.

33.     Also on the November 30, 2023 call, Morgan Stanley analyst Theodor Johann Thun asked about UiPath's customers' adoption of the Company's AI-powered tools:

[Y]ou're one of the few companies that's sort of uniquely positioned between traditional automation and generative AI technologies.  Where do you see customers kind of take the dollars from when they're spending on these AI technologies, whether that's within the product areas that you offer or, more broadly, anything that's kind of coming out of your customer conversations in terms of how spend is getting reallocated in light of AI?

34.     In response, Enslin told investors that the Company's success was driven by UiPath's turnaround strategy and "the business case we were able to drive with C-level suites":

[W]hen customers are looking at spending with us and the AI story and AI to automation connection really fits well to what customers want to invest.  And in many cases, the investments are coming out of the business case and business value that we produce in NorthStar and are able to show the efficiencies in how to gain so they can invest in innovation.  And they see us as an innovation leader today with AI and innovation, combined with our AI-powered platform. . . . I feel it's really driven by the business case we were able to drive with C-level suites and how we focus on industry solutions and how we've connected those to the buying cycle with customers.

35.     Defendant Dines further represented on the November 30, 2023 call that while customers were initially unsure about how to adopt AI technology for their business automation needs, customers now understood that UiPath's platform allowed them to "harness the power of AI" for automation:

I think that direction in the market that we are seeing right now around autonomous agents prove a bit our approach that always said that AI plus automation is the thing that drives the biggest outcomes for our customers.  Actually, this is what we are seeing.  A lot of our customers, after the initial little bit of a pause around how AI is going to help me with my automation, they realize that they need [a] powerful automation platform in order to harness the power of AI.

36.     What's more, Defendant Gupta told investors on November 30, 2023 that UiPath's investments in its turnaround strategy were delivering the "right returns" and that the Company was closely tracking those investments:

[W]e're investing in our frontline sales team and our sales capacity, and we'll continue to invest in areas where we see the right returns and the right investments.  And Rob [Enslin] and the team looks at that on an ongoing basis and we do as a leadership team.

37.     Defendant Gupta also specifically touted the success of UiPath's efforts to focus its sales efforts on enterprise customers with the highest propensity to spend on the Company's platform:

> The penetration and the sale of the platform . . . we continue to make really good progress on.  And we see a very good strong performance in the enterprise segment, particularly in North America.  A lot of the -- whatever headwinds we do see, we see really pronounced in the -- more pronounced in the lower end of the market. But overall, our strategy is on customers with a higher propensity to buy.  We feel like we're executing against that strategy, and we're seeing that results in the deal quality and the customer quality in the quarter.

38.     Analysts were impressed by UiPath's 3Q 24 results.  For example, Macquarie analyst Frederick Havemeyer titled his December 1, 2023 report, "FQ3/24: When a turnaround turns out well," while D.A. Davidson analyst Gil Luria titled his December 1, 2023 report, "Enterprise Alignment Bearing Fruit," and wrote, UiPath's "strategic bet, almost a year old, on driving value for big clients with the longest/broadest automation journeys is paying off."   In response to the Company's positive representations, UiPath's stock price increased nearly 27% in one day, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023.

39.     On March 13, 2024, UiPath issued a press release announcing its 4Q and FY 24 financial results.  In the press release, the Company reported "Record quarterly revenue of $405 million," an increase of 31% year-over-year, and that it achieved its "first quarter of GAAP profitability as a public company."  Defendant Enslin again attributed UiPath's success to its AI-powered Business Automation Platform:

> We delivered a strong close to the fiscal year . . . , underscoring the meaningful outcomes our Business Automation Platform delivers for our customers.  The combination of UiPath's AI and automation is the strategic change enabler for our customers that makes any digital transformation easier and faster, while empowering customers to innovate, adapt more quickly, and grow.

40.     Also on March 13, 2024, UiPath held its earnings call for 4Q 24.  During the call, Enslin attributed the Company's "strong close to the fiscal year," which "exceed[ed] our guidance," to the "demand for the depth and breadth of our platform and the team's focus on customer success."

41.     Further on the call, Enslin discussed UiPath's investments in its turnaround strategy, stating, "I am very pleased with the team's ongoing cost management and discipline around capital deployment, which focuses our energy on the right initiatives and sets us up for future success."

42.     Regarding UiPath's AI offerings, Enslin stated, "C-level executives are . . . prioritizing AI transformation" and "[o]ur business automation platform is the foundation to deliver the value across every organization.  We make AI actionable, unlocking the promise of this next evolution in technology."

43.     Enslin also told investors that UiPath's incorporation of AI-powered growth products into its Business Automation Platform was a competitive strength that enabled the Company to "close larger, more strategic deals":

> 18 months ago, we drove the evolution of the automation market from RPA to a full AI-powered business automation platform.  Our growth products have played a key role in our platform's evolution, setting us apart from the competition and serving as the link that connects AI and automation into actionable results.  Our platform also enables us to close larger, more strategic deals.

44.     Enslin further represented that UiPath's successful turnaround strategy had experienced "continued momentum" and laid the foundation for future growth:

> [W]e delivered a strong close to the year, demonstrating the continued momentum of our AI-powered business automation platform.  We're transforming industries and revolutionizing the way businesses operate.  And as we look to 2025, I believe our strategic investments in innovations and our go-to-market ecosystem position us well for continued momentum.

45.     Finally, Enslin unequivocally declared the turnaround strategy a success:

[T]here's no doubt there's better execution, right?  There's no doubt that's what we said we wanted to achieve better execution.  And we also wanted to make certain that the platform was relevant for C-level executives.  And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way.

46.     Once again, analysts were impressed by UiPath's results.  For example, Barclays analyst Raimo Lenschow wrote in a March 14, 2024 report, "UiPath continues to show better execution in a stable but dynamic macro environment."  And Oppenheimer analyst Brian Schwartz wrote in a March 14, 2024 report, "Management is executing well on its large customer growth and improving efficiency strategy, and the business is delivering better consistency in the quarterly results."

47.     The above statements identified in ¶¶29-46 were materially false and/or misleading.  In truth, UiPath's turnaround strategy had failed.  Fruitless investments and inconsistent execution plagued the Company's overhauled go-to-market strategy.  Additionally, far from a competitive strength, UiPath's AI-powered Business Automation Platform suffered from the Company's inability to adequately scale its AI-powered tools and caused "confusion" among customers.  As a result, UiPath experienced significant difficulties closing and/or expanding large multiyear deals.

**The Truth Begins To Be Revealed**

48.     After the close of trading on May 29, 2024, UiPath issued a press release announcing the resignation of Defendant Enslin as CEO effective June 1, 2024, and the reappointment of Defendant Dines as CEO.  Also on May 29, 2024, UiPath issued a separate press release announcing disappointing 1Q 25 financial results and a significant cut in its revenue guidance for fiscal year 2025.  Specifically, UiPath lowered its FY25 revenue guidance by

approximately 10%, or $150 million, from a range of $1.555 billion to $1.560 billion, to a range of $1.405 billion to $1.410 billion.

49.     UiPath also held a conference call on May 29, 2024 to discuss the 1Q 25 financial results and guidance.  While UiPath partially attributed the poor results and reduced guidance to macroeconomic factors and delays closing large multi-year deals in the quarter, Defendant Dines admitted that the Company's failed turnaround strategy was a factor.  According to Dines:

> [W]e saw inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes, which we are working to rectify.  While customer behavior is often a function of the broader macroeconomic environment, execution is something we can control.  And we recognize that we need to improve predictability on large multiyear deals.

50.     In the same vein, Dines further revealed that "the investments we have made to reaccelerate growth have fallen short of our expectations, made us less agile in responding to customer needs and created short-term pressure on operating margins, all of which we are committed to rectifying."

51.     Dines also blamed the poor results and reduced guidance on the Company's inability to scale "our growth products such as IDP," acknowledging that "there is a need to have a deeper execution strategy to scale these products to reach their full potential."

52.     Dines also acknowledged that UiPath's effort to focus on its customers' C-suites had not been effective:

> I think we went to a distance to go and pitch our business to C-level, which is actually great.  But the reality is that we have to increase our adoption by taking care of our traditional line of business customers with the CIO suite, which I think, will benefit a lot more for a new reinvigorated customer-centric approach.

53.     Dines also stated that UiPath failed to persuade customers that its AI-powered Business Automation Platform was effective, and that the platform caused confusion.  More specifically, when Evercore ISI analyst Chirag Haresh Ved asked, "when you're thinking about

large customers extending their cycles, are you seeing them stay on the sidelines as they're reevaluating their gen AI strategies," Dines replied in part, "I think that AI is creating a little bit of confusion with our customers.  And they are evaluating what kind of tasks are better suitable to automate the AI, what tasks are better with using our platform."

54.     Significantly, Gupta admitted UiPath had trouble closing multiyear deals with all types of customers.  For instance, when TD Cowen analyst Bryan C. Bergin asked, "as far as the deal scrutiny goes, the smaller deal sizes, the postponements, is that broad-based across the business," Gupta replied, "Bryan, it's broad-based.  I don't think – it's not that we're zoned in on one particular area.  So from a multiyear deal perspective, that's broad."

55.     Finally, because UiPath's go-to-market strategy had failed, Dines told investors that the Company would implement another new go-to-market strategy:

> As we look to the future, we are laser focused on enhancing our execution including improved sales linearity and deal scrutiny, driving higher efficiency across sales and the broader organization and driving a deeper and more execution-oriented strategy for our growth products.  We are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach.
>
> Lastly, we plan to go back to our roots, building a truly customer-centric organization, where co-innovating with our customers and partners is at the heart of everything we do.

56.     On this news, the price of UiPath stock declined $6.23 per share, or over 34%, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.

## LOSS CAUSATION

57.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of UiPath securities and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the

market on May 29, 2024, as alleged herein, the price of UiPath securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of UiPath securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired UiPath securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of UiPath and their families and affiliates.

59.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of May 30, 2024, there were more than 490 million shares of UiPath Class A common stock, owned by at least thousands of investors.

60.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.    Whether Defendants violated the Exchange Act;

B.    Whether Defendants omitted and/or misrepresented material facts;

C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.   Whether the price of UiPath's securities was artificially inflated;

F.   Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.   The extent of damage sustained by Class members and the appropriate measure of damages.

61.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

62.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

63.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

64.   UiPath's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.  The statements alleged to be false and misleading above relate to then-existing facts and conditions.

65.   To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

66.   Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement

was false or misleading and the statement was made by or authorized and/or approved by an executive officer of UiPath who knew that the statement was false.

## PRESUMPTION OF RELIANCE

67.     At all relevant times, the market for UiPath's securities was an efficient market for the following reasons, among others:

    A.   The Company's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    B.   As a regulated issuer, UiPath filed periodic public reports with the SEC;

    C.   UiPath regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    D.   UiPath was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for UiPath securities promptly digested current information regarding UiPath from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of UiPath securities during the Class Period suffered similar injury through their purchase of UiPath securities at artificially inflated prices and the presumption of reliance applies.

69.     A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

70.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

71.     During the Class Period, Defendants carried out a plan, scheme, and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase UiPath securities at artificially inflated prices.

72.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for UiPath securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

73.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about UiPath's business and

revenue prospects, as specified herein.

74.     During the Class Period, Defendants made the false statements specified above

which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business and revenue prospects, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UiPath's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

78.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against The Individual Defendants**

79.     Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of UiPath within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions,

participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about UiPath, the Individual Defendants had the power and ability to control the actions of UiPath and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

81.     **WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

82.     Plaintiff demands a jury trial.

Dated: June 20, 2024        Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

  */s/ Ross Shikowitz*

Ross Shikowitz
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
rshikowitz@bfalaw.com

-and-

Adam McCall (*pro hac vice* forthcoming)
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
Facsimile: 415-445-4020
amccall@bfalaw.com

*Counsel for Plaintiff Zack Steiner*

## CERTIFICATION

I, Zack Steiner, hereby certify as follows:

1.      I have reviewed the Complaint against UiPath, Inc. ("UiPath") and others alleging violations of the federal securities laws and have authorized its filing.

2.      I did not purchase or sell securities of UiPath at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in the UiPath securities that are the subject of the Complaint during the class period specified therein of December 1, 2023 to the close of trading on May 29, 2024, inclusive, are reflected in Schedule A, attached hereto.

5.      I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.      Beyond my *pro rata* share of any recovery, I will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __18__ day of June 2024.

DocuSigned by:

*Zack Steiner*
—2E2A17E9BD754E1...                    _____
Zack Steiner

**SCHEDULE A**

TRANSACTIONS IN

<u>UIPATH INC</u>

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/29/2024 | 2,373.00 | 18.37 | ($43,592.01) |
| Purchase | 05/29/2024 | 5,730.00 | 18.37 | ($105,260.10) |