**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
| --- | --- |
| IN RE UIPATH SECURITIES LITIGATION | Case No. 1:24-cv-04702 (JPC) (SDA)<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 8

III.    PARTIES ........................................................................................................... 9

IV.     BACKGROUND ALLEGATIONS................................................................... 10

        A.      UiPath's Business ................................................................................ 10

        B.      UiPath Goes Public and Immediately Faces Problems.......................... 11

        C.      UiPath Hires Defendant Enslin and Deploys a "Turnaround Strategy" in 2022 .. 12

        D.      Defendants Tout the Success of their Turnaround Strategy ................... 17

V.      FORMER EMPLOYEE ALLEGATIONS ........................................................ 22

        A.      FE-1 ..................................................................................................... 22

        B.      FE-2 ..................................................................................................... 28

        C.      FE-3 ..................................................................................................... 34

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS...................... 36

        A.      False and Misleading Statements Regarding Execution and Deal Quality.......... 36

        B.      False and Misleading Statements Regarding Investments in Sales Team and
                Customer Success ................................................................................ 38

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER........................................... 40

        A.      Enslin and Gupta Knew Shifts Away from Ramping Deals and Changes to
                Sales Compensation Were Undermining Multi-Year Deals, Deal Quality, and
                Execution of UiPath's Transformation ................................................ 40

        B.      Enslin and Gupta Had Continuous Access to Information Showing Their
                Statements Were False.......................................................................... 41

        C.      Defendant Enslin Attended Meetings During Which He Demonstrated Deep
                Knowledge of Execution and Customer Success Issues........................ 42

        D.      The Close Temporal Proximity Between the False and Misleading Statements
                and the Corrective Disclosures Further Supports Scienter .................... 43

        E.      Enslin's Departure Was Announced at the Same Time as the Corrective
                Disclosures ........................................................................................... 44

        F.      Defendants' False and Misleading Statements Concerned Core Operations
                Central to UiPath's Business ................................................................ 45

        G.      Corporate Scienter ............................................................................... 46

VIII.   LOSS CAUSATION......................................................................................... 46

IX.     CLASS ACTION ALLEGATIONS .................................................................. 49

X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 50

XI.    PRESUMPTION OF RELIANCE ................................................................................... 51

XII.   CLAIMS FOR RELIEF .................................................................................................. 52

XIII.  PRAYER FOR RELIEF .................................................................................................. 54

XIV.   JURY DEMAND ............................................................................................................. 55

Court-appointed Lead Plaintiff Simone Brunozzi ("Brunozzi") and Named Plaintiff Scott Cheslowitz ("Cheslowitz" and, together with Brunozzi, "Plaintiffs") allege fraud-based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder for a class period of December 1, 2023 to May 29, 2024, both inclusive (the "Class Period"), against UiPath, Inc. ("UiPath"), Robert Enslin (UiPath's former Chief Executive Officer) ("Enslin"), and Ashim Gupta (UiPath's Chief Financial Officer) ("Gupta").

Plaintiffs, by and through their counsel, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on, among other things, the independent investigation conducted by and through Lead Counsel. This investigation includes, but is not limited to, a review and analysis of public filings by UiPath with the Securities and Exchange Commission ("SEC"); transcripts of UiPath conferences with investors and analysts; press releases, media reports, and other information issued and disseminated by the Company; analyst reports concerning UiPath; other public information and data regarding the Company; and interviews with former UiPath employees.[1]

## I.    SUMMARY OF THE ACTION

1.    This securities class action concerns Defendants' false and misleading statements and omissions regarding the execution and status of UiPath's high-profile business strategy. In particular, Defendants misled investors into believing that (i) they were successful in executing valuable, multi-year contracts with customers, and (ii) UiPath's was investing in its sales team and customer support function (which UiPath called "customer success"), which contributed to that success.

---

[1] Emphasis is added and citations are omitted unless otherwise noted.

2.      Founded in 2005 by Daniel Dines ("Dines"), UiPath is a New York, New York based business automation software company.  Since its founding, the Company provided robotic process automation ("RPA") tools to its public and private sector customers to automate repetitive business tasks typically performed by humans.  These tools allow users to program certain instructions that the RPA tools then deploy to, among other things, log into applications, extract information from documents, move folders, fill in forms, read emails, and update information fields and databases.

3.      UiPath went public in 2021, raising over $1.34 billion in investor capital.  But the Company almost immediately faced stagnating growth and fierce competition that decimated its valuation.  In the year following UiPath's IPO, its revenue growth slowed, from a growth rate of 65% in the first quarter of 2021, to 32% in the first quarter of 2022.  Growth rates in the Company's key performance metric, annualized renewal run-rate, or "ARR" – which measures the ongoing revenue for a product projected over one year – similarly slowed from 64% to 50% over the same time period.  Ultimately, the Company's valuation dropped from $35 billion to under $10 billion, with the stock price falling from $90 per share on May 28, 2021, to an April 25, 2022, low of $17.66 per share.

4.      Forced to confront these developments, UiPath hired new leadership and pursued new business strategies and products.  As a first step, on April 27, 2022, UiPath announced the appointment of Defendant Enslin as co-CEO.  In announcing his hiring, Defendant Enslin was touted as an experienced and effective expert in implementing go-to-market strategies, and was tasked with what one industry analyst called the "existential mission" of "evolv[ing] [UiPath] from an RPA tool to [an] enterprise platform."

5.      On September 27, 2022, UiPath announced a turnaround strategy that branded UiPath as an AI-powered Business Automation Platform and overhauled the Company's go-to-market sales strategy.  The sales strategy overhaul included several facets, such as: (1) prioritizing selling UiPath's platform of products as opposed to allowing its customers to pick and choose single product offerings; and (2) investing in sales resources dedicated to the Company's largest customers and focusing sales efforts on its customers' C-suites.

6.      The Class Period begins roughly a year later, on December 1, 2023, the day after UiPath issued a press release touting the success of its business strategy.  During the Class Period, Defendants made numerous false and misleading statements and omissions.  Specifically, while announcing its financial results for the third quarter of FY 2024 (the period ending October 31, 2023), Defendants stated that UiPath's Business Automation Platform "enables us to close larger, more strategic deals."  Regarding its overhauled go-to-market strategy, Defendants represented that the Company was "executing against that strategy, and we're seeing [the] results in the deal quality and the customer quality," asserted that "our strategic investments in innovation and our go-to-market ecosystem positions us well for continued momentum," and insisted that "there's no doubt there's [been] better execution" since the implementation of the turnaround strategy.  Defendants also claimed that UiPath had been "investing in our frontline sales team and our sales capacity."

7.      Investors were impressed by the results and the apparent success of the turnaround strategy.  The price of UiPath stock immediately increased nearly 27% on the news, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023.  Analysts reacted positively, and picked up on Defendants' claims of a successfully executed strategy and Defendant Enslin's role in that strategy.  For example, on November 30, 2023, analysts at JP Morgan stated

that the upward shift in its price target reflected, in part, "continued execution by UiPath." Analysts at Truist supported a "Buy" rating on UiPath stock by citing to "GTM [go-to-market] transformation work being driven by co-CEO Rob Enslin."  TD Cowen agreed, emphasizing, "PATH continues to execute well on its revised go-to-market strategy…and it cites a more strategic conversation with the C suite in existing & prospective clients."  D.A. Davidson's analyst zeroed in on the perception that, "[e]xecution is strong across all parts of the business, driving GTM progress," adding UiPath's "strategic bet, almost a year old, on driving value for big clients with the longest/broadest automation journeys is paying off."

8.     Defendants continued to tout the success of their business strategy through the next fiscal quarter.  On March 13, 2024, UiPath reported "[r]ecord quarterly revenue of $405 million" for the fourth quarter of FY 2024 (the period ending January 31, 2024), a 31% increase year-over-year, and noted that it achieved its "first quarter of GAAP profitability as a public company."  The Company also announced Fiscal Year ("FY") 2025 (which began on February 1, 2024) revenue guidance in the range of $1.555 billion to $1.560 billion.  Once again, Defendants attributed UiPath's apparent success to the successful execution of its turnaround strategy, stating that "[o]ur platform also enables us to close larger, more strategic deals" and that there is "no doubt there's better execution."  Defendants also attributed demand to "the team's focus on customer success, which is at the core of everything we do."

9.     Investors were, once again, impressed with the results and UiPath's purported reasons for success.  Barclays cited "improving execution," while Oppenheimer reported, "[m]anagement is executing well on its large customer growth and improving efficiency strategy, and the business is delivering better consistency in the quarterly results."  Baptista Research attributed UiPath's quarter to, in part, "successful team focus on customer success."

10.     In truth, UiPath's turnaround strategy had failed.  Undisclosed changes to deal structure and compensation made it more difficult for the Company to execute multi-year deals— a problem exacerbated by the Company's inadequate investments in its sales and customer success functions, all of which plagued the Company's overhauled go-to-market strategy.

11.     While externally touting the success of its strategy and the "deal quality" it was seeing as a result, internally UiPath had in fact made an undisclosed reversal to how customer contracts were structured and how sales representatives were compensated.  These changes, unknown to investors, disincentivized the types of lucrative multi-year deals the Company prized. For context, UiPath had in September 2021 announced "the opportunity to move customers to deal structures with annual ramping," which UiPath said provided "better [returns on investment] for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath."  This "ramping" structure allowed UiPath to enter multi-year contracts in which the customer paid for, and got licenses to use, additional products in the latter portion of the deal (*e.g.*, 1,000 licenses in the first year, 3,000 in the second, and 5,000 in the third).  These multi-year deals were attractive to customers, who would be able to sample additional services without having to pay for them throughout the life of a contract.  Likewise, UiPath's sales team valued these multi-year deals because their compensation was tied to the revenue generated in the last years of the multi-year contracts (referred to as the "out-years").

12.     But beginning in 2023, and unknown to investors, Defendants internally instructed account executives and sales personnel to curtail the ramped deals for two reasons: (i) Defendants were unwilling to continue compensating sales personnel based on the out-years of the ramped contracts, and (ii) they thought the ramping structure discouraged customers from renewing contracts.  This decision backfired on Defendants.  Ultimately, their concealed decisions both

disincentivized salespeople from pursuing multi-year deals and, ironically, made such deals more expensive and less attractive to existing and new customers, who were now required to pay throughout the life of the contract for services that had previously been prorated.

13.     Contrary to Defendants' public assurances that UiPath was "investing in our frontline sales team and our sales capacity," internally, UiPath was in fact laying off its sales force and hollowing out its customer success function (which acted as a liaison with the customer to help them understand and deploy the products they had licensed).  As a result, UiPath experienced significant difficulties closing and/or expanding large multi-year deals.

14.     Defendants were intimately aware of these problems at the time of their false and misleading statements, and by mid-2023, had become "desperate" to close any deals they could. Indeed, by mid-2023, Defendants had become aware that prohibiting ramped deals had greatly impaired UiPath's ability to close multi-year contracts.  Defendant Enslin spoke internally about UiPath's execution challenges throughout 2023, demanding that salespeople execute any contracts they could and berating them for their inability to do so.  UiPath also had regular "win room" meetings, at which deals were discussed and in which Defendant Gupta was an active participant. In fact, during one such meeting in January 2023, Defendant Gupta had communicated to the sales teams that ramped deals would no longer be approved.

15.     Additionally, account executives regularly updated an internal platform called Clari, which provided real-time data and forecasting about potential deals.  Defendants Enslin and Gupta had continuous access to this platform and the information it provided, and former employees of UiPath shared that Defendants Enslin and Gupta were tracking deals in Clari and met regularly to discuss business forecasts and deal progress.

16.     Finally, Defendant Gupta was personally involved in laying off the sales and customer success functions at the same time he falsely reassured investors of UiPath's commitment to investing in those same functions.

17.     Defendants were forced to admit these known failings on May 29, 2024.  Just two and a half months after Defendants touted the success of UiPath's strategy, UiPath announced the sudden departure of Defendant Enslin as CEO and the reappointment of Dines as CEO.  Enslin's abrupt departure sent shockwaves through the market, with one analyst commenting that the "surprise leadership change" had "shocked investors" and wrote that the plan to have Enslin take the company forward "seems to have failed."  Another observed that "something is clearly amiss when a board of directors turns on a CEO it had hired just two years prior."

18.     Defendants further reported poor results and reduced guidance, which they attributed to the sales compensation changes and poor customer execution that they experienced throughout 2023.  Specifically, on the same day, UiPath announced disappointing financial results for the first quarter of FY 2025 (the period ending April 30, 2024) and significantly cut its FY 2025 revenue guidance by 10%, or $150 million, to a range of $1.405 billion to $1.410 billion.  In contrast to its statements from a few months earlier that highlighted successful execution and deal quality, UiPath attributed the poor results and guidance to several factors, conceding that "certain sales compensation changes" and other changes "incentivized a little bit less the multi-year deals." UiPath also attributed these poor results to "contract execution challenges on large deals," noting that a "change in customer behavior, particularly with large multiyear deals" caused "several large expansion opportunities [to be] pushed out of the quarter.  Defendants further admitted that "investments we have made to reaccelerate growth have fallen short of our expectations, [and] made us less agile in responding to customer needs."

19.     Dines conceded that the turnaround strategy was a failure.  He stated, "[a]s we look to the future, we are laser focused on enhancing our execution . . . , driving higher efficiency across sales . . . and driving a deeper and more execution-oriented strategy for our [AI-powered] growth products."  Dines also stated, "[w]e are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach" and "we plan to go back to our roots, building a truly customer-centric organization."

20.     On this news, the price of UiPath stock plummeted 34% in one day, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.  This steep drop was precipitated by unusually high trading volume of 86.6 million shares on May 30, 2024 (as compared to 26.4 million shares on May 29, 2024, and 10.5 million shares on May 28, 2024).  And analysts were shocked, calling the announcement a "sea change" and downgrading UiPath stock as a result.

## II.    JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because UiPath's headquarters is located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

25.    Lead Plaintiff Simone Brunozzi purchased and sold UiPath securities during the Class Period, as detailed in the Certification attached hereto as Exhibit A and incorporated herein, and has been damaged thereby.

26.    Named Plaintiff Scott Cheslowitz purchased and sold UiPath securities during the Class Period, as detailed in the Certification attached hereto as Exhibit B and incorporated herein, and has been damaged thereby.

27.    Defendant UiPath is a Delaware corporation with its corporate headquarters and principal place of business in New York, New York.  UiPath stock trades on the NYSE under the ticker symbol "PATH."

28.    Defendant Enslin is UiPath's former CEO.  On April 27, 2022, UiPath appointed Enslin co-CEO alongside Dines, effective May 16, 2022.  From February 1, 2024, until May 31, 2024, Enslin served as sole CEO of UiPath.

29.    Defendant Gupta is, and was at all relevant times, UiPath's CFO.

30.    Defendants Enslin and Gupta are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

31.    The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information available to them, the Individual Defendants knew the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## IV.    BACKGROUND ALLEGATIONS

### A.    UiPath's Business

32.    Founded in 2005 by Daniel Dines, UiPath provides business automation software, specifically a set of robotic process automation, or "RPA," and AI capabilities that allow its customers to discover and develop opportunities for automation and automate tasks using a digital workforce that seamlessly collaborates with humans.  UiPath's products let its customers automate a range of tasks traditionally performed by humans such as logging into applications, extracting information from documents, moving folders, filling in forms, reading emails, and updating information fields and databases.  Historically, UiPath focused on providing RPA tools for business automation, but with the recent evolution of AI, the Company has attempted to enhance its business automation offerings with AI-powered tools.

33.    UiPath derives revenue from selling (1) software licenses to use the Company's proprietary software; (2) the right to access certain software products hosted by UiPath; and (3) professional services.

34.    Historically, customers could deploy UiPath's platform on-premises (*i.e.*, in a physical facility or location), in the cloud, or in a hybrid environment.  In Fiscal Year 2023, the Company replaced hybrid offerings with "Flex Offerings," which according to its March 24, 2023, Annual Report, "moved toward unifying [UiPath's] commercial offerings for products with both

on-premise and cloud deployment options into a single offering that allows customers the choice of either deployment option throughout the term of the contract."

35.     According to pre-IPO filings with the SEC, UiPath historically engaged in three types of contracts with customers: (1) annual contracts that would expire after one year; (2) multi-year contracts where the total contract value is pre-paid up front; and (3) multi-year contracts that were paid annually—*i.e.*, the customer pays a portion of the total contract value at the beginning of each year.

36.     UiPath's key performance metric is annualized renewal run-rate, or "ARR," which reflects the ongoing revenue for a product projected over one year.  UiPath's most recent 10-K, issued March 27, 2024, defines annualized renewal run-rate ("ARR") as follows:

> ARR is the key performance metric we use in managing our business because it illustrates our ability to acquire new subscription customers and to maintain and expand our relationships with existing subscription customers. We define ARR as annualized invoiced amounts per solution SKU from subscription licenses and maintenance and support obligations assuming no increases or reductions in customers' subscriptions. ARR does not include the costs we may incur to obtain such subscription licenses or provide such maintenance and support, and does not reflect any actual or anticipated reductions in invoiced value due to contract non-renewals or service cancellations other than for certain reserves, for example those for credit losses or disputed amounts.

37.     Incremental ARR is the term used by UiPath to describe the total year-over-year change in ARR.   ARR factors in both annual and multi-year contracts.

**B.     UiPath Goes Public and Immediately Faces Problems**

38.     UiPath went public on April 21, 2021, and immediately faced trouble.  In the year following UiPath's IPO, the Company's valuation began to plunge.  Revenue growth slowed, from a growth rate of 65% in the first quarter of FY 2022 (which began on February 1, 2021), to 32% in the first quarter of FY 2023 (which began on February 1, 2022).  Growth rates in the Company's key performance metric, annualized renewal run-rate, or "ARR," similarly slowed from 64% to

50% over the same time period. Ultimately, the Company's valuation dropped from $35 billion to under $10 billion, with the stock price falling from $90 per share on May 28, 2021, to an April 25, 2022, low of $17.66 per share.

      **C.**      **UiPath Hires Defendant Enslin and Deploys a "Turnaround Strategy" in 2022**

39.      Defendants tried to respond to this poor performance by implementing new approaches to structuring deals, deploying a new business model, and hiring new executive leadership with purported expertise in their new strategies.

40.      On September 7, 2021, Defendant Gupta announced during the Q2 2022 Earnings Call that UiPath saw "***the opportunity to move customers to deal structures with annual ramping***, which we expect will lower our overall discounts. This structure creates better ROI for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath."

41.      Asked how "annual ramping" contracts would be structured, Defendant Gupta explained, "So what that means is ***instead of buying simple annual contracts***, what we see a larger demand for is getting ***larger-term commitments from some of our customers***. But the way they look at that is ***instead of buying 10,000 robots today, they may buy 1,000 robots today, 5,000 next year, 10,000 in year 3***. And those -- the license deliveries would happen into those years as we go down."

42.      Analysts responded favorably to the "annual ramping" concept. For example, on September 7, 2021, Canaccord Genuity Capital Markets wrote a report lauding the idea: "Management noted that it sees an opportunity to move customers to deal structures with annual ramping, which will allow it to lower its overall discounts (yielding better margins) and create better ROI for its customers and better long-term engagement opportunities for its partners."

Similarly, on September 8, 2021, JP Morgan observed, "UiPath commented that it sees opportunity to move customers to deal structures with annual ramping. This will lower its overall discounts and should not constrain ARR growth."

43.     On April 27, 2022, UiPath announced the appointment of Defendant Enslin as co-CEO.  In announcing the hiring, Dines touted Defendant Enslin's experience as President of Google Cloud, and underlined that Defendant Enslin would "focus on scaling our business." Defendant Enslin was brought in to oversee what one industry observer termed UiPath's "existential mission," specifically to "evolve [UiPath] from an RPA tool to [an] enterprise platform."  At the time of Defendant Enslin's hiring and in the ensuing months, analysts and observers noted that Defendant Enslin would use his experience at Google Cloud and SAP to help UiPath scale its operations and redefine its market strategy.  One industry commentator, the co-CEO of the industry publication *SiliconANGLE*, said Defendant Enslin would provide "adult supervision" at UiPath.  Defendant Enslin's background, according to analysts, made him an important part in executing a shift in UiPath's strategy.

44.     Faced with stagnating growth and declining demand for its RPA products, Defendant Enslin sought to move UiPath beyond its RPA roots.  RPA, unlike artificial intelligence, is typically defined by a "rules-based" approach, meaning the user provides the software with instructions on how to handle a task and the software faithfully executes those instructions. Artificial Intelligence, by contrast, employs self-learning to enable automations to learn how to read, write, listen, recognize patterns, and make complex decisions.  Paired together, RPA and AI technologies can work to automate repetitive tasks in the workplace and enables automation to take action based on learning and experience.  While UiPath offered some products with an AI-oriented approach, Defendant Enslin sought to expand UiPath's AI offerings.  For example, in

August 2022, UiPath acquired Re:infer, a London-based startup that provides natural language processing, or "NLP" tools for businesses.

45.    During UiPath's September 27, 2022 Investor Day conference call, the Company announced a turnaround strategy based on their new pursuit of AI technologies that was designed to accelerate growth.  The turnaround strategy included rebranding UiPath as an AI-powered Business Automation Platform and overhauling the Company's go-to-market sales strategy.

46.    UiPath's rebranding signaled a significant shift in strategy that placed AI at the forefront of the Company's business automation offerings.  UiPath's newly-announced Business Automation Platform, for instance, had three prongs: (1) Discover; (2) Automate; and (3) Operate. "Discover" referred to the ability to "continuously uncover opportunities for process and task improvements."  "Operate" referred to "run[ning] and optimiz[ing] a mission critical automation program at high scale."  It was the "Automate" prong, however, that most directly invoked AI. Specifically, UiPath stated that customers could, "[g]et more done with a digital workforce that seamlessly collaborates with your people and automates work via UI and API, powered with native integrated AI."

47.    One of the key AI-powered tools UiPath provides on its platform is intelligent document processing ("IDP"), which uses AI-based technologies to scan, read, and organize information in documents.  UiPath often refers to its AI-powered tools, such as IDP, as its "growth products."

48.    UiPath's embrace of Artificial Intelligence can be seen in how the Company changed its description of its business.  In its very first 10-K, issued on April 4, 2022, the Company's business overview mentioned AI just once: "Our platform leverages the power of artificial intelligence ("AI") based computer vision to enable our software robots to perform a vast

array of actions as a human would when executing business processes."  By contrast, the Company's most recent 10-K, issued March 27, 2024, explains, "[W]e have evolved from our beginnings in RPA into an end-to-end AI-powered Business Automation Platform through development and acquisitions, have launched new products, and have expanded our operations across the globe."  The 10-K goes on to explain, "Our platform allows customers to integrate AI with automation, enabling automation to take action based on learning and experience."  The 10-K's business overview emphatically concludes, "AI-powered automation is here, and its momentum is continuing to grow as organizations around the world begin to understand the combined power of automation and AI to drive efficiency and accelerate business outcomes. We aspire to be the defining business automation platform, advancing the evolution of automation and AI as a way of working and a catalyst for continuous reinvention."

49.     UiPath also announced in September 2022 that it overhauled its go-to-market strategy.  The new go-to-market sales strategy included adopting a new platform sales model that prioritized selling a large suite of the Company's products.  Under this new platform sales model, UiPath also announced a major shift in how its products would be offered to customers. Previously, UiPath sold each of its products separately, in an à la Carte fashion.  Now, the Company would offer its products as part of a "platform," composed on a Standard tier and a more robust Enterprise tier.

50.     UiPath's go-to-market overhaul dramatically changed how the Company paired account executives to types of customers.  Previously, UiPath's sales model grouped customers into two categories: "Enterprise," representing the largest customers, and "Corporate/Mid-Market and Small and Medium Businesses," which represented all non-Enterprise customers.  Under this model, UiPath's customer coverage ratios included one account executive for every 50 accounts

in the Enterprise category, and one account executive for every 150 accounts for all other customers.

51.    With its go-to-market overhaul, UiPath went from two to three customer segments: Enterprise, Corporate/Mid-Market, and Small and Medium Businesses.  According to UiPath, this model allowed for better aligned and more efficient sales strategies for each of the customer types. During its September 27, 2022, Investor Day, UiPath's Chief Business Officer Chris Weber said the new sales strategy would "focus a higher density of resources" on Enterprise customers "who represent the highest propensity" to drive sales growth, including by focusing sales efforts on companies' C-suites.

52.    Thus, UiPath revised its sales coverage ratios, placing one account executive on every 10 accounts in the Enterprise category and one account executive on every 70 accounts in the Corporate/Mid-Market category.

53.    Analysts and observers viewed these announcements as a pivotal moment for UiPath.  In a September 28, 2022, report, BofA Securities called it a "model reset."  That same day, BMO issued a report that described these announcements as representing UiPath's "maturing from an RPA company to an automation company."  On September 29, 2022, the industry publication *SiliconANGLE*, quoting an industry analyst, reported that UiPath was on an "existential mission" to "[e]volve from [an] RPA tool to [an] enterprise platform."  That report quoted one industry analyst as saying, to get to the next level, UiPath must focus on "platform, platform, platform."

54.    On July 10, 2023, UiPath announced that, effective January 31, 2024, Dines would resign as co-CEO, leaving Enslin as the sole CEO while Dines assumed a newly-created role as

Chief Innovation Officer. Dines would continue to serve as Executive Chairman of UiPath's Board of Directors.

**D.** **Defendants Tout the Success of their Turnaround Strategy**

55.     Throughout the Class Period, Defendants touted the success of this transformation. The day before the start of the Class Period on November 30, 2023, after the market close, UiPath issued a press release announcing strong financial results for the third quarter of FY 2024 (the period ending October 31, 2023), including revenue of $326 million, a 24% year-over-year increase, which the Company attributed to the successful execution of its turnaround strategy. In the press release, Defendant Enslin touted "***the team's execution and the transformational results we deliver***":

> I am pleased with our strong third quarter results with ARR growing 24 percent year-over-year to $1.378 billion, driven by the team's execution and the transformational results we deliver.

56.     In the same press release, Defendant Gupta stated that "[g]iven the strength of our business model we expect to balance growth and profitability, while investing in the business to position UiPath for long-term success."

57.     The press release also quoted Dines as stating, "[o]ur unwavering commitment to understanding the needs of our customers is key to our success. In our most recent platform release, 2023.10, we delivered scores of new capabilities that seamlessly translate the potential of AI into tangible action, accelerate productivity, spark innovation, and drive business outcomes for our customers."

58.     Also on November 30, 2023, after the close of trading, UiPath held its Earnings Call to discuss its third quarter of FY 2024 financial results. On that call, Defendant Enslin further touted the success of the turnaround strategy, stating:

Our third quarter results underscore the compelling value our end-to-end automation platform delivers for our customers and the strength of our business model . . . As many of you know, at the beginning of this fiscal year, we pivoted our go-to-market resources towards organizations that have a meaningful runway to invest in enterprise automation over the long term. This investment has significantly increased our presence in the C-suite and helped raise our profile with partners of all sizes.

59.    Defendant Gupta elaborated that "our strategy is on customers with a higher propensity to buy" and "[w]e feel like we're executing against that strategy, and **we're seeing that [sic] results in the deal quality and the customer quality in the quarter**."

60.    Defendant Gupta also tied the Company's purported success to its investments in its sales team. On the November 30, 2023, Earnings Call, Defendant Gupta told investors that UiPath's investments in its turnaround strategy, particularly in its "sales team" and "sales capacity," were delivering the "right returns" and that the Company was closely tracking those investments:

And so **we have been investing, whether that is within our product team as well as our sales team**. I mentioned earlier, **we're investing in our frontline sales team and our sales capacity**, and we'll continue to invest in areas where **we see the right returns and the right investments**. And Rob [Enslin] and the team looks at that on an ongoing basis and we do as a leadership team.

61.    In response to a question about growing sales expenses, Gupta added:

First is we are **going to continue to invest in our sales team and our sales capacity**, especially as we head into next year. And then the second is, if you recall, we also are dealing with -- we also have the reallocation of our software expenses. So first through third quarter, you'll see sales and marketing versus G&A a little bit lopsided and which will be caught up in [the] fourth quarter.

62.    UiPath's perceived execution of its new strategy was important to investors. Analysts repeatedly seized on Defendants' claims of a successfully executed strategy and Defendant Enslin's role in that strategy. For example, on November 30, 2023, analysts at JP Morgan stated that the upward shift in its price target reflected, in part, "continued execution by

UiPath." That same day, analysts at Truist supported a "Buy" rating on UiPath stock by citing to "GTM [go-to-market] transformation work being driven by co-CEO Rob Enslin." TD Cowen's analyst emphasized, "PATH continues to execute well on its revised go-to-market strategy…and it cites a more strategic conversation with the C suite in existing & prospective clients." D.A. Davidson's analyst zeroed in on the perception that, "Execution is strong across all parts of the business, driving GTM progress." RBC reported, "We like that the changes over the last year around a reworked GTM" and "focus on customers with the largest potential to buy."

63.     Analysts were also impressed by UiPath's 3Q FY 2024 results, which they attributed to UiPath's perceived success in executing contracts. For example, Macquarie analyst Frederick Havemeyer titled his December 1, 2023, report, "FQ3/24: When a turnaround turns out well," while D.A. Davidson analyst Gil Luria titled his December 1, 2023 report, "Enterprise Alignment Bearing Fruit," writing UiPath's "strategic bet, almost a year old, on driving value for big clients with the longest/broadest automation journeys is paying off." In response to the Company's positive representations, UiPath's stock price increased nearly 27% in one day, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023.

64.     On January 10, 2024, UiPath announced that Defendant Enslin would join the Company's Board of Directors and become sole CEO of UiPath effective February 1, 2024. Dines, meanwhile, shifted to the newly-created role of Chief Innovation Officer and served as UiPath's Executive Chairman of the Board. This announcement confirmed the Company's previous announcement seven months earlier, on July 10, 2023, that Dines would resign as co-CEO, leaving Enslin as the sole CEO while Dines assumed the CIO role.

65.     Defendants continued to tout the Company's purported success, and the claim that UiPath was executing its new strategy successfully, in the next fiscal quarter. On March 13, 2024,

UiPath issued a press release announcing its fourth quarter and FY 2024 financial results, for the three-month period ending January 31, 2024.  In the press release, the Company reported "Record quarterly revenue of $405 million," an increase of 31% year-over-year, and that it achieved its "first quarter of GAAP profitability as a public company."  Defendant Enslin again attributed UiPath's success to its AI-powered Business Automation Platform:

> "We delivered a strong close to the fiscal year . . . , underscoring the meaningful outcomes our Business Automation Platform delivers for our customers.  The combination of UiPath's AI and automation is the strategic change enabler for our customers that makes any digital transformation easier and faster, while empowering customers to innovate, adapt more quickly, and grow."

66.    On the Earnings Call held that day, Defendant Enslin claimed that UiPath's incorporation of AI-powered growth products into its Business Automation Platform was a competitive strength that enabled the Company "to close larger, more strategic deals":

> "18 months ago, we drove the evolution of the automation market from RPA to a full AI-powered business automation platform. Our growth products have played a key role in our platform's evolution, setting us apart from the competition and serving as the link that connects AI and automation into actionable results. ***Our platform also enables us to close larger, more strategic deals.***"

67.    Enslin further represented that UiPath's successful turnaround strategy had experienced "continued momentum" and laid the foundation for future growth:

> [W]e delivered a strong close to the year, demonstrating the continued momentum of our AI-powered business automation platform.  We're transforming industries and revolutionizing the way businesses operate.  And as we look to 2025, I believe ***our strategic investments in innovations and our go-to-market ecosystem position us well for continued momentum***.

68.    Defendant Gupta likewise touted UiPath's execution:

> "***The team executed well in the fourth quarter*** and I am particularly pleased with our significant year-over-year increase in operating margins, including our first quarter of GAAP profitability as a public company, and record cash flow."

69.     Finally, Defendant Enslin unequivocally declared the turnaround strategy a success:

> "*[T]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution*. And we also wanted to make certain that the platform was relevant for C-level executives. And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way."

70.     Once again, analysts were impressed by UiPath's results and seized on Defendants' statements in issuing their positive reports.  For example, Barclays analyst Raimo Lenschow favorably cited "improving execution," writing in a March 14, 2024, report, "UiPath continues to show better execution in a stable but dynamic macro environment."  Oppenheimer analyst Brian Schwartz similarly wrote in a March 14, 2024, report, "Management is executing well on its large customer growth and improving efficiency strategy, and the business is delivering better consistency in the quarterly results."

71.     Meanwhile, analysts at William Blair cheered, "UiPath continues to execute well as the combination of AI and automation is resonating with customers and is helping elevate UiPath's platform conversation into the C-suite."  JP Morgan reported that, "UiPath [is] Positioning Itself as AI Winner," elaborating that, "UiPath states that the increased customer focus on AI catalyzed by the rise of GenAI technologies is driving incremental opportunities for its business."  JP Morgan specifically cited Defendant's own comments, including, "C-level executives are no longer solely prioritizing digital transformation.  They are also prioritizing AI transformation," "what you see now is the Head of AI hubs and the Chief AI Officer calling us into conversations to expand automation using Gen AI," and, "I think we're getting tailwind with AI and automation in that space in terms of the discussions that we're having today."

## V.    FORMER EMPLOYEE ALLEGATIONS

72.    Together with the allegations attributed to the former employees ("FEs") of UiPath herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.[2]

### A.    FE-1

73.    FE-1 worked at UiPath as an Enterprise account executive from February 2022 to October 2024. FE-1 was assigned to the "strategic portfolio" Enterprise group.  The strategic portfolio Enterprise customers typically included high-tech, airline, communication, media, and "telco" companies.

74.    <u>UiPath Engaged in "Ramped" Deals</u>.  Leading up to FY 2024 (which began on February 1, 2023), UiPath had been engaged in so-called "ramped" deals with customers. According to FE-1, account executives put bundles of licenses in the last quarter of the last year of a contract, typically the third year of a contract.  When customers questioned why they needed the additional licenses, account executives responded that this was "how we can get you the best discount, if we add these licenses to the last quarter of the last year of the agreement."

>    a.    FE-1 provided an example of a three-year, ramped deal.  Such a deal, hypothetically, had 1,000 licenses in the first year, 2,000 licenses in the second year, and 5,000 licenses in the third year, with "a bunch of licenses in the last quarter in the last year."
>
>    b.    According to FE-1, these ramped deals were permitted by executives before 2023, allowing sales representatives to "put licenses in the last quarter of the last year of

---

[2] Former UiPath employees are referred to herein as "FEs."

a commercial agreement." FE-1 explained that this had the effect of "hockey sticking the exit value of the contract, which made the deal look bigger."

75.    <u>UiPath Begins to Change its Policy, Disincentivizing Ramped Deals</u>. Fiscal Year 2024—*i.e.*, calendar year 2023—marked a shift in how UiPath permitted ramped deals. According to FE-1, in early to mid-2023, FE-1 had a deal with a potential customer, which FE-1 was trying to structure as a ramped deal. Defendant Gupta told FE-1 that he did not want to do the deal because he did not want to pay FE-1 commission on the deal and because the proposed deal was structured as a ramped transaction that "we do not want to do." As a result, the would-be customer got upset and did a 12-month deal instead, according to FE-1.

76.    <u>In 2024, Additional Changes to Sales Incentives and UiPath's Commercial Policy Result Fewer Multi-Year Deals</u>. According to FE-1, UiPath also changed the commercial policy and accompanying compensation plan again at the beginning of fiscal year 2025 (in early calendar 2024). FE-1 described that UiPath "tightened the screws" on the changes made the year prior.

   a.    According to FE-1, UiPath executives decided to tighten the screws on, and further remove incentives for, paid-up-front deals in 2024 beginning no later than February 2024, building on changes in 2023. Instead, UiPath structured the incentive compensation around "paid annual" deals. Following internal calls in which the new compensation structure for fiscal year 2025 was revealed and discussed, the account executives left those calls saying they were just going to do 12-month deals because the compensation is the same or more than if they did three-year deals paid annually.

b.  FE-1 pointed out that Defendant Gupta had changed the commission policy and plan which angered account executives and disincentivized them from seeking multi-year deals.

77.    UiPath Forced Customers on to its Flex Platform, Further Disincentivizing Multi-Year Deals.  According to FE-1, UiPath began forcing customers on to its Flex platform in 2023. This happened when a contract came up for renewal, and UiPath forced customers to adopt the Flex platform and charged them a 30 percent increase, despite most customers saying they did not want the new Flex option and were happy staying with the on-premises option.

a.  As a result, FE-1 reported, many customers who were forced on to the Flex platform opted to only agree to 12-month deals rather than multi-year deals.  Moreover, customers used those 12 months to contemplate how to move away from UiPath entirely.

b.  FE-1 reported "a lot of contentious conversations" with customers who "got pissed" and said, "If you are going to do this, I am going to do a short-term, 12-month deal and look for alternatives."

c.  FE-1 further reported that, had account executives been able to do more ramped deals, they likely could have been "more creative on contractual terms" to make the move to the Flex platform more attractive to customers.

78.    Defendants Enslin and Gupta Were Active in "Win Room" Meetings.  FE-1 reported that Defendants Enslin and Gupta were active in "win room" meetings.  These were meetings where Company executives met with sales personnel to discuss the details of proposed deals and decisions were made about whether to pursue deals and how to structure them.

a. For example, FE-1 participated in a January 2023 "win room" meeting, which was also attended by Defendant Gupta. Defendant Gupta was "very active" in the January 2023 meeting, FE-1 recalled. During this meeting, Defendant Gupta rejected a potential deal because it was ramped.

b. FE-1 reported that Gupta was the "ultimate decision maker on whether they were going to approve or deny the deal, deal structure, and details of it."

c. According to FE-1, Defendant Enslin participated in these meetings as well.

d. Executives provided feedback on how they wanted to structure deals and ultimately approved or denied deals during meetings.

e. FE-1 reported that the impacts of changes in the commercial policy and compensation changes were evident in both "win room" meetings as well as in Salesforce and Clari forecasts.

f. FE-1 also reported that win room meetings were scheduled and documented with an Outlook calendar notice and/or invite. The events were named "win room meeting," which was a "big deal review," FE-1 confirmed.

g. These "win room" meetings included an accompanying Word document that was two pages in length, which was completed by the sales representative ahead of the meeting. The information included in the Word document was: 1) name of the customer; 2) current footprint of the account; 3) what the customer currently spends; 4) who the executives are; 5) who the account executive is talking to at the customer; 6) what is the opportunity; 7) what is the deal structure; 8) how big is the deal; 9) next steps; 10) what the account executive needs internally or externally; and, 11) what is the plan to close the deal.

h.  On the topic of what was needed to close the deal, the account executives provided information about discounts, as well as the structure and ramping the deal.

i.  The Word documents were shared to and store in a SharePoint file.  FE-1 said there was a win room SharePoint link, with win room meeting attendees directed to put their relevant documents in a specific SharePoint file because "this is where we are going to run the meeting from."  Gupta was on the emails and had access to the SharePoint link, as did Enslin.

79.  <u>Defendant Enslin Lamented Execution Failures on Internal Calls</u>.  According to FE-1, Defendant Enslin chided attendees on quarterly "all-hands" calls that "We need to do better on execution."  According to FE-1, everyone knew that this meant UiPath "was not executing, was not closing big, strategic deals."  FE-1 reported that Enslin made these statements about needing to execute better in October 2023.

80.  <u>Executives Knew About Declining Deal Quality</u>.  According to FE-1, UiPath executives Enslin, Dines, and Gupta were looking at the deal numbers in the pipeline through the Clari platform.  FE-1's manager informed him in a one-on-one call that Defendant Gupta was looking at the pipeline and making layoff decisions about "who has things to work on and who does not."

a.  According to FE-1, the Clari system, among other things, tracked emails and activities with customers, and customer opportunities.  The Clari system had functionality that "confirmed or denied" what the account executive was saying was his or her forecast for the upcoming period. In other words, if for example a sales representative said he or she was going to bring in $500,000 in the upcoming

quarter, Clari had built-in processes to check whether the recent activity of the account executive was sufficient to support that projection.

b. FE-1 confirmed that account executives were required to update their Clari forecast weekly, and thus FE-1 and other account executives had weekly calendar reminders to update their forecasts. FE-1 reported that these regular, frequent updates to the Clari forecasts afforded the executives insight into whether the account executives were "on top of these deals and opportunities," and "if not, what do we need to do to fix it."

81. <u>Contrary to UiPath's Claims, the Company Was Gutting Investment in Sales and Customer Success</u>. The typical role of "customer success" is to proactively work with customers to ensure they are satisfied with the product(s) they purchased and to address any issues that arise. FE-1 reported that UiPath was letting go of customer success managers and automation program advisors, which were critical support roles for the sales team. UiPath was also "getting rid of sales support and services – setting customers up to fail." In doing so, UiPath was not setting customers up for success because the account executives, who were each covering between 10 and 20 accounts, could not effectively take over the support functions.

a. These layoffs occurred on a rolling basis. FE-1 explained that layoffs occurred during 2023 and into the first quarter of fiscal year 2024.

b. In the October 2023 call, Gupta made statements about "getting lean and mean" in response to economic conditions. FE-1 recalled that Gupta spoke about the economic conditions at the time and that other companies were laying off employees, and UiPath was "no different" than the other companies that were experiencing layoffs at the time. Gupta's statements also referenced the Company

perhaps being more "methodical about it [the layoffs] and how we go about it." The call during which Gupta made these statements was conducted via Zoom. FE-1 could not recall if it was recorded. FE-1 said roughly 350 employees attended from the go to market organization. FE-1 also identified similar calls in the second calendar quarter of 2024.

    c.    Attendees posed questions in response to Gupta's statements in the October 2023 call. For instance, FE-1 recalled that there were questions posed about "what does this mean" and "how do you define that" in terms of the plan to get mean and lean. Attendees also asked how decisions were going to be made regarding who was staying and what roles were going to be eliminated. Gupta gave general answers about terminating employees who provided certain services.

82.    <u>Enslin's Desperation</u>. According to FE-1, Defendant Enslin became desperate in the summer of 2023 to execute contracts—six to nine months prior to his departure from UiPath. This included Enslin making "unprofessional" comments during all-hands calls that FE-1 attended. FE-1 was also on calls where Enslin berated sales personnel, "got aggressive," cursed, and "hit his desk with his fist." According to FE-1, "You could tell he [Enslin] was frustrated" due to UiPath's inability to execute deals.

**B.**    **FE-2**

83.    FE-2 worked at UiPath from February 2021 to early December 2023. FE-2 joined the Company through the Cloud Elements acquisition. FE-2 initially worked for UiPath as a commercial account manager from February to November 2021. In this capacity, FE-2 supported legacy Cloud Element clients. In November 2021, FE-2 was promoted to the role of emerging account executive.

84. <u>UiPath Engaged in "Ramped" Deals</u>.  When FE-2 joined the Emerging Enterprise sales group in November 2021 and throughout 2022, UiPath was encouraging FE-2 and FE-2's colleagues to sell larger deals in a ramp structure.  FE-2 defined a contract that had a ramp structure as one that had built-in growth in the last years of the agreement term.  For instance, a ramp-structured deal might have had a three-year term, and had 25 percent growth built into the second year and again in the third year.

    a. In addition to being ramped, these deals were also prorated.  According to FE-2, a ramp-structured, prorated deal was arranged in the following manner:  an account executive sold a three-year contract with a ramp structure, and put a certain dollars' worth of licenses in the last month of the contract, typically by tacking-on product bundles in the last months of a contract.  The customer only paid for the use of those licenses during the months they were tacked on, meaning the licenses did not show up as a huge expense to the customer.

    b. However, according to FE-2, when a three-year deal renewed, the tacked-on licenses that had been pro-rated were not prorated anymore.  As a result, the previous agreement was less expensive for the customer in comparison: whereas in the renewed agreement the customer had to pay for the units throughout the contract, in the previous ramp-structured, prorated deal, the licenses kicked in and related costs were incurred in the latter years of the deal.

    c. FE-2 also reported that, during this time, account executives were paid a commission based on the value of the last year of the contract (called the "out-year").  According to FE-2, this incentivized account executives to seek multi-year deals with bundles tacked on to the out-years—*i.e.*, the end of contracts.

85. <u>UiPath Begins Changing the Ramped Deal Practice</u>.  According to FE-2, at some point before early 2023, the Company realized that account executives were structuring the deals with bundles tacked on in the last months of contracts.  By the early 2023 timeframe, FE-2 recalled that sales personnel were told that they could no longer prorate licenses within the last six months of a contract.

    a.    FE-2 recalled an all-hands Emerging Enterprise group call in early calendar 2023, during which FE-2 and others were informed that the way that the Company had prorated deals was now consider bad practice with the ramp deals. The account executives were informed that UiPath was changing the way contracts were structured and that account executives could no longer ramp licenses in the last six months of deal.

    b.    FE-2 said account executives stopped prorating deals after this directive in the beginning of 2023, because such deals would no longer be approved.

86. <u>Departure from Ramped, Prorated Deals Leads to Fewer Customer Contracts</u>.  FE-2 reported to Regional Vice President Ben Bade, who wanted his team to close larger, multi-year deals because shorter-duration contracts lead to existing customers either not renewing their contracts or reducing the number of products they licensed.  FE-2 said this was referred to as customer "churn."

    a.    The deals UiPath began executing in 2023 could no longer be prorated in the last six months of the contract. These deals were consequentially more expensive for customers.  If a customer had previously signed a ramp-structured, prorated deal prior to 2023, the customer had likely only paid licenses for certain bundled products in the last several months of the contract.  Upon renewal in 2023, that

same customer may have been charged for licenses for 11 months or more. The result was that customers felt like they did not want to add in more products because doing so was more expensive.

b. Furthermore, FE-2 reported, UiPath was no longer permitting account executives to provide the types of significant discounts that helped secure multi-year deals. Without those discounts, customers—who wanted to spend the same amount they previously had—often opted to either leave UiPath or reduce the size of their contracts.

c. In summer 2023, Area Vice President Alexandra Milne called out this issue and told FE-2 and others that for every deal UiPath brought on, one or two other customers either left UiPath or reduced the size of their contracts.

87.    <u>In Response to the Issues Caused by UiPath's New Ramping Policies, Emerging Enterprise is Restructured</u>. FE-2 explained that halfway through 2023, the Emerging Enterprise team was restructured in an attempt to reduce the loss of customers or customers reducing the size of their contracts. FE-2 was told this by SVP of Global Commercial Sales Sean Kay. However, as of at least December 2023, the Emerging Enterprise group was not meeting its new sales goals and there remained a lot of customers who were either leaving UiPath or reducing the size of their contracts.

88.    <u>Customer Success Issues Contribute to Lost or Reduced Contracts</u>. Another reason customers left UiPath or reduced the size of their contracts was that the Company's customer success function was markedly deficient.

a. FE-2 said that the customer success team worked with the customers to understand why they purchased UiPath's products and periodically met with the customers to

ensure that the customer was satisfied with the software and to address any issues that the customers had.

b. FE-2 explained that there was not a strong customer success team to grow and stay with the customers. FE-2 identified one specific customer that left UiPath in or around March 2023 because it had been oversold licensed and no one from UiPath ever followed up with them after they purchased the licenses.

89.    <u>Enslin Raised Issues with Emerging Enterprise</u>.  FE-2 participated in a call with CEO Robert Enslin on December 5, 2023, just five days after UiPath's November 30, 2023, earnings release.  The call lasted approximately 15 minutes and was held via Zoom at 7 a.m. MT. The call was not typical because Enslin did not usually participate in the sales calls.  There were roughly 40 attendees, which included the entire Emerging Enterprise team, managers, and directors.

a. Enslin announced that Emerging Enterprise was not doing well, meaning it was not closing deals.  As a result of the poor performance, Enslin publicly demoted a Senior Vice President of Global Commercial Sales on the call.

b. FE-2 explained that Enslin had involved himself with the Emerging Enterprise group's deals prior to the December 2023 call because Emerging Enterprise was not doing well.

c. On the call, Enslin also said that Enterprise and Emerging Enterprise were going to operate as one sales team and that Enslin was going to oversee it.

90.    <u>Account Executives Used the Clari System to Provide Deal Updates</u>.  UiPath account executives used the Salesforce information system as the customer relationship management tool and the Clari system for forecasting the value of deals and when they would be

executed.  For instance, they made notes in the Salesforce system about discussions they had with prospects and documented their pipeline in that tool.  They used the Clari system to weigh the likelihood that deals in their pipeline would materialize in the near term.  Clari also integrated seamlessly into Salesforce, so that one could look at Salesforce to discern what was forecasted.

    a.  Every week, each account executive reviewed the deals he or she had in the pipeline and, using Clari, forecasted when they anticipated those contracts to be signed and what the value of the deals was anticipated to be.

    b.  Account executives reviewed their assessments with their direct manager.

    c.  Anyone, including Defendant Enslin, that wanted to look at these inputs could have access to look at it.

91.   <u>Defendant Enslin's Meetings to Discuss Business Forecasts</u>.  FE-2 was aware that Defendant Enslin met with Senior Vice President for Global Commercial Sales Sean Kay to discuss the forecast for potential customer contracts.  Forecasts were rolled up from the account executive level to Enslin in the following manner:

    a.  Account executives were directed to update their forecasts in Clari.  Those forecasts were collected by an Area Vice President, who met with the Senior Vice President for Global Commercial Sales one on one to discuss what was happening in their respective books of business.  FE-2 said the Senior Vice President for Global Commercial Sales then reported to Defendant Enslin and they talked about the forecast, according to FE-2.

    b.  FE-2's boss regularly asked FE-2 to update the forecast data in Clari because her boss met with Defendant Enslin to discuss it.

C. **FE-3**

92.    FE-3 worked at UiPath from November 2021 through January 2024. FE-3 was initially an Emerging Enterprise account executive for State, Local, and Education ("SLED") customers for the Pacific Northwest region until February 2023.  FE-3 said that the SLED team was disbanded without explanation in February 2023.  Then, from February 2023 until FE-3 left the Company on January 31, 2024, FE-3 was a mid-market global account manager.  In this latter role, FE-3 was responsible for managing small to medium-sized customers in Latin America and Canada.

   a.  SLED represented the "state, local, and education public sector." As a SLED account executive, FE-3 covered sales to state universities and agencies, and to Native American authorities in the states of Alaska, Washington, Idaho, Montana, Wyoming, and Oregon.  FE-3 added that each state was set up differently, but the SLED coverage included state agencies such as Health and Human Services, SNAP, and DMV in different states. The SLED accounts varied dramatically in size.

   b.  In FE-3's second role as a global account manager, FE-3 only focused on Latin America.   In this role, FE-3 was tasked with managing accounts, including renewals.

93.    No Customer Success Support.  FE-3 reported that, when FE-3 was mid-market global account manager covering Latin America, there was no customer success support for FE-3's Latin America customers, even though some of those customers spent upwards of $400,000 annually with UiPath.  FE-3 also reported that UiPath under-hired customer success support, and added that the lack of adequate customer support was frequently discussed in team meetings.  FE-

3 added that UiPath lost deals and experienced deal delays because of the failure to provide sufficient or effective customer support.

94.     FE-3 added that FE-3 was very vocal with management about customer success and management know that the customer success function "was trash and everyone complained." FE-3 reported that the customer success situation never improved during FE-3's employment.

95.     Cancellations Surged as UiPath Forced Customers on to Flex Platform.  FE-3 confirmed that UiPath was forcing customers onto the Flex Platform, which FE-3 said was $8,000 to $10,000 more expensive annually than the previous on-prem platform customers used.  Upon contract renewal, customers were told there was no option, but to upgrade to the new, more expensive platform. A good portion of FE-3's job as an account manager for Latin America was handling contract renewals.  FE-3 said cancellations were a big issue in the region FE-3 covered, with as many as 30 percent of customers cancelling, in lieu of being forced onto the new Flex platform.  FE-3 reported that UiPath customers began to be forced onto the Flex Platform by  April or May 2023.

96.     Thousands of Customers Terminated Contracts in January 2024. FE-3 explained that Ingram Micro was a partner that sold UiPath software to customers in Latin America. In late January 2024, Ingram Micro dropped all of their accounts that represented $25K or less in annual revenue due to customer disdain over the forced move to the Flex Platform.  FE-3 said that this translated to thousands of customers with contracts of $25K or less immediately terminating or not renewing their accounts when they came up for renewal.

97.     Enslin Participated in Quarterly Business Reviews, Which Discussed Customer Success.  According to FE-3, Defendant Enslin frequently participated and spoke during Quarterly Business Reviews.  FE-3 reported that Defendant Enslin participated in an October 2023 Quarterly

Business Review, during which the issue of customer support was addressed.  FE-3 said that UiPath's lack of customer support was discussed for about "10 minutes" while Defendant Enslin was present at this October 2023 meeting, which was conducted via Zoom.

98.    <u>Flex Was Also Discussed During These Quarterly Business Reviews</u>.  FE-3 also reported that, during the same October 2023 Quarterly Business Review, attendees discussed the issue of forcing customers onto UiPath's Flex platform.   This included a discussion of customers cancelling or not renewing contracts because they were being forced onto the Flex platform. Defendant Enslin was on the call during this discussion, according to FE-3.

99.    <u>Enslin Regularly Attended Emerging Enterprise Meetings</u>.  FE-3 reported that Defendant Enslin regularly attended meetings of the Emerging Enterprise team.  For example, FE-3 attended a December 2023 call—as discussed by FE-2—during which Defendant Enslin said that Emerging Enterprise was not performing well.  FE-3 described "a lot of talk about internal changes" during the meeting, and said it was "not a great call."

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS

100.    Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions.  Specifically, Defendants represented to investors that (i) UiPath was successful in executing valuable, multi-year contracts with customers, and (ii) UiPath's investments in its sales team and customer success function were driving that success.

101.    The specific statements and omissions alleged to be false and misleading are set forth below.

### A.    False and Misleading Statements Regarding Execution and Deal Quality

102.    During UiPath's 3Q FY 2024 Earnings Call on November 30, 2023, after the close of trading, Defendant Gupta elaborated that "our strategy is on customers with a higher propensity

to buy" and "*[w]e feel like we're executing against that strategy, and we're seeing that [sic] results in the deal quality and the customer quality in the quarter.*"

103.    On March 13, 2024, UiPath issued a press release announcing its fourth quarter and FY 2024 financial results, for the period ending January 31, 2024.  In the press release, Defendant Enslin attributed UiPath's success to its AI-powered Business Automation Platform, stating:

> "*We delivered a strong close to the fiscal year . . . , underscoring the meaningful outcomes our Business Automation Platform delivers for our customers*.  The combination of UiPath's AI and automation is the strategic change enabler for our customers that makes any digital transformation easier and faster, while empowering customers to innovate, adapt more quickly, and grow."

104.    In UiPath's 4Q FY 2024 Earnings Call on March 13, 2024, Defendant Enslin claimed that UiPath's incorporation of AI-powered growth products into its Business Automation Platform was a competitive strength that enabled the Company "to close larger, more strategic deals":

> "18 months ago, we drove the evolution of the automation market from RPA to a full AI-powered business automation platform. Our growth products have played a key role in our platform's evolution, setting us apart from the competition and serving as the link that connects AI and automation into actionable results. *Our platform also enables us to close larger, more strategic deals*."

105.    During the 4Q FY 2024 Earnings Call, Defendant Enslin unequivocally declared the turnaround strategy a success:

> "*[T]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution*. And we also wanted to make certain that the platform was relevant for C-level executives. And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way."

106.    The foregoing statements in ¶¶ 102-105 were false and misleading because while Defendants claimed that their business model was resulting in "better execution" and "deal quality," the opposite was true; during the Class Period, Defendants suffered from poor execution

because they had in reality instructed salespeople to reverse the focus on "annual ramping," which disincentivized critical multi-year deals and resulted in fewer deals being executed.

107.     The foregoing statements in ¶¶ 102-105 were also false and misleading because having chosen to speak about UiPath's deal quality and execution, Defendants omitted and concealed the truth that Defendants had reversed UiPath's previously touted focus on annual ramping and in fact made internal changes to compensation and deal structure in 2023 and 2024, which they did not disclose to investors; these changes resulted in fewer multi-year deals being executed.

### B.     False and Misleading Statements Regarding Investments in Sales Team and Customer Success

108.     In UiPath's 3Q FY 2024 Earnings Call on November 30, 2023, Defendant Gupta told investors:

> And so **we have been investing, whether that is within our product team as well as our sales team**. I mentioned earlier, **we're investing in our frontline sales team and our sales capacity**, and **we'll continue to invest in areas where we see the right returns and the right investments**. And Rob [Enslin] and the team looks at that on an ongoing basis and we do as a leadership team.

109.     During that same Earnings Call, in response to a question about growing sales expenses, Gupta added:

> First is **we are going to continue to invest in our sales team and our sales capacity, especially as we head into next year**. And then the second is, if you recall, we also are dealing with -- we also have the reallocation of our software expenses. So first through third quarter, you'll see sales and marketing versus G&A a little bit lopsided and which will be caught up in [the] fourth quarter.

110.     In UiPath's 4Q FY 2024 Earnings Call on March 13, 2024, Defendant Enslin stated:

> "To help customers and prospects get the most out of our capabilities, **we plan to continue our investments in targeted sales areas**, weighting our resources towards large enterprise customers where we see the biggest opportunity for expansion. **This includes investments in** growth product specialists, **sales engineers to support our customers** and further industry verticalization in areas like financial services, insurance, health care and public sector. **This approach has been instrumental in**

***driving momentum in North America, including large strategic deals***, and we are investing in other regions where we are seeing early traction."

111.    In UiPath's 4Q FY 2024 Earnings Call on March 13, 2024, Defendant Enslin also stated:

> "We reported a strong close to the fiscal year, exceeding our guidance across both top and bottom line metrics, driven by demand for the depth and breadth of our platform ***and the team's focus on customer success, which is at the core of everything we do***. Our momentum also reinforces my confidence in the strategic role we play for our customers and the investments we are making in our future."

112.    The foregoing statements in ¶¶ 108-111 were false and misleading and omitted and concealed the truth because, rather than "investing in our frontline sales team and our sales capacity," and contrary to the claim that demand could be attributed to "the team's focus on customer success, which is at the core of everything we do," the Company was in fact cutting sales and customer success personnel, which in turn led to customers leaving UiPath or reducing the size of their contracts and made it more difficult for UiPath to acquire and retain customers.

113.    The foregoing statements in ¶¶ 108-111 were also false and misleading because having chosen to speak about UiPath's investment in its sales and success functions, Defendants omitted and concealed the truth that UiPath had been laying off sales representatives, laying off customer success personnel, and that such cuts were leading to fewer new customer contracts and fewer renewals.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

114.    The Individual Defendants and corporate Defendant UiPath knew or were reckless in not knowing that the Exchange Act Statements were materially false and misleading when made. Set forth below is a summary of the allegations that support scienter.

### A.    Enslin and Gupta Knew Shifts Away from Ramping Deals and Changes to Sales Compensation Were Undermining Multi-Year Deals, Deal Quality, and Execution of UiPath's Transformation

115.    As recounted in detail by several former employees, the Individual Defendants were in positions to know, with real-time information, that multi-year deals and deal quality were declining.  For example, FE-1 participated in a January 2023 "win room" meeting, which was attended by Defendant Gupta.  Defendant Gupta was a "very active" participant in the meeting. During these meetings, executives provided feedback on "how they want to structure" deals, and ultimately approved or denied deals in these meetings.

116.    During "win room" meetings, account executives provided information about discounts, the structure of the deal, and information about ramping the deal.  (FE-1.)

117.    According to FE-1, Gupta was the "ultimate decision maker on whether they were going to approve or deny the deal, deal structure, and details of it."

118.    FE-1 also reported that Defendant Enslin participated in win room meetings. Attendees received in advance a Word document that was two pages in length, which was completed by the sales representative ahead of the meeting.  The information included in the Word document was: 1) name of the customer; 2) current footprint of the account; 3) what the customer currently spends; 4) who the executives are; 5) who the account executive is talking to at the customer; 6) what is the opportunity; 6) what is the deal structure; 7) how big is the deal; 8) next steps; 9) what the account executive needs internally or externally; and, 10) what is the plan to close the deal.

119. Defendant Gupta was on emails circulating this win room Word document, and both Defendants Enslin and Gupta had access to a SharePoint link for the document, according to FE-1.

120. On a September 7, 2021, Earnings Call for Q2 2022, in which Dines participated, Defendant Gupta announced the "opportunity to move customers to deal structures with annual ramping," demonstrating his involvement in the initial decision to ramp customer contracts.

**B.    Enslin and Gupta Had Continuous Access to Information Showing Their Statements Were False**

121. Defendants Enslin and Gupta all had continuous access to the Clari platform, which forecast the value of deals and when they would be executed. Thus, according to FE-1, the Individual Defendants were "looking at the numbers in the pipeline" through Clari.

122. According to multiple FEs, Clari was an important platform for forecasting deals. FE-2 reported that Clari was used to weigh the likelihood that deals in the pipeline would materialize in the near term. (FE-1; FE-2.)

123. According to FE-2, Defendant Enslin regularly met with Senior Vice President for Global Commercial Sales Sean Kay to discuss business forecasts. Those forecasts were input into Clari by account executives and were subsequently collected by Area Vice Presidents who met with the Senior Vice President for Global Commercial Sales to discuss what was happening in their respective book of business. Following those meetings, the Senior Vice President for Global Commercial Sales reported to Defendant Enslin to discuss the forecast, according to FE-2.

124. FE-2 reported that FE-2's boss regularly requested that FE-2 update next steps in Clari, specifically because Defendant Enslin and Senior Vice President for Global Commercial Sales Sean Kay were going to meet to discuss it. FE-2 reported receiving messages from her boss

explaining that Defendant Enslin was going to talk with the Senior Vice President for Global Commercial Sales about the forecast.

125.    Defendant Gupta also described how UiPath and its executives had access to real-time information.  At the June 12, 2024, Mizuho Technology Conference, Defendant Gupta explained:

> [W]e really look at three things as we evaluate our pipeline. ***The first is when we have field input, sales signals. We know the major renewals.*** That's not a mystery, that doesn't need something that's there. So we are very deeply connected with the field in our customer base.
>
> ***Second, data science.*** A good chunk of our business is statistical, and ***you can see trends ahead of time***, right? In terms of just the flow and where we are on the run rate. So we're able to look at that and then make appropriate adjustments on the factors that we said. And the ***third is our traditional FP&A forecast. Really, starting with where we are, pipeline, conversion rates and those types of things***.

126.    FE-1's manager informed him, in a one-on-one call, that Defendant Gupta was "looking at the pipeline and making layoff decisions" based on "who has things to work on and who does not."

127.    In an October 2023 internal call, Defendant Gupta made statements about "getting lean and mean" and that UiPath was laying employees off.  (FE-1.)

### C.    Defendant Enslin Attended Meetings During Which He Demonstrated Deep Knowledge of Execution and Customer Success Issues

128.    Defendant Enslin began to exhibit "desperation" in the summer of 2023 due to UiPath's inability to execute customer contracts, according to FE-1.  This included making "unprofessional" comments during all-hands calls, including where Enslin berated sales personnel, "got aggressive," hit his desk with his fist, and betrayed frustration.

129.    Defendant Enslin attended all-hands calls, including one in October 2023 on which he chided attendees about the need to do better "on execution," according to FE-1.  This was widely

understood by attendees, including FE-1, to mean that UiPath was not executing, including not closing big, strategic deals.

130.    Defendant Enslin participated in Quarterly Business Reviews, during which the lack of customer success support was discussed, such as in October 2023, one month prior to the start of the Class Period.  Additionally, the resistance UiPath faced from customers cancelling or not renewing contracts after being forced onto the Flex platform was discussed at this meeting. (FE-3.)

131.    Defendant Enslin also regularly attended Emerging Enterprise meetings, including leading a sales team call on December 5, 2023, in which he declared that the Emerging Enterprise group was not doing well, meaning it was not closing deals, and in which he publicly demoted the Senior Vice President for Global Commercial Sales.  Enslin also determined that Emerging Enterprise and Enterprise would operate as one sales team, which Enslin would oversee.  (FE-2; FE-3.)

### D.    The Close Temporal Proximity Between the False and Misleading Statements and the Corrective Disclosures Further Supports Scienter

132.    The close temporal proximity of only two and a half months between Defendants' false and misleading statements and their corrective disclosures further supports a strong inference that Defendants knew or were deliberately reckless in not knowing that their statements were false. On November 30, 2023, and March 13, 2024, Defendants made false and misleading statements that they were seeing "results in deal quality," that their "platform also enables us to close larger, more strategic deals," and that "we are going to continue to invest in our sales team and our sales capacity."  In reality, Defendants were suffering declining contract execution and had significantly cut their investments in the sales and customer success teams.  They were forced to admit this only two and half months after their last false statement, on May 29, 2024, when they admitted that they

were suffering from "inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes" and that "the investments we have made to reaccelerate growth have fallen short of our expectations."  The quick turnaround between Defendants making the false statements and finally admitting the truth supports a strong inference that they knew or were reckless in not knowing the falsity of their statements at the time.

**E.    Enslin's Departure Was Announced at the Same Time as the Corrective Disclosures**

133.    On May 29, 2024, the same date on which UiPath announced the corrective disclosures, the Company also announced the departure of Defendant Enslin, effective June 1, 2024.  The departure occurred only months after Enslin became the sole CEO and a member of UiPath's Board of Directors in February 2024.  The departure also occurred three days after the end of the Class Period, when Defendants disclosed the full extent of the truth as UiPath revealed that they were suffering from "inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes" and that "the investments we have made to reaccelerate growth have fallen short of our expectations."

134.    That day, the industry publication *SiliconANGLE* said the "surprise leadership change" had "shocked investors" and wrote that the plan to have Enslin take the company forward "seems to have failed."  That same article added that, "On a conference call with analysts, Dines was quite open about the problems faced by the company, *which likely contributed to Enslin's decision to quit*."

135.    *SiliconANGLE,* citing Constellation Research analyst Holger Mueller, also reported "that something is clearly amiss when a board of directors turns on a CEO it had hired just two years prior," adding that Mueller "pointed out that Enslin was enlisted for his commercial acumen

and there was an expectation that he would help the company to grow much faster, yet he failed to deliver on that."

136.    Subsequent analyst reports echoed the market's shock.  In a May 30, 2024, report, RBC called Defendant Enslin's departure "abrupt."  That day, William Blair called it a "sudden change," while a Macquarie Equity Research report the following day described it as a "sudden departure."

137.    The proximity of Defendant Enslin's departure, combined with analyst and industry observer reactions tying the resignation to the corrective disclosures, suggests that Defendant Enslin's departure was associated with the misconduct described in the Complaint.

**F.    Defendants' False and Misleading Statements Concerned Core Operations Central to UiPath's Business**

138.    The core operations doctrine further supports a strong inference of scienter for two reasons.  The Individual Defendants had detailed involvement in the minutia of UiPath's operations, including the execution of the strategy announced in September 2022, the execution and monitoring of deals, policies regarding ramping contracts and sales compensation, and decisions to invest in sales representatives and customer success personnel.

139.    Defendants made false and misleading statements and omitted material information concerning UiPath's execution of its turnaround strategy, and Defendants repeatedly touted that the Company was "executing," including claiming that there was "no doubt" that execution had been improved.  Defendants similarly made false and misleading statements and omitted material information concerning UiPath's deal quality and customer quality, something that the Company had repeatedly touted to investors.  Analysts were focused on the Company's reassurances, as discussed herein, including highlighting the "continued execution by UiPath," the "focus on customers with the largest potential to buy," and the sense that UiPath was "improving execution."

140.    Defendants also made false and misleading statements and omitted material information concerning UiPath's sales team and customer success team.  Defendant Enslin touted "customer success" as "at the core of everything we do," and Defendant Gupta claimed that UiPath was "investing in our frontline sales team."  Thus, decisions regarding UiPath's sales and customer success efforts were core operations.

### G.    Corporate Scienter

141.    As alleged above, Defendants Enslin and Gupta, both of whom acted with scienter, had actual and apparent authority over UiPath and acted within the scope of their apparent authority in making the misstatements at issue.  Their scienter is imputed to the Company.

## VIII.   LOSS CAUSATION

142.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of UiPath stock, distorted the value of UiPath options, and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 29, 2024, as alleged herein, the price of UiPath stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of UiPath stock and call options, as well as sale of put options, during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

143.    After the close of trading on May 29, 2024, UiPath issued a press release announcing the resignation of Defendant Enslin as CEO effective June 1, 2024, and the reappointment of Dines as CEO.  Also on May 29, 2024, UiPath issued a separate press release announcing disappointing financial results for the first quarter of FY 2025 and a significant cut in

its revenue guidance for fiscal year 2025. Specifically, UiPath lowered its FY 2025 revenue guidance by approximately 10%, or $150 million, from a range of $1.555 billion to $1.560 billion, to a range of $1.405 billion to $1.410 billion.

144.     UiPath also held a conference call on May 29, 2024, to discuss the first quarter of FY 2025 financial results and guidance. While UiPath partially attributed the poor results and reduced guidance to macroeconomic factors and delays closing large multi-year deals in the quarter, Dines admitted that the Company's failed turnaround strategy, execution challenges, and sales compensation changes were a factor. According to Dines:

> *[W]e saw inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes*, which we are working to rectify. While customer behavior is often a function of the broader macroeconomic environment, execution is something we can control. And we recognize that we need to improve predictability on large multiyear deals.

145.     In the same vein, Dines further revealed that "the investments we have made to reaccelerate growth have fallen short of our expectations, made us less agile in responding to customer needs, and created short-term pressure on operating margins, all of which we are committed to rectifying."

146.     Dines also blamed the poor results and reduced guidance on the Company's inability to scale "our growth products such as IDP," acknowledging that "there is a ***need to have a deeper execution strategy*** to scale these products to reach their full potential."

147.     Dines also acknowledged that UiPath's effort to focus on its customers' C-suites had not been effective:

> I think we went to a distance to go and pitch our business to C-level, which is actually great. But the reality is that we have to increase our adoption by taking care of our traditional line of business customers with the CIO suite, which I think, will benefit a lot more for a new reinvigorated customer-centric approach.

148.    Significantly, Gupta admitted UiPath had trouble closing multi-year deals with all types of customers.  For instance, when TD Cowen analyst Bryan C. Bergin asked, "as far as the deal scrutiny goes, the smaller deal sizes, the postponements, is that broad-based across the business," Gupta replied, "Bryan, it's broad-based.  I don't think – it's not that we're zoned in on one particular area.  ***So from a multiyear deal perspective, that's broad***."

149.    Finally, because UiPath's go-to-market strategy had failed, Dines told investors that the Company would implement another new go-to-market strategy:

> As we look to the future, we are laser focused on enhancing our execution including improved sales linearity and deal scrutiny, driving higher efficiency across sales and the broader organization and driving a deeper and more execution-oriented strategy for our growth products.  We are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach.

> Lastly, we plan to go back to our roots, building a truly customer-centric organization, where co-innovating with our customers and partners is at the heart of everything we do.

150.    On this news, the price of UiPath stock declined $6.23 per share, or over 34%, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.  This steep drop was precipitated by unusually high trading volume of 86.6 million shares on May 30, 2024 (as compared to 26.4 million shares on May 29, 2024, and 10.5 million shares on May 28, 2024).

151.    The reaction of investment analysts was highly negative, focused on the aforementioned corrective disclosures, and conveyed a sense that the Company had deceived them. For example, on May 30, 2024, TD Cowen downgraded UiPath stock, describing a "***sea change in tone & outlook*** that materialized versus just 2 months ago with its 4Q24 results."  TD Cowen specifically mentioned "***execution issues***."

152.    Also on May 30, 2024, Macquarie downgraded UiPath stock, and observed that, based on the Company's prior statements, "[w]e thought going into FQ1 that UiPath had executed

on its turnaround story and stabilized growth.  With the sudden departure of CEO Rob Enslin, a guidance cut, and management acknowledging that the company's go-to-market strategy has underperformed its expectations, we see our prior view was incorrect."

## IX.    CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf all persons and entities who purchased or acquired UiPath securities, including stock and call options, as well as those that sold put options on UiPath stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of UiPath and their families and affiliates.

154.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of May 30, 2024, there were more than 490 million shares of UiPath Class A common stock, owned by at least thousands of investors.

155.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.    Whether Defendants violated the Exchange Act;

B.    Whether Defendants omitted and/or misrepresented material facts;

C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of UiPath securities was artificially inflated or otherwise distorted;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

156.  Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

157.  Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

158.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

159.  UiPath's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.  The statements alleged to be false and misleading above relate to then-existing facts and conditions.

160.  To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

161.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of UiPath who knew that the statement was false.

## XI.    PRESUMPTION OF RELIANCE

162.    At all relevant times, the market for UiPath securities was an efficient market for the following reasons, among others:

A.    The Company's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

B.    As a regulated issuer, UiPath filed periodic public reports with the SEC;

C.    UiPath regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.    UiPath was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

163.    As a result of the foregoing, the market for UiPath securities promptly digested current information regarding UiPath from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of UiPath stock and call

options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and the presumption of reliance applies. Likewise, all sellers of the Company's put options during the Class Period suffered similar injury through their transactions at prices that were distorted by the artificially inflated price of UiPath stock, and the presumption of reliance applies.

164.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## XII.    CLAIMS FOR RELIEF

## <u>COUNT I</u>

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

165.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

166.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase UiPath securities at artificially inflated prices.

167.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UiPath securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about UiPath's business and revenue prospects, as specified herein.

169.    During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

170.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business and revenue prospects, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

171.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UiPath stock and call options. Plaintiffs and the Class would not have purchased the Company's stock and call options at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct. Similarly, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they sold the Company's put options at prices that were distorted by the artificially inflated price of UiPath stock. Plaintiffs and the Class would not have sold the Company's put options at the prices they sold them, or at all, had they been aware that the market prices had been distorted by the artificially inflated price of UiPath stock.

172.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock and call options, and sales of put options during the Class Period.

173.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

174.    Plaintiffs repeat, incorporate, and re-allege each and every allegation set forth above as if fully set forth herein.

175.    The Individual Defendants acted as controlling persons of UiPath within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about UiPath, the Individual Defendants had the power and ability to control the actions of UiPath and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**XIII.   PRAYER FOR RELIEF**

176.    **WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

177.    Plaintiffs demand a jury trial.

Dated: November 22, 2024                    Respectfully submitted,

BLEICHMAR FONTI & AULD LLP

  /s/ Joseph A. Fonti

Joseph A. Fonti
George N. Bauer
Ross Shikowitz
William Freeland
300 Park Avenue, Suite 1301
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
gbauer@bfalaw.com
rshikowitz@bfalaw.com
wfreeland@bfalaw.com

-and-

Adam C. McCall (appearing *pro hac vice*)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
amccall@bfalaw.com

*Counsel for Lead Plaintiff Simone Brunozzi and Named Plaintiff Scott Cheslowitz and Lead Counsel for the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

*/s/   Joseph A. Fonti*
Joseph A. Fonti

# EXHIBIT A

## CERTIFICATION

I, Simone Brunozzi, hereby certify as follows:

1.      I have reviewed the Amended Class Action Complaint against UiPath, Inc. ("UiPath") and others alleging violations of the federal securities laws (the "Complaint") and have authorized its filing.

2.      I did not purchase or sell securities of UiPath at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as lead plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.  I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the benefit of the Class.

4.      My transactions in the UiPath securities that are the subject of the Complaint during the Class Period are reflected in Schedule A, attached hereto.

5.      Other than in the instant action, I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.      Beyond my *pro rata* share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct on ___11/21/2024___.

Signed by:

*Simone Brunozzi*
472E8BAA5166467...

Simone Brunozzi

1

## SCHEDULE A
### TRANSACTIONS IN
### UIPATH INC

COMMON STOCK

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/01/2024 | 100,000.00 | 19.03 | ($1,903,398.00) |
| Sale | 05/23/2024 | -9,424.00 | 19.27 | $181,581.82 |

PATH 02/16/2024 $25.00 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 12/08/2023 | -1,000.00 | 1.60 | $160,000.00 |

PATH 01/17/2025 $22.50 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/01/2024 | 3,000.00 | 2.36 | ($707,589.00) |
| Purchase | 05/23/2024 | 2,000.00 | 2.36 | ($472,296.00) |
| Purchase | 05/24/2024 | 1,000.00 | 2.34 | ($234,061.00) |

PATH 01/17/2025 $30.00 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/01/2024 | -3,000.00 | 0.81 | $242,079.00 |

PATH 01/17/2025 $35.00 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 03/14/2024 | 2,000.00 | 1.81 | ($362,344.00) |

PATH 01/17/2025 $15.00 PUTS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/01/2024 | -3,000.00 | 1.25 | $376,320.00 |

PATH 01/17/2025 $17.50 PUTS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 03/14/2024 | -2,000.00 | 1.74 | $347,770.00 |
| Sale | 05/23/2024 | -2,000.00 | 1.99 | $397,086.00 |
| Sale | 05/24/2024 | -1,000.00 | 2.15 | $215,354.00 |

# EXHIBIT B

# CERTIFICATION

I, Scott Cheslowitz, hereby certify as follows:

1.      I have reviewed the Amended Class Action Complaint against UiPath, Inc. ("UiPath") and others alleging violations of the federal securities laws and authorize its filing.

2.      I did not purchase or sell securities of UiPath that are the subject of the Complaint at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in the UiPath securities that are the subject of the Complaint during the Class Period are reflected in Schedule A, attached hereto.

5.      Other than in the instant action, I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.      Beyond my *pro rata* share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct on ____11/20/2024____.


DocuSigned by:

*Scott Cheslowitz*
BB06786CBC9E9442...
Scott Cheslowitz

**SCHEDULE A**
TRANSACTIONS IN
UIPATH INC

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 01/22/2024 | 3,200.00 | 23.54 | ($75,325.76) |
| Purchase | 01/22/2024 | 800.00 | 23.61 | ($18,885.28) |
| Purchase | 01/24/2024 | 100.00 | 23.37 | ($2,336.86) |
| Purchase | 01/25/2024 | 750.00 | 23.14 | ($17,353.88) |
| Purchase | 01/25/2024 | 100.00 | 23.14 | ($2,314.00) |
| Purchase | 02/07/2024 | 1,050.00 | 23.07 | ($24,218.25) |
| Purchase | 02/08/2024 | 1,000.00 | 23.50 | ($23,500.00) |
| Sale | 03/12/2024 | -1,000.00 | 24.79 | $24,790.00 |
| Purchase | 03/18/2024 | 1,000.00 | 23.07 | ($23,069.80) |
| Purchase | 03/21/2024 | 1,000.00 | 23.67 | ($23,669.90) |
| Sale | 03/28/2024 | -1,000.00 | 22.72 | $22,720.20 |
| Purchase | 04/11/2024 | 1,000.00 | 21.37 | ($21,369.70) |
| Purchase | 04/11/2024 | 2,000.00 | 21.40 | ($42,793.20) |
| Purchase | 04/11/2024 | 479.00 | 21.40 | ($10,248.54) |
| Purchase | 04/11/2024 | 1,000.00 | 21.39 | ($21,385.30) |
| Sale | 04/15/2024 | -2,000.00 | 20.00 | $40,000.00 |
| Purchase | 05/13/2024 | 2,000.00 | 19.81 | ($39,619.80) |
| Purchase | 05/20/2024 | 2,500.00 | 20.31 | ($50,767.00) |
| Purchase | 05/22/2024 | 2,500.00 | 19.96 | ($49,896.40) |