UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                     :

IN RE UIPATH, INC. SECURITIES LITIGATION    :       24 Civ. 4702 (JPC)

                                  :         <u>OPINION AND ORDER</u>
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

UiPath, Inc. ("UiPath" or the "Company") is a publicly traded software firm that provides robotic process automation tools and artificial intelligence services to other businesses. In 2023, amid slowing growth and waning investor confidence, the Company unveiled a sweeping turnaround strategy: a reimagined sales model, an aggressive push into artificial intelligence, and new executive leadership to guide the effort. For a time, the new strategy seemed to be working, with the Company reporting excellent financial results in the second half of 2023 into early 2024. But on May 29, 2024, the Company made a sharp course correction. It reported disappointing earnings, cut its full-year revenue forecast by $150 million, and announced the abrupt resignation of its Chief Executive Officer ("CEO"). The next day, UiPath's stock price fell by more than one third.

On behalf of a putative class of investors, Lead Plaintiff Simone Brunozzi and Named Plaintiff Scott Cheslowitz (collectively, "Plaintiffs") now seek to hold UiPath and two of its senior officers liable for securities fraud. In their Amended Complaint, Plaintiffs allege that, during the Class Period spanning December 1, 2023, through May 29, 2024, UiPath, former CEO Robert Enslin, and current Chief Financial Officer ("CFO") Ashim Gupta (collectively, "Defendants") made materially misleading statements and omissions concerning the Company's execution of

contracts with its customers, deal quality, and strategic investments.  Plaintiffs assert one claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 against all Defendants, and a second claim under Section 20(a) of the Exchange Act against Enslin and Gupta.  The gravamen of Plaintiffs' charge is that Defendants projected a false façade of commercial momentum that concealed mounting internal difficulties.

Federal securities laws, however, do not guarantee smooth sailing in turbulent markets.  Nor do they permit disappointed investors to recast business setbacks as actionable fraud.  As the Supreme Court has admonished, permitting such suits threatens to "transform a private securities action into a partial downside insurance policy."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005).  The question here, then, is not whether UiPath's strategy succeeded, but whether Plaintiffs have plausibly alleged that Defendants misled the market.  They have not.  For reasons that follow, the Court grants Defendants' motion to dismiss the Amended Complaint, but grants Plaintiffs leave to amend if they believe they can cure the pleading deficiencies identified herein.

## I.  Background

### A.    Facts[1]

Founded in 2005 by Daniel Dines, UiPath is a New York-based enterprise software company that offers a suite of robotic process automation ("RPA") tools and artificial intelligence

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 30 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that on a motion to dismiss, courts "may consider any written instrument attached to the complaint, statements or

("AI") capabilities which allow customers to automate routine tasks. Am. Compl. ¶¶ 2, 32. UiPath went public in April 2021, raising over $1.34 billion in investor capital. *Id.* ¶¶ 3, 38. But the Company quickly encountered stagnating growth and increased competition, with its valuation plummeting from $35 billion to under $10 billion and its stock price falling from $90 per share to a low of $17.66 just one year later. *Id.*

To address these issues, UiPath implemented new approaches to structuring deals with its customers, deployed a new business model, and hired new executive leadership—what Plaintiffs call UiPath's "turnaround strategy." *Id.* ¶¶ 4, 39, 45. As an initial step, on April 27, 2022, the Company announced the appointment of Enslin—an industry veteran from SAP and Google Cloud—as co-CEO with Dines. *Id.* ¶¶ 4, 43, 54. One industry commentator believed Enslin would provide "adult supervision" at UiPath, while another viewed Enslin's appointment as part of an "existential mission" to "evolve UiPath from an RPA tool to an enterprise platform." *Id.* ¶ 43 (alterations adopted). Under Enslin's nascent leadership, UiPath expanded its AI offerings, acquiring a London-based startup that offered natural language processing tools for businesses. *Id.* ¶ 44. And during its September 27, 2022, Investor Day conference call, UiPath announced a comprehensive strategy centered on rebranding itself as an AI-powered "Business Automation Platform" and restructuring its go-to-market strategy. *Id.* ¶¶ 5, 45. UiPath's rebrand placed AI offerings (called "growth products") at the forefront of its business automation offerings, *id.* ¶ 47, as reflected in the Company's March 27, 2024, Form 10-K[2]: "[W]e have evolved from our beginnings in RPA to an end-to-end AI-powered Business Automation Platform through

_____

documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

[2] Form 10-K is a comprehensive financial report that public companies must file annually with the SEC. *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

development and acquisitions, have launched new products, and have expanded our operations across the globe," *id.* ¶ 48 (internal quotation marks omitted) (alternation in Amended Complaint). That same Form 10-K also emphatically proclaimed that "AI-powered automation is here, and its momentum is continuing to grow." *Id.* (internal quotation marks omitted). In overhauling its go-to-market strategy, UiPath grouped its products into platform bundles to prioritize selling a suite of products instead of à la carte offerings, redesigned its customer segmentation model to allow for more granular sales strategies, and revised its sales coverage ratios to focus its resources on large enterprise clients and C-suite-level sales. *Id.* ¶¶ 5, 49-52. Some analysts and observers viewed these changes favorably, calling the new strategy a "model reset" and a "maturing" moment for the Company. *Id.* ¶ 53. On July 10, 2023, UiPath announced that, effective January 31, 2024, Dines would resign as co-CEO and take on the newly created Chief Innovation Officer position, leaving Enslin as sole CEO. *Id.* ¶ 54.

UiPath issued a press release and held its earnings call after the close of trading on November 30, 2023—the day before the Class Period begins. *Id.* ¶¶ 55, 58. In the press release, UiPath announced strong financial results for the third quarter of fiscal year 2024 (August through October 2023), including revenue of $326 million, which represented a 24% year-over-year increase. *Id.* ¶ 55. Enslin wrote that he was "pleased with [the Company's] strong third quarter results . . . , driven by the team's execution and the transformational results [UiPath] deliver[s]," and reiterated similar statements on the earnings call later that day. *Id.* ¶¶ 55, 58. Gupta, the Company's CFO, elaborated on the call that UiPath's "strategy is on customers with a higher propensity to buy" and "[w]e feel like we're executing against that strategy, and we're seeing that [sic] results in the deal quality and the customer quality in the quarter." *Id.* ¶¶ 59, 102 (emphasis omitted). Gupta also touted the Company's investments in its sales team:

> And so we have been investing, whether that is within our product team as well as our sales team. I mentioned earlier, we're investing in our frontline sales team and our sales capacity, and we'll continue to invest in areas where we see the right returns and the right investments. And Rob [Enslin] and the team looks at that on an ongoing basis and we do as a leadership team.

*Id.* ¶¶ 60, 108 (emphasis omitted). In response to a question about growing sales expenses, Gupta added:

> First is we are going to continue to invest in our sales team and our sales capacity, especially as we head into next year. And then the second is, if you recall, we also are dealing with -- we also have the reallocation of our software expenses. So first through third quarter, you'll see sales and marketing versus [general and administrative expenses] a little bit lopsided and which will be caught up in [the] fourth quarter.

*Id.* ¶¶ 61, 109 (emphasis omitted).

UiPath's stock surged on the news—increasing nearly 27% from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023. *Id.* ¶¶ 7, 63. Analysts similarly responded favorably to the earnings report, with those at JP Morgan remarking that the upward shift in price target reflected, in part, "continued execution by UiPath." *Id.* ¶ 62. Other analysts were positive on UiPath's stock, citing the Company's "go-to-market transformation work being driven by co-CEO Rob Enslin," its "revised go-to-market strategy" that includes "a more strategic conversation with the C[-]suite in existing [and] prospective clients," UiPath's "focus on customers with the largest potential to buy," and the Company's strong "[e]xecution . . . across all parts of the business." *Id.* (internal quotation marks omitted). On January 10, 2024, UiPath confirmed its previous announcement that Dines would resign as co-CEO, and announced that Enslin would join the Company's Board of Directors and become sole CEO of UiPath effective February 1, 2024. *Id.* ¶ 64.

Just a few months later, UiPath announced another wildly successful quarter—the fourth quarter of fiscal year 2024 (November 2023 through January 2024). *Id.* ¶ 65. In a March 13, 2024,

press release, the Company reported "[r]ecord quarterly revenue of $405 million," a 31% year-over-year increase, and announced that it had achieved its "first quarter of [Generally Accepted Accounting Principles] profitability as a public company." *Id.* In that press release, Enslin credited the new AI platform and go-to-market strategy for the Company's success:

> We delivered a strong close to the fiscal year . . . , underscoring the meaningful outcomes our Business Automation Platform delivers for our customers. The combination of UiPath's AI and automation is the strategic change enabler for our customers that makes any digital transformation easier and faster, while empowering customers to innovate, adapt more quickly, and grow.

*Id.* ¶¶ 65, 103 (alteration in original; emphasis omitted). Enslin reiterated this sentiment on UiPath's earnings call that day, linking the Company's strong financials to its revamped platform:

> 18 months ago, we drove the evolution of the automation market from RPA to a full AI-powered business automation platform. Our growth products have played a key role in our platform's evolution, setting us apart from the competition and serving as the link that connects AI and automation into actionable results. Our platform also enables us to close larger, more strategic deals.

*Id.* ¶¶ 66, 104 (emphasis omitted). During the call, Enslin also credited UiPath's customer-centric approach for the strong quarter:

> We reported a strong close to the fiscal year, exceeding our guidance across both top and bottom line metrics, driven by demand for the depth and breadth of our platform and the team's focus on customer success, which is at the core of everything we do. Our momentum also reinforces my confidence in the strategic role we play for our customers and the investments we are making in our future.

*Id.* ¶ 111 (emphasis omitted). And, repeating a message Gupta delivered in the previous quarter's earnings call, Enslin added that UiPath would continue investing in its sales function:

> To help customers and prospects get the most out of our capabilities, we plan to continue our investments in targeted sales areas, weighting our resources towards large enterprise customers where we see the biggest opportunity for expansion. This includes investments in growth product specialists, sales engineers to support our customers and further industry verticalization in areas like financial services, insurance, health care and public sector. This approach has been instrumental in driving momentum in North America, including large strategic deals, and we are investing in other regions where we are seeing early traction.

*Id.* ¶ 110 (emphasis omitted).  Finally, Enslin discussed the success of the turnaround strategy as a whole:

> [T]here's no doubt there's better execution, right?  There's no doubt that's what we said we wanted to achieve better execution.  And we also wanted to make certain that the platform was relevant for C-level executives.  And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way.

*Id.* ¶¶ 69, 105 (alteration in original; emphasis omitted).

Analysts again were impressed with UiPath's results, writing, for example, that "UiPath continues to show better execution," that "[m]anagement is executing well on its large customer growth and improving efficiency strategy," and that "UiPath continues to execute well as the combination of AI and automation is resonating with customers and is helping elevate UiPath's platform conversation into the C-suite."  *Id.* ¶¶ 70-71 (internal quotation marks omitted).

UiPath's success, however, proved fleeting.  After the market close on May 29, 2024—approximately two-and-one-half months after the last earnings call—UiPath disclosed disappointing financial results for the first quarter of fiscal year 2025 (which began February 1, 2024), revised its full-year revenue guidance downward by approximately 10%, or $150 million, and announced the resignation of Enslin and the reappointment of Dines as CEO effective June 1, 2024.  *Id.* ¶ 143.  In a series of candid remarks on a conference call that same day, Dines elaborated on the causes and consequences of the turnaround strategy's breakdown.  He acknowledged that the Company "saw inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes, which [UiPath is] working to rectify."  *Id.* ¶ 144 (emphasis omitted).  While UiPath partially attributed the poor results and reduced guidance to "customer behavior" and the "broader macroeconomic environment," Dines also cited "execution" problems and the "need to improve predictability on large multiyear deals."  *Id.*  In the same vein, Dines further revealed that "the investments we have made to reaccelerate growth have fallen short

of our expectations, made us less agile in responding to customer needs, and created short-term pressure on operating margins, all of which we are committed to rectifying." *Id.* ¶ 145. He also blamed the negative developments on UiPath's inability to scale the new growth products, acknowledging a "need to have a deeper execution strategy to scale these products to reach their full potential." *Id.* ¶ 146 (emphasis omitted).

Reflecting on the Company's past missteps, Dines observed that UiPath "went to a distance to go and pitch [its] business to C-level," but "the reality is" that the Company "ha[s] to increase [its] adoption by taking care of [its] traditional line of business customers." *Id.* ¶ 147. As a remedy, Dines revealed that UiPath would be pursuing "a new reinvigorated customer-centric approach." *Id.* He told investors:

> As we look to the future, we are laser focused on enhancing our execution including improved sales linearity and deal scrutiny, driving higher efficiency across sales and the broader organization and driving a deeper and more execution-oriented strategy for our growth products. We are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach.
>
> Lastly, we plan to go back to our roots, building a truly customer-centric organization, where co-innovating with our customers and partners is at the heart of everything we do.

*Id.* ¶ 149.

On this news, the price of UiPath's stock dropped $6.23 per share, falling from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024—a decline of over 34%. *Id.* ¶ 150. From an investor's perspective, as some analysts put it, Dines's statement represented a "sea change in tone [and] outlook" as compared to the earnings report just over two months prior, with "management acknowledging that the company's go-to-market strategy has underperformed expectations." *Id.* ¶¶ 151-152 (emphasis omitted). Plaintiffs allege, however, that UiPath's

outward-facing success in the second half of fiscal year 2024 was not reflected internally, and that Enslin and Gupta knew that the revamped go-to-market strategy was not working.

Using information gleaned from three former UiPath employees,[3] Plaintiffs allege that several internal business decisions made by UiPath leadership resulted in stagnating deal flow for the Company beginning in 2023 and continuing into 2024. First, UiPath set limits on how sales representatives could structure new deals. Since at least late 2021, UiPath had internally promoted the "annual ramping" of larger contracts—a practice by which multi-year contracts were structured with built-in growth in the number of licenses in the final years or months of the agreement term.[4] *Id.* ¶¶ 40-41, 74, 84. Such "ramped" contracts were often also prorated, with the customer only paying for the use of licenses during the months those licenses were active. *Id.* ¶ 84. Beginning in early- to mid-2023, however, UiPath leadership abruptly changed course: ramped and prorated contracts were now considered "bad practice," and sales representatives were not to enter into such deal structures. *Id.* ¶¶ 75, 78(a), 84(b), 85-86.

Second, in addition to discouraging ramped contracts, UiPath revised the compensation structure for sales representatives in a way that disincentivized such deals. Before the change in policy, account executives were paid a commission based on the value of the final year of the

---

[3] The Amended Complaint alleges information provided by three former UiPath employees, who are identified as FE-1, FE-2, and FE-3, and collectively as the FEs. FE-1 was an "Enterprise account executive" for UiPath, assigned to the "strategic portfolio" group, from February 2022 to October 2024. Am. Compl. ¶ 73. FE-2 worked at UiPath from February 2021 to early December 2023, most recently as an "emerging account executive." *Id.* ¶ 83. FE-3 worked at UiPath from November 2021 through January 2024, first as an "Emerging Enterprise account executive" until February 2023, and then as a "mid-market global account manager," responsible for managing small- to medium-sized customers in Latin America and Canada. *Id.* ¶ 92.

[4] According to FE-1, a "ramped" contract, "hypothetically, had 1,000 licenses in the first year, 2,000 licenses in the second year, and 5,000 licenses in the third year, with a bunch of licenses in the last quarter in the last year." Am. Compl. ¶ 74(a) (internal quotation marks omitted). This had the effect of "hockey sticking the exit value of the contract, which made the deal look bigger." *Id.* ¶ 74(b).

contract, incentivizing multi-year deals with bundles of additional licenses tacked on to the final months of the contract. *Id.* ¶ 84(c). UiPath removed this incentive for account executives no later than February 2024 and instead structured compensation around "paid annual" deals, making it more profitable for account executives to close multiple single-year deals than single multi-year deals. *Id.* ¶ 76.

Third, UiPath began to force customers onto its "Flex" platform beginning in April or May 2023. *Id.* ¶¶ 77, 95. Historically, customers could deploy UiPath's platform on-premises (*i.e.*, hosted on their own servers), in the cloud (*i.e.*, hosted by UiPath or a third party), or in a hybrid environment (*i.e.*, some combination of the two). *Id.* ¶ 34. In 2022, UiPath replaced its hybrid offering with the "Flex" platform: a new offering that combined the deployment types into a single product that gave customers the flexibility to switch between on-premises and cloud deployments at any point during the contract term. *Id.* UiPath charged $8,000 to $10,000 more for the Flex platform annually than the on-premises platform—sometimes increasing the price of contract renewals by 30%—and beginning in 2023 customers had no choice upon renewal but to upgrade to the more expensive Flex platform. *Id.* ¶¶ 77, 95.

Fourth and finally, UiPath reduced the headcount of its sales support staff—specifically customer success managers and automation program advisors—during 2023 and into early 2024.[5] *Id.* ¶ 81. On an October 2023 all-hands call, Gupta spoke about the need for UiPath to get "lean and mean," and justified the rolling layoffs with reference to the current economic conditions and practices of similar companies. *Id.* ¶ 81(b).

---

[5] Although the Amended Complaint states that the "layoffs occurred during 2023 and into the first quarter of fiscal year 2024," Am Compl. ¶ 81(a), Plaintiffs explain that this "is a typographical error, and should say 'fiscal year 2025,'" which began on February 1, 2024, Dkt. 35 ("Opposition") at 7 n.2.

According to Plaintiffs, these business decisions backfired on UiPath.  Without the ability of account executives to offer ramped and prorated contracts, potential customers faced higher contract prices.  *Id.* ¶¶ 77(c), 86.  And existing customers who were accustomed to pricing flexibility pushed back, shortening contract terms or refusing to sign altogether.  *Id.* ¶ 86.  UiPath exacerbated these issues by changing the compensation structure for its sales representatives, which disincentivized its own employees from pursuing longer-form deals and motivated them to close shorter-duration contracts with higher customer churn.  *Id.* ¶¶ 84-86.  UiPath's decision to aggressively push the more expensive Flex platform only added to the pile.  FE-3 reported that as many as 30% of the customers in FE-3's coverage region canceled their contracts rather than transition to the new Flex platform.  *Id.* ¶ 95.  And the reduction of UiPath's customer success team was the final stroke in the Company's (unknowingly) self-sabotaging campaign.  Without a properly functioning customer success team ensuring customer satisfaction with purchases, UiPath experienced deal delays and lost customers.  *Id.* ¶¶ 88, 93; *see id.* ¶ 88(b) (FE-2 reporting having lost a customer because no customer success manager followed up with the client after purchasing the product).

## B.    Procedural History

Plaintiff Zack Steiner filed the original Complaint in this action on June 20, 2024.  Dkt. 1.  On August 6, 2024, Plaintiff Simone Brunozzi filed a substantively similar complaint in *Brunozzi v. UiPath, Inc.*, No. 24 Civ. 5959 (JPC) (S.D.N.Y.).  The Court consolidated the two cases and granted Brunozzi's unopposed motion to be appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, on September 5, 2024.  Dkt. 24.

On November 22, 2024, Plaintiffs filed the Amended Complaint.  Dkt. 30.  Plaintiffs bring claims under the Exchange Act "on behalf [of] all persons and entities who purchased or acquired

UiPath securities, including stock and call options, as well as those that sold put options on UiPath stock during the Class Period," which is December 1, 2023, to May 29, 2024, both inclusive. Am Compl. ¶ 153. The Amended Complaint pleads two Counts. In Count I, Plaintiffs allege that Defendants made a variety of materially false and misleading statements in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5. Am. Compl. ¶¶ 165-173; *see id.* ¶¶ 100-113 (listing the allegedly materially false and misleading statements). In essence, Plaintiffs argue that Defendants made material misstatements and omissions by representing to investors that "UiPath was successful in executing valuable, multi-year contracts with customers" and by representing that "UiPath's investments in its sales team and customer success function were driving that success." *Id.* ¶ 100. In Count II, Plaintiffs allege that by virtue of those alleged material misstatements and omissions, and due to their control over UiPath, Enslin and Gupta violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Am. Compl. ¶¶ 174-175.

Defendants moved to dismiss the Amended Complaint on January 21, 2025. Dkts. 31, 32 ("Motion"), 33 ("Polubinski Decl."). Plaintiffs filed their opposition on March 21, 2025, Dkt. 35, and Defendants replied on April 21, 2025, Dkt. 37 ("Reply").

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). A plaintiff alleging fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Conclusory allegations or allegations unsupported by factual assertions are insufficient. *See ATSI Commc'ns*, 493 F.3d at 99.

Securities fraud claims under Section 10(b) must also satisfy the PSLRA's heightened pleading requirements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). The PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *accord Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*,

988 F.3d 157, 161 (2d Cir. 2021)).  The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000).  Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### III.  Discussion

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b-5, provides, among other things, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted).

Plaintiffs challenge statements made by Defendants that fall into two categories: (a) statements regarding UiPath's execution of contracts with customers and the quality of those deals (the "Execution Statements"), *see* Am. Compl. ¶¶ 102-107, and (b) statements regarding the Company's investments in its sales team and customer success function (the "Investment

Statements"), *see id.* ¶¶ 108-113.  Defendants argue that Plaintiffs fail to plead a material misrepresentation or omission and scienter with respect to all statements, and additionally fail to plead loss causation with respect to the Investment Statements.  As discussed below, two of the Execution Statements plainly are nonactionable and all four lack adequate allegations of scienter, while loss causation is not sufficiently alleged for the Investment Statements.  Because these fatal flaws reach all of the challenged statements, Count I and by extension Count II are dismissed.[6]  But the Court will allow Plaintiffs to further amend the Amended Complaint if they believe that they can cure these issues.

A.    **The Execution Statements**

Four statements by Enslin and Gupta constitute the Execution Statements: (1) Gupta's statement during the November 30, 2023, earnings call that "our strategy is on customers with a higher propensity to buy" and "[w]e feel like we're executing against that strategy, and we're seeing that [sic] results in the deal quality and the customer quality in the quarter," *id.* ¶ 102 (emphasis omitted; alterations in original); (2) Enslin's statement in the March 13, 2024, press release that "[w]e delivered a strong close to the fiscal year . . . , underscoring the meaningful outcomes our Business Automation Platform delivers for our customers," *id.* ¶ 103 (emphasis omitted; alteration in original); (3) Enslin's statement during the March 13, 2024, earnings call that "[o]ur platform also enables us to close larger, more strategic deals," *id.* ¶ 104 (emphasis omitted); and (4) Enslin's statement during the same earnings call that "[t]here's no doubt there's

---

[6] Defendants filed eleven exhibits along with their motion to dismiss.  Dkt. 33.  Plaintiffs argue the Court cannot consider these materials for the truth of the matters asserted therein. Opposition at 9.  The Court declines to reach to what extent it is appropriate to consider those exhibits because, for reasons explained herein, the Court grants the motion to dismiss without considering the additional documents.

better execution, right?  There's no doubt that's what we said we wanted to achieve better execution," *id.* ¶ 105 (emphasis omitted; alteration in Amended Complaint).

### 1.    Material Misstatements and Omissions

To survive a motion to dismiss, "a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Although "[t]he Supreme Court has instructed that 'silence, absent a duty to disclose, is not misleading under Rule 10b-5,'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (alterations adopted) (quoting *Basic*, 485 U.S. at 239 n.17), Rule 10b-5's prohibition on misleading omissions "requires disclosure of information necessary to ensure that statements already made are clear and complete," *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").  This means that, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  That said, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, courts must look at the "context and manner of presentation."  *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (internal quotation marks omitted).  "The ultimate question, however, remains whether a 'reasonable investor could have been misled to believe something in contradiction to the omitted facts.'"  *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347 (S.D.N.Y. 2024)

(alteration adopted) (quoting *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011)).

Materiality, in turn, is "satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted); *see also Basic*, 485 U.S. at 231 ("[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."). This inquiry is "fact-specific" and "necessarily depends on all relevant circumstances." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.* ("*ECA*"), 553 F.3d 187, 197 (2d Cir. 2009); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." (internal quotation marks omitted)). The Supreme Court has been "careful not to set too low a standard of materiality," *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted), instead ensuring that the "materiality hurdle" remains a "meaningful pleading obstacle," *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). At the motion to dismiss stage, however, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (alteration adopted; internal quotation marks omitted).

Still, certain categories of representations are immaterial as a matter of law, and thus cannot support a claim under federal securities laws. Among these are expressions of mere corporate

puffery or optimism—claims that "'are too general to cause a reasonable investor to rely upon them,' and thus 'cannot have misled a reasonable investor.'"  *In re Vivendi, S.A.*, 838 F.3d at 245 (first quoting *ECA*, 553 F.3d at 206; then quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).  The doctrine rests on the premise that such statements are so lacking in specificity or falsifiability that no reasonable investor would rely on them in making investment decisions.  Although there is "no definitive test to determine how vague a statement must be to qualify as puffery," *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018), *aff'd in part, vacated in part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020), a central inquiry is whether the statement at issue is "a determinate, verifiable statement," *Omnicare*, 575 U.S. at 184, that can be tested against an "objective, black-and-white standard," *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023).  *See In re Synchrony Fin.*, 988 F.3d at 168 (contrasting a nonactionable "vague expression of opinion" with an actionable "concrete description and a factual representation" (alteration adopted; internal quotation marks omitted)); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.* ("*Okla. Firefighters*"), 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018) (emphasizing that certain "statements were non-verifiable" and thus nonactionable), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

In the same vein, "corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."  *Novak*, 216 F.3d at 309.  So long as "the public statements are consistent with reasonably available data," optimistic expressions of confidence remain nonactionable.  *Id.*; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident

about their stewardship and the prospects of the business that they manage.").  This is a key qualifier, however.  Statements that "address[] concrete and measurable areas of the defendant company's performance" are potentially actionable, even if presented with the hopeful outlook that corporate executives are expected to express.  *Okla. Firefighters*, 300 F. Supp. 3d at 570; *accord Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019).  That is why, for example, corporate "statements that a strategic move has been 'a success,' that a company is 'moving well forward,' that 'things are going well,' or that operations are 'successful,' will typically be considered puffery," *Haw. Structural Ironworkers Pension Tr. Fund*, 422 F. Supp. 3d at 845 (quoting *Okla. Firefighters*, 300 F. Supp. 3d at 570), absent any articulation of verifiable "metrics on which a reasonable investor would rely," *In re Synchrony Fin.*, 988 F.3d at 171.  *See Novak*, 216 F.3d at 315 (concluding that statements that the defendants' "inventory situation was 'in good shape' or 'under control'" were not puffery because the defendants "allegedly knew that the contrary was true"); *Nguyen*, 297 F. Supp. 3d at 488 ("[P]ollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant.").

The second and third of the four Execution Statements plainly are nonactionable under these standards.  Enslin's statement in the March 13, 2024, press release that UiPath "delivered a strong close to the fiscal year" which "underscor[ed] the meaningful outcomes our Business Automation Platform delivers for our customers," Am. Compl. ¶ 103 (emphasis omitted), lacks any verifiably misleading statement upon which an investor could rely.  To be sure, the first part of this statement conveyed concrete or measurable information about UiPath's financial performance: UiPath "delivered a strong close to the fiscal year."  But this was nothing except accurate.  In the third quarter of fiscal year 2024—the fiscal year Enslin referenced in his

statement—UiPath reported a twenty-four percent year-over-year increase in revenue.  *Id.* ¶ 55.
And in the next quarter—the final of that fiscal year—UiPath reported a record quarterly revenue
that marked a thirty-one percent year-over-year increase.  *Id.* ¶ 65.  Such back-to-back financial
reports surely can be permissibly characterized as a "strong close to the fiscal year."  Enslin's
accurate recounting of past performance cannot serve as the basis for a securities fraud claim.  *See
In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y.
Nov. 25, 2003) ("Defendants may not be held liable under the securities laws for accurate reports
of past successes, even if present circumstances are less rosy." (internal quotation marks omitted)),
*aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004).

The remainder of this statement—regarding the "meaningful outcomes our Business
Automation Platform delivers for our customers," Am. Compl. ¶ 103 (emphasis omitted)—is
puffery.  Even if read to link UiPath's strong financial performance to its Business Automation
Platform, this language contains no determinate and verifiable information that could be measured
against an "objective, black-and-white standard."  *In re Philip Morris Int'l*, 89 F.4th at 418.
Rather, it includes the broad, qualitative descriptor "meaningful" and conclusory language
"delivers" and "underscores"—words that are tied to no independently verifiable metric and are
"too general to cause a reasonable investor to rely upon them."  *Id.* at 417; *see id.* (concluding that
the defendants' characterization of "their methodology as 'rigorous,' 'extensive,' 'thorough,'
'systematic,' 'unique in completeness and transparency,' 'the best science,' and 'very advanced,'
and the scientists who performed them as 'expert' and 'world-class,'" were all "vague
descriptions" and "inactionable as 'mere puffery'" (alteration adopted)).  A company's
announcement that its product "delivers" "meaningful outcomes" for its customers is generalized
corporate boasting and a quintessential example of nonactionable puffery.  *See City of Sterling*

*Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 92 (S.D.N.Y. 2022) (concluding that an executive's statement promoting the company's "unique patient-focused leadership model" was an "instance of optimistic sentiment and self-congratulations that imparted no specific and meaningful information to a reasonable investor, and, as puffery, [was] not actionable"). Indeed, one would be hard pressed to find a company that does not promise value in what it sells; that a company touts its product as useful is a tale as old as commerce.

The same holds true for the third Execution Statement—Enslin's statement during the March 13, 2024, earnings call that UiPath's "platform . . . enables us to close larger, more strategic deals." Am. Compl. ¶ 104 (emphasis omitted). Although the term "larger" could, in theory, refer to a concrete metric such as deal size, Enslin's statement identifies no baseline, reference point, or comparative data against which a reasonable investor could assess its accuracy. More to the point, the Court must consider the statement's broader context. *See In re Vivendi, S.A.*, 838 F.3d at 250 (stressing the importance of context). Enslin's use of the word "enables" underscores the statement's aspirational tone; his statement describes the Business Automation Platform's *potential*, not *actual*, performance. Defendants made no claim, as Plaintiff suggest, that in fact "they were 'clos[ing] larger, more strategic deals.'" Opposition at 2 (alteration in original). Rather, the statement concerns the Company's optimistic belief in the platform's general capability to support higher-value transactions—a "vague expression of opinion" too general to be actionable. *In re Synchrony Fin.*, 988 F.3d at 168 (alteration adopted). Nor does the reference to "more strategic deals" provide any more determinacy. To the contrary, "strategic" is an "inherently subjective" characterization that reflects management's business judgment, not a characterization whose objective, factual accuracy could be verified with certainty. *See In re*

*Philip Morris Int'l*, 89 F.4th at 418).  Like the second Execution Statement, this one is no more than corporate cheerleading—inactionable puffery conveying no material information.

The first and fourth Execution Statements, however, present closer calls.  The first Executive Statement—Gupta's assertion during the November 30, 2023, earnings call that UiPath was "executing against [its] strategy" of focusing on "customers with a higher propensity to buy," and that the Company was "seeing . . . results in the deal quality and the customer quality in the quarter," Am. Compl. ¶ 102 (emphasis omitted)—is cast in the present tense and appears to evaluate actual performance during a specific quarter.  Taken at face value, the statement could be interpreted as signaling measurable progress in implementing a concrete strategic shift.  At the same time, the operative terms "deal quality" and "customer quality" are, to a degree, qualitative and judgment-laden, lacking any definition or reference point by which their accuracy could be assessed.  The fourth Executive Statement—Enslin's statement during the March 13, 2024, earnings call that "[t]here's no doubt there's better execution," and that "[t]here's no doubt that's what we said we wanted to achieve better execution," *id.* ¶ 105 (emphasis omitted)—occupies a similar analytical middle ground.  On the one hand, the statement plausibly could be read to suggest the realization of a previously stated corporate objective, particularly in light of UiPath's recently overhauled go-to-market strategy following a lackluster few years.  *See id.* ¶¶ 5, 45, 47-48.  But on the other, the phrase "better execution," standing alone, is vague and undefined: it could refer to any number of internal performance indicators, or it may reflect not any precise metric but rather management's subjective assessment.

In the end, however, the Court need not reach whether the first and fourth Execution Statements, as pleaded, were puffery or corporate optimism, or whether either statement otherwise was in fact misleading as to a material fact.  As explained in the next section, those statements are

not actionable under Section 10(b) and Rule 10b-5 because the Amended Complaint fails to adequately plead scienter for any of the Execution Statements.

### 2.    Scienter

As noted, to state a claim for securities fraud, the PSLRA requires that plaintiffs "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To qualify as "strong," "'[a]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 51 (2d Cir. 2025) (quoting *Tellabs*, 551 U.S. at 324). And the "requisite state of mind, or scienter[,] that the plaintiff must allege is an intent to deceive, manipulate or defraud." *Id.* (alteration adopted; internal quotation marks omitted). A plaintiff may make such a showing by alleging facts that demonstrate either (1) "a 'motive and opportunity to commit the fraud'" or (2) "'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford* ("*Blanford*"), 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99). Courts must, however, "assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021). Thus, "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *ECA*, 553 F.3d at 199 (internal quotation marks omitted).

To properly allege motive, Plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 307-08). This they have failed to do. While the Amended

Complaint does not allege any motive[7] on the part of Enslin or Gupta, *see* Am. Compl. ¶¶ 114-141 (making allegations of scienter), Plaintiffs argue in opposing dismissal that Enslin's and Gupta's motive was "to keep their errors out of the limelight in the hopes that good news would overtake any bad news," Opposition at 27; *see also id.* ("Here, Enslin was fighting for his job, having been brought in to successfully turn UiPath around, and Gupta was responsible for UiPath's execution woes as a result of his decision to stop annual ramping, among other changes."). Even interpreting Plaintiffs' argument generously, Enslin's and Gupta's supposed motive amounts to nothing more than a desire to conceal past errors, to remain employed as executives, or to protect their professional reputations. But the Second Circuit has "consistently rejected as insufficient" allegations "based on motives possessed by virtually all corporate insiders." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.* ("*Teamsters Loc. 445*"), 531 F.3d 190, 196 (2d Cir. 2008); *see also Kalnit*, 264 F.3d at 139 ("Motives that are generally possessed by most corporate directors and officers do not suffice . . . ."). Such generally possessed motives include, for example, the "motive to maintain the appearance of corporate profitability," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996), and the desire of corporate officers "to protect their executive positions and compensation," *Kalnit*, 264 F.3d at 139, or to "prolong the benefits of holding corporate office," *Novak*, 216 F.3d at 307. Enslin's and Gupta's alleged motive falls comfortably within such examples of generally possessed motives, and, as such, is insufficient to support a finding of scienter. For "[i]f motive could be pleaded by alleging the defendant's desire for continued employment, . . . the required showing of motive . . . would be no realistic check on

---

[7] Defendants do not appear to contest that Enslin and Gupta, as corporate officers, had the requisite opportunity. *See generally* Motion at 18-19; Reply at 8-9; *see also Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 319 n.28 (S.D.N.Y. Jan. 5, 2024) ("Corporate officers are generally considered to have the opportunity to commit fraudulent acts based on insider information." (citing *In re Scholastic*, 252 F.3d at 74)).

24

aspersions of fraud, and mere misguided optimism would become actionable under the securities laws." *Shields*, 25 F.3d at 1130.

As discussed below, at least with respect to the Execution Statements, Plaintiffs have also failed to plead "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. A showing of "conscious recklessness" entails "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106 (internal quotation marks omitted). Recklessness has also been defined as "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F.3d at 203 (quoting *Kalnit*, 264 F.3d at 142). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Blanford*, 794 F.3d at 306 (quoting *ECA*, 553 F.3d at 199). The assessment of whether conscious misbehavior or recklessness has been adequately pleaded "is a highly fact-based inquiry," *Kalnit*, 264 F.3d at 142, and courts must "analyz[e] scienter holistically," *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020); *accord Tellabs*, 551 U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

### i.    Access to Contrary Information

Plaintiffs' main scienter argument is that Enslin's and Gupta's "access to real-time information showing deal and customer quality supports a strong inference of conscious or reckless

misbehavior."  Opposition at 23.  Plaintiffs point to four sources of information: (1) "win room" meetings, (2) the Clari platform, (3) all-hands calls, and (4) Quarterly Business Reviews ("QBRs").  *Id.* at 22-23.

With respect to the first source of information, FE-1 reported that both Enslin and Gupta "were active in 'win room' meetings."  Am. Compl. ¶ 78.  In these meetings, "Company executives met with sales personnel to discuss the details of proposed deals and decisions were made about whether to pursue deals and how to structure them."  *Id.*  The sales representative responsible for the potential deal would create a two-page document for the executives that outlined the details of the customer and the opportunity from the deal, the deal's structure, and the plan to close the deal. *Id.* ¶ 78(g).  For each win room meeting, Enslin and Gupta had access to the prepared documents and would participate in the discussions.  *Id.* ¶ 78(i).  Gupta acted as the "ultimate decision maker" on whether a deal would be approved, and he once rejected a potential deal of FE-1's because it had a ramped structure.  *Id.* ¶ 78(a)-(b).

Enslin and Gupta also had continuous access to the Clari platform, a central tool used by UiPath to forecast deal values and assess the timing of contract executions.  *Id.* ¶¶ 80, 90-91. Integrated with Salesforce, Clari tracked customer communications, activities, and opportunities, and enabled account executives to make and regularly update deal forecasts.  *Id.* ¶¶ 80, 90. According to FE-1 and FE-2, these forecasts—which account executives were expected to update weekly, and which then were "rolled up from the account executive level to Enslin" through layers of sales leadership—provided Enslin and Gupta with real-time visibility into UiPath's sales pipeline.  *Id.* ¶¶ 80, 90-91.  Clari could functionally "confirm[] or den[y]" whether a sales representative's forecast was credible based on the representative's recent activity, allowing leadership to determine whether employees were "on top of the[] deals and opportunities," and "if

not, what . . . to do to fix it." *Id.* ¶ 80(a)-(b) (internal quotation marks omitted).  FE-1 reported that Gupta reviewed Clari not only to track performance but also to make personnel decisions, including layoffs, based on "who has things to work on and who does not." *Id.* ¶ 80.  Gupta also emphasized UiPath leadership's access to real-time data, touting at a June 2024 technology conference the Company's ability to "see trends ahead of time" using "field input, sales signals," and "traditional . . . forecast[ing]." *Id.* ¶ 125 (emphasis omitted).

Plaintiffs also cite to various meetings to support their allegation that Enslin and Gupta had access to information that contradicted their Execution Statements.  According to FE-1, for example, Enslin was "unprofessional" and "frustrated" during quarterly all-hands meetings in the summer of 2023, chiding employees to "do better on execution." *Id.* ¶¶ 79, 82 (internal quotation marks omitted).  FE-1 understood this to mean that UiPath "was not executing, was not closing big, strategic deals." *Id.* ¶ 79.  Enslin also participated in QBRs. *Id.* ¶¶ 97-98.  During one such QBR in October 2023, FE-3 reported that "attendees discussed the issue of forcing customers onto UiPath's Flex platform" and the attendant loss of deals. *Id.* ¶ 98.

These allegations, considered individually or taken together, do not amount to "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  Plaintiffs' theory hinges on the assertion that Enslin and Gupta had access to "real-time information" through their participation in internal meetings and review of Clari, and that this access allegedly contradicted their public statements concerning the Company's execution during the second half of the 2024 fiscal year. *See* Opposition at 22-24.  But "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Loc. 445*, 531 F.3d at 196 (alteration adopted) (quoting *Novak*, 216 F.3d at 309).  "To meet this standard, a plaintiff must plead facts supporting the

inference that defendants had access to specific contradictory information at the time they made their misleading statements." *Shemian v. Rsch. In Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013) (alteration adopted; internal quotation marks omitted), *aff'd,* 570 F. App'x 32 (2d Cir. 2014).

Plaintiffs' allegations concerning the four sources of internal information they identified—win-room meetings, the Clari platform, all-hands calls, and QBRs—do not satisfy this burden. To begin, Plaintiffs do not identify any specific report or communication from these sources that directly contradicted Enslin's or Gupta's public Execution Statements. Instead, Plaintiffs rely on general descriptions of Enslin's and Gupta's participation in meetings and access to company-wide sales tools. Courts in this District have consistently rejected such generalized allegations as insufficient to plead scienter. *In re Turquoise Hill Res.*, 625 F. Supp. 3d at 237 (collecting cases); *see also, e.g.*, *In re Adient plc Sec. Litig.*, No. 18 Civ. 9116 (RA), 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (rejecting an access-to-information argument because the plaintiffs failed to "specifically identify the reports or the allegedly contradictory information contained therein" (internal quotation marks omitted)); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 220 (S.D.N.Y. 2020) (rejecting an access-to-information argument because the plaintiff "fail[ed] to identify the specific information contained in [the allegedly contradictory] reports, or that which was discussed at the meetings, nor how such information contradicted [the challenged] public statements").

With respect to the win-room meetings, Plaintiffs' allegations fall well short of showing that Enslin or Gupta had access to, or ignored, information that rendered their challenged statements inaccurate. The Amended Complaint does not identify what was said during any particular meeting, much less allege any information conveyed during those meetings that

contradicted the substance of Enslin's and Gupta's Execution Statements.  That Gupta once rejected a deal because it was ramped does not support the inference that he "had access to *specific contradictory information*" at the time of his Execution Statements.  *Shemian*, 2013 WL 1285779, at *14 (emphasis added; internal quotation marks omitted).  Nor does mere participation in meetings where deal structuring was discussed, without any allegations as to how those discussions contradicted Enslin's or Gupta's Execution Statements, constitute the sort of specific, contradictory knowledge required to support an inference of scienter.  *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 242 (S.D.N.Y. 2023) (concluding that participation in "weekly forecast meetings" did not "support an inference of scienter" because the complaint "fail[ed] to explain how [the] information discussed during those meetings . . . contradicted [the defendants'] public statements, as is required to show scienter" (internal quotation marks omitted)).

Plaintiffs' allegations concerning the Clari platform are similarly insufficient.  Although Plaintiffs describe Clari as a sophisticated forecasting tool and assert that Enslin and Gupta regularly reviewed the data contained therein, *see* Am. Compl. ¶¶ 80, 90, 91, Plaintiffs fail to allege with specificity what the platform showed at any relevant time that would have cast doubt on Defendants' Execution Statements.  "[A] complaint must allege more than the mere existence of contradictory information to support a securities fraud claim; it must allege particularized facts that suggest that the defendants knew of and disregarded such information."  *Woolgar*, 477 F. Supp. 3d at 220.  Plaintiffs' failure to plead the specific contents of any Clari forecast reviewed by Enslin or Gupta precludes an inference of scienter; their general access to sales data in Clari is not enough.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (explaining that an "unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a

motion to dismiss"); *Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (rejecting as insufficient "vague and general averments that [the defendants] had access to internal corporate documents and data during the class period, including real-time customer and sales information," because the plaintiffs did not "allege[] any facts indicating that the content of the reports or data to which [the defendants] were privy was inconsistent with their statements in the class period"); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (concluding that the defendants' "access to daily sales reports" did not support an inference of scienter because "the complaint fail[ed] to specify exactly what information was contained in the report or how said information contradicted [the defendants'] public statements, as is required to show scienter" (internal quotation marks omitted)); *Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021) (explaining that "simply asserting that executives had access to extensive raw data that reflected problems" in the defendant company's financials was "insufficient to raise an inference of scienter," because "scienter requires that a defendant be specifically informed of contrary information"); *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19 Civ. 6180 (LAP), 2021 WL 1226627, at *13 (S.D.N.Y. Mar. 30, 2021) (concluding that the defendants' access to company "tools" was insufficient to show scienter because the plaintiff "specifie[d] *no information in those tools* that runs counter to [the defendants'] statements at the time they were made").

For the same reason, Plaintiffs' allegations regarding the all-hands meetings and the QBRs, even considered along with the remaining allegations, fall short. Enslin's frustration and charge for employees to "do better on execution" during one all-hands meeting before the Class Period began does not itself give rise to a strong inference of scienter. There are myriad reasons why management might pressure employees to perform better, and a mere allegation that "executive

defendants are 'closely involved' in running their business is not enough to show that they had access to contrary information." *City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19 Civ. 10825 (JPO), 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021), *aff'd*, No. 21-909-cv, 2021 WL 5142702 (2d Cir. Nov. 5, 2021). "Although evidence of a hands-on management style may support an inference of scienter in some cases, it is insufficient to establish scienter on its own." *Maloney*, 518 F. Supp. 3d at 781. Further, although FE-3 reported that attendees at one QBR in October 2023 "discussed the issue of forcing customers onto UiPath's Flex platform" and the resulting loss of deals, Am. Compl. ¶ 98, this allegation is "insufficiently particular to support an inference of scienter" for any of the Execution Statements, *In re AppHarvest*, 684 F. Supp. 3d at 242. Crucially, the Amended Complaint "fail[s] to specify exactly how said information contradicted Defendants' public statements." *In re Turquoise Hill Res.*, 625 F. Supp. 3d at 237 (internal quotation marks omitted); *see also In re AppHarvest*, 684 F. Supp. 3d at 242 (concluding that the defendants' participation in "weekly forecast meetings," during which "a variety of metrics" were discussed, was "insufficiently particular to support an inference of scienter" (internal quotation marks omitted)).

Plaintiffs attempt to bolster their theory of scienter by alleging that FE-1 "reported that the impacts of changes in the commercial policy and compensation changes were evident in both 'win room' meetings as well as in Salesforce and Clari forecasts." Am. Compl. ¶ 78(e). This allegation is likewise too vague to support a strong inference of scienter. Plaintiffs do not plead what the impacts were, how they were reflected in any particular meeting or forecast, or how they conflicted with any specific public statement. As with the other allegations, Plaintiffs fail to identify any piece of information of which Enslin and Gupta were aware—at the time of their Execution Statements—that contradicted what they said publicly. *See Woolgar*, 477 F. Supp. 3d at 220

(finding no inference of scienter because the complaint "fail[ed] to identify the specific information contained in [the internal] monthly reports, or that which was discussed at the meetings, nor how such information contradicted [the defendants'] public statements").  Nor do Plaintiffs allege that these purported "impacts" were unambiguously negative or material in a way that would make Defendants' Execution Statements "highly unreasonable" and "an extreme departure from the standards of ordinary care."  *ECA*, 553 F.3d at 203 (quoting *Kalnit*, 264 F.3d at 142); *see In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020) (rejecting allegations premised on executives' "access to the [defendant c]ompany's internal expense forecasts" because there were no allegations that "support[ed] [the] existence of contrary predictions").

Taken together, Plaintiffs' allegations about Enslin's and Gupta's access to contrary information fall well short of "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns*, 493 F.3d at 99.  Those allegations do not show that either Enslin or Gupta acted with a state of mind "approximating actual intent," *Stratte-McClure*, 776 F.3d at 106, nor do they raise an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314.  At most, Plaintiffs "gesture[] broadly at internal financial data that could either have supported or contradicted Defendants' statements."  *Hawes v. Argo Blockchain plc*, No. 23 Civ. 7305 (CM), 2024 WL 4451967, at *18 (S.D.N.Y. Oct. 9, 2024).  That is not enough.  Without any allegations as to "what information was contained in [Clari or revealed during the meetings] or how that information contradicted Defendants' public statements," the Amended Complaint's allegations concerning that information fail to raise a strong inference of scienter with respect to the Execution Statements.  *In re Adient plc*, 2020 WL 1644018, at *28.

###### ii.    Additional Pieces of Circumstantial Evidence

Plaintiffs argue that three other pieces of circumstantial evidence, considered alongside Enslin's and Gupta's access to contrary financial information, support a finding of scienter: (1) the timing of Enslin's departure, Opposition at 24-25; *see* Am. Compl. ¶¶ 133-137; (2) the "proximity between the final alleged misstatement and the corrective disclosure," Opposition at 25; *see* Am. Compl. ¶ 132; and (3) that the "turnaround strategy was at the core of UiPath's business," Opposition at 24; *see* Am. Compl. ¶¶ 138-140.  Even put together, these allegations are too thin a reed to support the requisite strong inference of scienter.

First, Plaintiffs contend that Enslin's departure was "[s]uspiciously timed" and "supports a strong inference of scienter" because it was "announced the day of the corrective disclosure." Opposition at 24-25 (capitalization normalized).  It is well established that "[t]erminations or resignations of corporate executives are insufficient alone to establish an inference of scienter," for "there are any number of reasons that an executive might resign, most of which are not related to fraud."  *Woolgar*, 477 F. Supp. 3d at 240 (internal quotation marks omitted).  Plaintiffs, therefore, must plead "[a]dditional factual allegations linking the termination or resignation to the alleged fraud."  *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132 (LAP), 2023 WL 2632258, at *22 (S.D.N.Y. Mar. 24, 2023); *see also Schiro v. Cemex S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind.").  Indeed, it is hardly suspicious in isolation for a company's CEO to depart upon the company's announcement of disappointing financial results.  In the absence of allegations linking Enslin's departure to the alleged fraud, *see generally* Am. Compl. ¶¶ 133-137; *see also generally*

Opposition at 24-25, the timing of Enslin's departure does not give rise to a strong inference of scienter, either standing alone or considered with Plaintiffs' other allegations.

Second, Plaintiffs argue that the temporal proximity between the May 29, 2024, corrective disclosure and Enslin's and Gupta's Execution Statements supports a strong inference of scienter. Opposition at 25. Plaintiffs acknowledge that "proximity alone, without corroborative evidence, is insufficient to give rise to a strong inference of scienter," *Bettis v. Aixtron SE*, No. 16 Civ. 25 (CM), 2016 WL 7468194, at *16 (S.D.N.Y. Dec. 20, 2016), but they argue that the Amended Complaint alleges such corroboration. *See* Opposition at 25 (citing Am. Compl. ¶¶ 78-81, 86, 89-91, 97-99). The corroborating allegations that Plaintiffs point to, however, are their assertions regarding Enslin's and Gupta's supposed access to contrary information in the form of the Clari platform and their participation in win-room meetings, all-hands calls, and QBRs. *See* Am. Compl. ¶¶ 78-81, 86, 89-91, 97-99. For the reasons discussed above, these allegations are insufficient to connect Enslin and Gupta to information contradicting their Execution Statements, *see supra* III.A.2.i, and thus cannot corroborate Plaintiffs' temporal proximity argument. Without such corroboration, the more plausible inference to be drawn from the temporal proximity is that UiPath believed its turnaround strategy was proving successful—especially given the strong financial reporting for the second half of fiscal year 2024—and promptly revised its guidance once additional information revealed otherwise.

Finally, even if Plaintiffs are correct that UiPath's turnaround strategy was at the core of its business, the core operations doctrine does not support an inference of scienter here. "The core operations doctrine provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL

14206678, at *3 n.4 (2d Cir. Oct. 25, 2022) (summary order) (internal quotation marks omitted). Because the Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA," *id.*, courts in this Circuit generally treat core operations allegations as providing "supplementary but not independently sufficient means to plead scienter," *Cortina v. Anavex Life Scis. Corp.*, No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (internal quotation marks omitted). Where, as here, "Plaintiff[s'] other allegations fall short of supporting a compelling inference of scienter, allegations that a misstatement affected a core operation generally cannot fill the gap." *May v. Barclays PLC*, No. 23 Civ. 2583 (LJL), 2025 WL 887300, at *26 (S.D.N.Y. Mar. 21, 2025) (collecting cases).

### iii.       Corporate Scienter

Finally, Plaintiffs assert corporate scienter, arguing that the Amended Complaint raises an inference of scienter for UiPath by adequately pleading scienter for Enslin or Gupta. *See* Opposition at 27. There are two routes for pleading corporate scienter: "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted). Plaintiffs have done neither. As discussed above, their allegations fall short of establishing that either Enslin or Gupta acted with the requisite scienter, and Plaintiffs have made no allegations concerning any other officer or director who may have been involved in the dissemination or approval of the alleged fraudulent statements. *See* Am. Compl. ¶ 141 ("Defendants Enslin and Gupta, both of whom acted with scienter, had actual and apparent authority over UiPath and acted within the scope of their apparent authority in making

the misstatements at issue.  Their scienter is imputed to the Company.").  Nor are the statements

"so 'dramatic' that collective corporate scienter may be inferred."  *Jackson v. Abernathy*, 960 F.3d

94, 99 (2d Cir. 2020) (quoting *Teamsters Loc. 445*, 531 F.3d at 195-96).

*    *    *

In all, with respect to the Execution Statements, Plaintiffs have "failed to plead facts giving

rise to an inference of scienter 'at least as compelling' as the more obvious, and less sinister,

conclusion—that Defendants simply miscalculated and poorly executed on [a corporate strategy]

in a fast-moving and highly competitive industry."  *Shemian*, 2013 WL 1285779, at *19.

Accordingly, the Court grants Defendants' motion to dismiss to the extent that the Amended

Complaint's theory of liability for Count I is premised on the four Execution Statements.

## B.    The Investment Statements

Defendants argue that Plaintiffs' allegations also fail with respect to the Investment

Statements—that is, those statements in which Plaintiffs allege that UiPath "gave investors the

false impression that UiPath was making sufficient investments in its sales team and customer

success functions."  Opposition at 14; *see also* Am. Compl. ¶¶ 108-113.  Four challenged

statements fall into this category: (1) Gupta's statement during the November 30, 2023, earnings

call that "we have been investing, whether that is within our product team as well as our sales

team . . . , we're investing in our frontline sales team and our sales capacity, and we'll continue to

invest in areas where we see the right returns and the right investments," Am. Compl. ¶ 108

(emphasis omitted); (2) Gupta's statement during the same November 30, 2023, earnings call that

"we are going to continue to invest in our sales team and our sales capacity, especially as we head

into next year," *id.* ¶ 109 (emphasis omitted); (3) Enslin's statement during the March 13, 2024,

earnings call that "we plan to continue our investments in targeted sales areas . . . includ[ing]

36

investments in . . . sales engineers to support our customers," adding that "[t]his approach has been instrumental in driving momentum in North America, including large strategic deals," *id.* ¶ 110 (emphasis omitted); and (4) Enslin's statement during that same March 13, 2024, earnings call that "the team's focus on customer success . . . is at the core of everything we do," *id.* ¶ 111 (emphasis omitted). Plaintiffs claim that these statements "were false and misleading and omitted and concealed the truth" because "the Company was in fact cutting sales and customer success personnel, which in turn led to customers leaving UiPath or reducing the size of their contracts and made it more difficult for UiPath to acquire and retain customers." *Id.* ¶ 112. Plaintiffs further allege that, "having chosen to speak about UiPath's investment into sales and success functions, Defendants omitted and concealed the truth that UiPath had been laying off sales representatives [and] laying off customer success personnel, and that such cuts were leading to fewer new customer contracts and fewer renewals." *Id.* ¶ 113.

Defendants argue that the Investment Statements were not material misstatements or omissions, that Plaintiffs fail to allege scienter as to those statements, and that Plaintiffs' allegations fail to establish loss causation. Motion at 13-14, 17-27. Given the Court's holding below that Plaintiffs fail to allege loss causation, the Court does not reach Defendants' alternative grounds for dismissal with respect to the Investment Statements.

### 1.    Loss Causation

To prevail on a federal securities fraud claim, a plaintiff must link his loss to the complained-of actions taken by the defendant. Known as "loss causation," this core element is the "causal connection between the material misrepresentation and the loss." *Dura Pharms.*, 544 U.S. at 342; *see also Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." (internal quotation marks omitted)); 15 U.S.C. § 78u-

4(b)(4) (requiring a plaintiff to "prov[e] that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages").  Oft-analogized to the tort-law concept of proximate cause, loss causation "is intended to fix a legal limit on a person's responsibility, even for wrongful acts." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks omitted).  Thus, loss causation examines "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant": such causation is established when "that relationship is sufficiently direct," but not when "the connection is attenuated" or when the plaintiff fails to connect "the content of the alleged misstatements or omissions and the harm actually suffered." *Id.* (internal quotation marks omitted).

To establish loss causation, a plaintiff must show "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." *Id.* at 173.  A loss is sufficiently foreseeable when "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.*  And the materialization of a concealed risk—that is, the event or events that divulge the previously concealed information—causes a plaintiff's loss when "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (internal quotation marks omitted).  So to establish loss causation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.*

Most classically, loss-inducing events take the form of corrective disclosures.  "A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363 (S.D.N.Y. 2009).  Such a disclosure, however, "constitutes a sufficient foundation for loss causation allegations only

if it possesses a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement." *Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012); *see also In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 465 (S.D.N.Y. 2022) ("[A] corrective disclosure must possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement." (internal quotation marks omitted)); *In re Take-Two Interactive Sec. Litig.* ("*Take-Two*"), 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) ("[A] particular disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate.").

### 2.    Plaintiffs' Failure to Plead Loss Causation as to the Investment Statements

Plaintiffs rest their theory of loss causation for the Investment Statements entirely on Dines's May 29, 2024, statement that the "investments we have made to reaccelerate growth have fallen short of our expectations, [and] made us less agile in responding to customer needs." Am. Compl. ¶ 18 (internal quotation marks omitted; alteration in original); *accord id.* ¶ 142 ("Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 29, 2024, as alleged herein, the price of UiPath stock fell precipitously, as the prior artificial inflation came out of the price."); *id.* ¶ 145 ("In the same vein, Dines further revealed that 'the investments we have made to reaccelerate growth have fallen short of our expectations, made us less agile in responding to customer needs, and created short-term pressure on operating margins, all of which we are committed to rectifying.'"); *see* Opposition at 28 (arguing the adequacy of the Amended Complaint's pleading of a corrective disclosure). Plaintiffs' theory thus appears to be that Dines's remark revealed that the Company had not actually made the investments in its sales team and customer success functions previously described by Enslin and Gupta. *See* Opposition at 28 ("UiPath told investors—sometimes in response to analyst

questions—that they were focused on investing in sales and customer success, but in reality were cutting those investments."). But that interpretation strains Dines's statement well beyond its language and context.

For a comment to serve as a corrective disclosure, it must possess a sufficient nexus to the challenged statements such that it "somehow reveals to the market that [those] prior statements were not entirely true or accurate." *Take-Two*, 551 F. Supp. 2d at 283. Dines's May 29, 2024, comment does no such thing. Enslin's and Gupta's Investment Statements from November 2023 and March 2024 were specific and detailed. They touted investments "within our product team as well as our sales team," in "our frontline sales team and our sales capacity," and in "targeted sales areas" such as "growth product specialists [and] sales engineers." Am Compl. ¶¶ 108-110 (emphasis omitted); *see id.* ¶ 111 (Enslin stating that "the team's focus on customer success . . . is at the core of everything we do" (emphasis omitted)). Dines's later statement, by contrast, was oblique and nonspecific. It did not mention the sales team, customer success, or any particular area of investment; Dines simply observed, in broad terms, that the Company's investments "to reaccelerate growth" had underperformed. *Id.* ¶ 145.

This disparity in specificity dooms Plaintiffs' claims regarding the Investment Statements. Under no reasonable interpretation did Dines's comment suggest that the Investment Statements "were not entirely true or accurate," *Take-Two*, 551 F. Supp. 2d at 283; it reflected no contradiction, no correction, and no concession of past inaccuracy. Dines did not repudiate or even reference the prior statements about UiPath's investments in its sales team and focus on customer success. He did not say that those investments were not made, nor did he suggest—either explicitly or implicitly—that they were somehow materially different than what Enslin and Gupta had previously represented. Indeed, Plaintiffs have not alleged any contemporaneous

market reaction—whether via analyst commentary, investor reports, or press coverage—that suggests Dines's statement was understood as signaling that the Investment Statements were false or misleading. *See* Am. Compl. ¶¶ 142-152. Plaintiffs essentially claim that Dines's remark made investors aware of how certain investments in the Company's growth fell short of expectations, which, by some unexplained connection, also disclosed to investors that UiPath in fact did not make investments in its sales team and customer success function. This purported nexus between the loss-causing event and the Investment Statements is far too dubious to support a finding of causation.

More to the point, Plaintiffs' claim fails even accepting their strained interpretation of Dines's comment as relating to UiPath's investments in its sales team and customer success function. If Dines was implicitly referring to the Company's prior sales-related and customer success-related investments, then his statement only reinforced the truth of Defendants' prior representations. Dines's remark that "the investments *we have made* . . . have fallen short of our expectations," *id.* ¶ 145 (emphasis added), presupposes that certain investments had in fact been made. In the Investment Statements, Enslin and Gupta did not promise particular outcomes; they emphasized the importance of UiPath's customer success function and stated that the Company had made, and would continue to make, investments in its broader sales team. *Id.* ¶¶ 108-111. If those investments were in fact made—as Dines's statement confirms—then there was nothing inaccurate in Enslin's and Gupta's statements to correct. That those investments later "f[ell] short of [UiPath's] expectations," *id.* ¶ 145, does not retroactively render the original statements false or misleading. Under Plaintiffs' own interpretation, then, their grievance is not that UiPath lied about investing in its sales and customer success teams, but that those investments failed to yield favorable outcomes. That is a business risk—not securities fraud. Dines's statement reflects

41

disappointment in the results of a course of action, not revelation of a prior misstatement or omission, and cannot plausibly serve as a corrective disclosure and establish loss causation.

Plaintiffs nonetheless argue that Dines's statement is causally connected to the loss because the Amended Complaint alleges that "UiPath's investments had 'fallen short' and UiPath was less agile in part because [it was] not making the investments that investors were assured had been made." Opposition at 28 (emphasis omitted) (citing Am. Compl. ¶ 112); *see also* Am. Compl. ¶ 112 (alleging that the Investment Statements were false or misleading because, contrary to those statements, "the Company was in fact cutting sales and customer success personnel, which in turn led to customers leaving UiPath or reducing the size of their contracts and made it more difficult for UiPath to acquire and retain customers"). That allegation may suffice to plead foreseeability—namely, that a failure to invest in the sales team and customer success personnel could reasonably lead to poor business performance. *See Lentell*, 396 F.3d at 173 (explaining that "the risk that caused the loss [must be] within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor"). That alone, however, is not enough. The market cannot react to what it never learns, and without such a reaction, Plaintiffs' loss cannot be causally connected to the alleged fraud. Plaintiffs therefore must also allege that "the loss [was] caused by the materialization of the concealed risk," *id.*—namely, that the truth about UiPath's failure to invest was somehow revealed to the market and that such revelation caused the drop in the Company's stock price. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.").

In other words, Plaintiffs cannot sufficiently allege loss causation without allegations that the loss was caused by the market learning about, and reacting negatively to, the falsity of UiPath's

prior statements. UiPath's disclosure of disappointing financial results and downward revision of its full-year revenue guidance, even paired with Dines's statement, did not expose the falsity of UiPath's prior Investment Statements. A comparison to the Second Circuit's opinions in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) and *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016) is instructive. In *Lentell*, investors sued Merrill Lynch for falsely inflating the research and investment recommendations concerning certain public companies, in an effort to fraudulently increase the market price of the securities and maintain investment banking business with those companies. 396 F.3d at 165. For two such companies, Merrill Lynch rated the stocks highly from 1999 to late 2000 or early 2001, during which period the companies' stock prices remained high. *Id.* at 165-67. The stock price for each company plummeted after Merrill Lynch's downgrading of the investment recommendations in late 2000 to early 2001. *Id.* The plaintiffs argued that they had pleaded loss causation by way of corrective disclosure because "Merrill's eventual downgrades of [the companies'] stock . . . negatively impacted the price of those securities," which caused the plaintiffs' loss. *Id.* at 175 n.4. The Second Circuit disagreed, however, explaining that this was not enough to plead loss causation because the corrected ratings did "not reveal to the market the falsity of the prior recommendations," and the plaintiffs did not otherwise plead "that the subject of those false recommendations" was "the cause of the *decline* in stock value." *Id.* at 175 & n.4 (internal quotation marks omitted). Rather, the market learned of the alleged fraud "no earlier than April 2002," when the New York Attorney General's Office submitted an affidavit in state court in connection with its investigation into Merrill Lynch. *Id.* at 164, 175 n.4. "Merrill's concealed opinions regarding the [companies'] stock could not have caused a decrease in the value of those companies before the concealment was made public." *Id.* at 175 n.4.

In *Vivendi*, by contrast, the plaintiffs sufficiently pleaded loss causation because they connected the subject of the alleged misstatements to the loss. 838 F.3d at 260-63. In that case, the utilities company Vivendi made repeated statements concerning its financial soundness and strong cash flow. *Id.* at 234-35. Soon after, however, Vivendi took actions that "indicated to the market that Vivendi needed cash badly"—for example, it sold fifty-five million of its treasury shares and its stake in a subsidiary. *Id.* at 262-63. "[A]lthough no specific corrective disclosure ever exposed the precise extent of Vivendi's alleged fraud," the company's actions nonetheless "revealed the truth about Vivendi's liquidity risk." *Id.* And after news of each such action hit the market, Vivendi's stock dropped precipitously. *Id.* at 236-37. The "concealment of 'the *subject*' of Vivendi's alleged misstatements—its liquidity risk—was therefore 'the cause of the actual loss suffered'" by the plaintiffs. *Id.* at 263 (quoting *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

Here, Plaintiffs cannot adequately plead loss causation by merely alleging that UiPath's stock price remained high when the Investment Statements were made and fell following the Company's disclosure of a disappointing quarterly performance and downward adjustment of its revenue guidance.[8] Just as in *Lentell*, where the stock drop followed Merrill Lynch's downgrades but not any revelation that its earlier recommendations were fraudulent, the alleged loss here followed a disclosure of business underperformance, not any revelation that Defendants' Investment Statements were false or misleading. And unlike *Vivendi*, where a series of events constructively "revealed the truth" about Vivendi's liquidity problem, UiPath's disclosure and

---

[8] Under Plaintiffs' theory, loss causation for a prior misstatement could be established whenever a company reports poor financial results, so long as the subject of that earlier misstatement can be linked, however loosely, to the company's bottom line. Such an approach would vastly expand the well-settled limits for liability under Rule 10b-5.

downward adjustment did not expose any falsity regarding the Investment Statements. *In re Vivendi, S.A.*, 838 F.3d at 262. So here, as in *Lentell* and in contrast to *Vivendi*, no loss-inducing event revealed an alleged misrepresentation to the market, leaving the causal link between the alleged fraud and the loss unpleaded.

In sum, Plaintiffs do not allege that "the truth [came] out" about the lack of investment, either "by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud." *In re Vivendi, S.A.*, 838 F.3d at 262. Absent such allegations, the "concealment of 'the *subject*' of [Defendants'] alleged misstatements"—its sales team and customer success investments—cannot be "'the cause of the actual loss suffered' by Plaintiffs." *Id.* at 263 (quoting *Suez Equity Invs.*, 250 F.3d at 95). As explained above, Dines's statement in no way communicated to investors—either explicitly or implicitly, and either considered alone or in conjunction with the financial disclosure and downward adjustment—that UiPath had failed to invest in its sales team or customer success function. Because Defendants' alleged corrective disclosure through Dines's May 29, 2024, comment "does not reveal the falsity of Defendants' challenged public statements," it "cannot establish loss causation, a pleading failure that 'is fatal under Second Circuit precedent.'" *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *14 (S.D.N.Y. Mar. 30, 2012) (quoting *Lentell,* 396 F.3d at 175); *see also In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 679 (S.D.N.Y. 2007) ("Without providing a nexus between the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation with respect to the [challenged statement].").  The Court therefore grants Defendants' motion to dismiss to the extent that the Amended Complaint's theory of liability on Count I is based on the four Investment Statements.

### C.    Section 20(a)

Because the Court has dismissed Plaintiffs' Section 10(b) and Rule 10b-5 claim, the Section 20(a) claim likewise fails for lack of a primary violation.  *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations).  The Court therefore dismisses Count II of the Amended Complaint.

### D.    Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor.  Opposition at 29 ("[T]he Court should deny Defendants' Motion to Dismiss.  Alternatively, Plaintiffs respectfully request leave to amend.").  Because the Amended Complaint is the first complaint following Brunozzi's appointment as Lead Plaintiff, the Court grants leave to amend.  The Court emphasizes that Plaintiffs should only file a second amended complaint if they are able to remedy the pleading deficiencies identified herein.

## IV.  Conclusion

For reasons stated above, Defendants' motion to dismiss the Amended Complaint is granted.  The parties' requests for oral argument, Dkts. 34, 36, are denied as moot.  If Plaintiffs decide to file a second amended complaint, they must file it within fourteen days of the date of this Opinion and Order.  Failure to file a second amended complaint by that deadline, or failure to obtain an extension of time to file a second amended complaint in advance of that deadline, will result in the dismissal of all of Plaintiffs' claims with prejudice, at which point the Court will direct

the Clerk of Court to enter judgment in Defendants' favor and to close the case.  The Clerk of

Court is respectfully directed to terminate the motions pending at Docket Numbers 31 and 34.

      SO ORDERED.

Dated: July 23, 2025                   _____
      New York, New York                JOHN P. CRONAN
                                          United States District Judge