**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE UIPATH SECURITIES LITIGATION | Case No. 1:24-cv-04702 (JPC) (SDA) <br><br> <u>CLASS ACTION</u> <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................... 1

II.     JURISDICTION AND VENUE ............................................................................. 8

III.    PARTIES .............................................................................................................. 9

IV.     SUBSTANTIVE ALLEGATIONS ....................................................................... 10

        A.    UiPath's Business ...................................................................................... 10

        B.    UiPath Goes Public and Immediately Faces Problems................................ 11

        C.    UiPath Tries to Right the Ship .................................................................... 12

        D.    Defendants Tout the Success of their Turnaround Strategy ........................ 16

        E.    UiPath's Strategy Backfires........................................................................ 20

        F.    UiPath Begins to Reveal the Truth .............................................................. 22

V.      FORMER EMPLOYEE ALLEGATIONS ............................................................ 24

        A.    FE-1............................................................................................................ 24

        B.    FE-2............................................................................................................ 29

        C.    FE-3............................................................................................................ 35

        D.    FE-4............................................................................................................ 39

        E.    FE-5............................................................................................................ 44

        F.    FE-6............................................................................................................ 45

        G.    FE-7............................................................................................................ 47

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS............................... 48

        A.    False and Misleading Statements Regarding Execution and Deal Quality........... 48

        B.    Misstatements and Omissions Presenting Risks As Mere Hypothetical
              Possibilities When They Had Already Materialized............................................ 50

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER............................................................ 51

        A.    Enslin and Gupta Knew From Internal Meetings That Shifts Away from
              Ramping Deals and Changes to Sales Compensation Were Undermining
              Multi-Year Deals, Deal Quality, and Execution of UiPath's Transformation...... 51

        B.    Enslin and Gupta Had Continuous Access to Information Showing Their
              Statements Were False.......................................................................................... 54

        C.    The Close Temporal Proximity Between the False and Misleading Statements
              and the Corrective Disclosures Further Supports Scienter .................................. 57

        D.    Enslin's Departure Was Announced at the Same Time as the Corrective
              Disclosures........................................................................................................... 57

E.    Defendants' False and Misleading Statements Concerned Core Operations Central to UiPath's Business ................................................................. 58

F.    Corporate Scienter ..................................................................................... 59

VIII.    LOSS CAUSATION.................................................................................................. 59

IX.    CLASS ACTION ALLEGATIONS ......................................................................... 62

X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................................... 64

XI.    PRESUMPTION OF RELIANCE ............................................................................ 64

XII.    CLAIMS FOR RELIEF ............................................................................................ 65

XIII.    PRAYER FOR RELIEF ........................................................................................... 68

XIV.    JURY DEMAND ...................................................................................................... 68

Court-appointed Lead Plaintiff Simone Brunozzi ("Brunozzi") and Named Plaintiff Scott Cheslowitz ("Cheslowitz" and, together with Brunozzi, "Plaintiffs") allege fraud-based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder for a class period of December 1, 2023 to May 29, 2024, both inclusive (the "Class Period"), against UiPath, Inc. ("UiPath"), Robert Enslin (UiPath's former Chief Executive Officer) ("Enslin"), and Ashim Gupta (UiPath's Chief Financial Officer) ("Gupta").

Plaintiffs, by and through their counsel, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on, among other things, the independent investigation conducted by and through Lead Counsel. This investigation includes, but is not limited to, a review and analysis of public filings by UiPath with the Securities and Exchange Commission ("SEC"); transcripts of UiPath conferences with investors and analysts; press releases, media reports, and other information issued and disseminated by the Company; analyst reports concerning UiPath; other public information and data regarding the Company; and interviews with former UiPath employees.[1]

## I.  SUMMARY OF THE ACTION

1.  This securities class action concerns Defendants' false and misleading statements and omissions regarding the execution of Defendants' acclaimed new "go-to-market" strategy and the status of UiPath's customer retention. In particular, Defendants misled investors into believing that they were successful in executing valuable, multi-year contracts with larger customers, those "with a higher propensity to buy" UiPath's technology. In reality, Defendants knew throughout

---

[1] Emphasis is added and citations are omitted unless otherwise noted.

the Class Period that UiPath's business was in rapid decline, as customers were either not renewing their contracts or materially reducing the value of their contracts.

2.     On May 29, 2024, Defendants were forced to admit that their high-profile turnaround strategy, first announced in 2022, had failed.  This strategy depended on securing and retaining customers "with a higher propensity to buy" large, multi-year deals.  But in May 2024, UiPath was forced to admit that "inconsistent execution," "contract execution challenges on large deals," "certain sales compensation changes," and "a change in customer behavior, particularly with large multiyear deals" had eviscerated UiPath's customer retention.  UiPath also announced the sudden departure of Defendant Enslin as CEO and the reappointment of founder Daniel Dines as CEO ("Dines").  Dines effectively conceded that the turnaround strategy was a failure, proclaiming that UiPath would be "laser focused on enhancing our execution," "driving a deeper and more execution-oriented strategy," and "we plan to go back to our roots, building a truly customer-centric organization."

3.     Unbeknownst to investors, UiPath's execution failures had long been underway, and were documented and well known internally.  Specifically, throughout 2023 and into 2024, it was widely known within the Company that UiPath was experiencing massive customer "churn" – *i.e.*, customers either not renewing contracts or materially reducing the size of their contracts – which directly undermined a core pillar of UiPath's turnaround strategy: generating multi-year deals with the largest customers.

4.     The turnaround strategy began with Defendant Enslin's appointment as CEO in April 2022 and culminated with UiPath's announcement in September 2022 of an overhauled "go-to-market" ("GTM") strategy.  The GTM strategy adopted a new platform sales model that prioritized pitching a large suite of the Company's products, and focused UiPath's sales efforts on

selling high-value, multi-year deals to UiPath's larger customers (*i.e.*, those with a "higher propensity to buy").

5.      Analysts and observers lauded these developments.  In a September 28, 2022, report, BofA Securities called this a "model reset."  Barclays declared that "management did well in detailing its new go-to-market motion," explaining that, "UiPath is looking to better position sales conversations to the c-suite level, from selling to COE's or lines of businesses, and ramping its sales force to sell the platform and business outcomes vs. products in more an a-la-carte fashion."  That same day, BMO described these announcements as representing UiPath's "maturing from an RPA company to an automation company," and noted that "[m]ost of the [Investor Day] analyst event focused on expanding the portfolio and improving the go to market" strategy.

6.      But the strategy secretly backfired.  Shortly after the announcement of the GTM strategy, Defendant Gupta instructed that sales representatives could no longer offer customers so-called "ramped" deal structures.  These structures allowed a customer's contract to grow in value over multiple years—or, "ramp"—such that a contract worth $1 million in the first year would be worth $2 million in year two, and then $3 million in year three.  That same contract might have 1,000 licenses in the first year, 2,000 licenses in the second year, and 3,000 licenses in the third year.  UiPath began offering these types of deals in September 2021, to much analyst fanfare.

7.      But in 2023, shortly after the GTM turnaround strategy was announced, UiPath began to disincentivize these "ramped" deals.  As a result, rather than enter into more costly contracts requiring payment for licenses throughout the deal, as opposed to only paying at the tail-end under the ramped structure, customers refused to renew their contracts altogether or at reduced values.  Once UiPath wound down ramped deals, churn increased almost "immediately," including

among UiPath's "Global 2000" customers with the "highest propensity to buy."  Related changes to UiPath's commercial policy and sales compensation structure, further exacerbated the churn. As a result of these churn events, UiPath's sales figures rapidly declined, it was unable to execute large, multi-year deals with customers, and the sales teams were unable to meet their quotas.

8.    Throughout the Class Period, these customer "churn" issues were widely documented and discussed internally by Defendants Enslin and Gupta.  For example:

a.  FE-4, a former senior director for GTM Strategy and Operations, reports that churn was discussed "all the time" during weekly Americas forecast calls that Defendants Enslin (and occasionally, Gupta) attended.  These meetings were specifically intended for "calling a number up to" the chief revenue officer or chief executive officer "so they could forecast to the Street and the Board."

b.  FE-1, a former account executive, and FE-4 reported that churn was also discussed at "win room" meetings that Enslin and Gupta also attended.

c.  FE-3, a former mid-market global account manager, and FE-6, a former sales leader, likewise reported that Defendant Enslin participated in an October 2023 Quarterly Business Review meeting during which UiPath's alarming churn figures were presented and discussed extensively.

d.  FE-5, a former global account director, recalled that Defendant Gupta "saw reports" from the Clari platform that showed increasing churn prior to his November 2023 statements that began the Class Period, and was regularly on "calls with sales leadership weekly about renewals."

e.  FE-6 and FE-7 reported that Defendants routinely used the Gainsight system which likewise showed information on the "health of the accounts" and specifically that churn was increasing in 2023 and 2024.

9.  Yet, in late 2023, nearly a year after it was announced, investors and analysts eagerly awaited news that the lauded new GTM strategy was a success.  As the Class Period began, on November 30, 2023, instead of revealing that UiPath was experiencing increasing churn, failing to execute on its strategy, and failing to secure lucrative deals, Defendant Gupta boasted that "our strategy is on customers with a higher propensity to buy" and "[w]e feel like *we're executing against that strategy, and we're seeing [] results in the deal quality and the customer quality in the quarter.*"

10.  Although false, this was the news investors had been waiting for.  As D.A. Davidson analyst Gil Luria affirmed the next day, UiPath's "strategic bet, almost a year old, on driving value for big clients with the longest/broadest automation journeys *is paying off*."  Other analysts also relied on Defendants' false assurances, touting the Company's purported execution. For example, in November and December 2023, analysts remarked that UiPath "continues to *execute well* on its revised go-to-market strategy" and noted that UiPath management "spoke positively on its *sales execution* and progress on its [go-to-market] changes."  Several analysts at the time, including Canaccord Genuity, RBC, Barclays, and J.P. Morgan, even raised their price targets for UiPath's stock as a result of Defendants' false statements.

11.  Investors also bought the Defendants' false assurances.  Following Gupta's November 30, 2023, statements, UiPath's stock price increased *nearly 27% in one day*, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023.

12. The materiality of Defendants' false statements is further illustrated by the following Figure 1. As indicated, after UiPath announced the GTM strategy in September 2022, the market effectively held its breath waiting to see how the strategy would fare. Between September 2022 and November 30, 2023, UiPath's stock price remained relatively flat with an average closing price of $15.28. But as soon as Defendants falsely assured investors that the strategy was working on November 30, 2023, the stock price rocketed, as if investors were just waiting to hear that the GTM strategy was a success.



13. Defendants reaffirmed their false narrative on March 13, 2024, as Defendant Enslin assured investors that "[t]here's *no doubt there's better execution*, right?" Again, analysts bought Defendants' story. On March 14, 2024, Barclays published a report lauding UiPath for "improving execution" and "show[ing] *better execution* in a stable but dynamic macro environment." Analysts at William Blair likewise noted "the company's *improving execution*," while Oppenheimer reported, "[m]anagement is *executing well on its large customer growth* and

improving efficiency strategy, and the business is delivering better consistency in the quarterly results."

14.    However, Defendants' fraud was unsustainable and just two months after Gupta's statement, Defendants were forced to admit what they knew all along.  On May 29, 2024, Dines admitted that the Company's failed turnaround strategy, execution challenges, and sales compensation changes contributed to UiPath's disappointing Q1 2025 results and reduced revenue guidance for the year.  According to Dines, "we saw *inconsistent execution, which included contract execution challenges* on large deals and certain sales compensation changes, which we are working to rectify."

15.    Analysts reacted immediately, specifically calling out Defendants' deception regarding the execution of the GTM strategy.  For instance, TD Cowen downgraded UiPath stock, describing a "*sea change in tone & outlook* that materialized versus just 2 months ago with its 4Q24 results" and specifically mentioning UiPath's "*execution issues*."  Macquarie downgraded UiPath stock, and observed, among other things, that, based on the Company's prior statements, "[w]e thought going into FQ1 that UiPath had executed on its turnaround story and stabilized growth." However, Macquarie acknowledged, "we see our prior view was incorrect."  Morgan Stanley lowered its price target from $25 to $15 per share, observing that "prior sales strategy changes over-rotated the company towards more C-suite engagement, while also lowering incentives for multi-year deals, leading to down-sizing and slippage in large deals during the quarter."  TD Cowen, citing Dines, acknowledged that UiPath lost its "fanatical customer centricity" once "larger organization GTM [Go-To-Market] processes" and a "bigger emphasis on selling into the C-suite for larger deals became the strategy."

16.     As the truth emerged, the price of UiPath stock collapsed 34% in a single day, dropping $6.23 per share, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.  As depicted in Figure 1 above, Defendants' fraud alone propped up UiPath's stock price, with an average closing price of $22.50 between the first false statement and Defendants' May 29, 2024 admission.  As soon as the truth was revealed, the bottom fell out, and UiPath's stock has never recovered.  Since the close of the Class Period, UiPath's stock price has lingered at an average close of $12.41 (Green Section of Figure 1).

17.     Lead Plaintiff and the Class now seek recovery of the damages Defendants' fraud caused.

## II.    JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because UiPath's headquarters is located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

22.    Lead Plaintiff Simone Brunozzi purchased and sold UiPath securities during the Class Period, as detailed in the Certification attached hereto as Exhibit A and incorporated herein, and has been damaged thereby.

23.    Named Plaintiff Scott Cheslowitz purchased and sold UiPath securities during the Class Period, as detailed in the Certification attached hereto as Exhibit B and incorporated herein, and has been damaged thereby.

24.    Defendant UiPath is a Delaware corporation with its corporate headquarters and principal place of business in New York, New York.  UiPath stock trades on the NYSE under the ticker symbol "PATH."

25.    Defendant Enslin is UiPath's former CEO.  On April 27, 2022, UiPath appointed Enslin co-CEO alongside Dines, effective May 16, 2022.  From February 1, 2024, until May 31, 2024, Enslin served as sole CEO of UiPath.

26.    Defendant Gupta is, and was at all relevant times, UiPath's CFO.

27.    Defendants Enslin and Gupta are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

28.    The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability, and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew the adverse facts and omissions specified herein had not

been disclosed to, and were being concealed from the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    UiPath's Business

29.    Founded in 2005 by Daniel Dines, UiPath provides business automation software, specifically a set of robotic process automation, or "RPA," and AI capabilities that allow its customers to discover and develop opportunities for automation and automate tasks using a digital workforce that seamlessly collaborates with humans.  UiPath's products let its customers automate a range of tasks traditionally performed by humans such as logging into applications, extracting information from documents, moving folders, filling in forms, reading emails, and updating information fields and databases.  Historically, UiPath focused on providing RPA tools for business automation, but with the recent evolution of AI, the Company has attempted to enhance its business automation offerings with AI-powered tools.

30.     UiPath derives revenue from selling (1) software licenses to use the Company's proprietary software; (2) the right to access certain software products hosted by UiPath; and (3) professional services.

31.    Historically, customers could deploy UiPath's platform on-premises (*i.e.*, in a physical facility or location), in the cloud, or in a hybrid environment.  In Fiscal Year 2023, the Company replaced hybrid offerings with "Flex Offerings," which according to its March 24, 2023, Annual Report, "moved toward unifying [UiPath's] commercial offerings for products with both on-premise and cloud deployment options into a single offering that allows customers the choice of either deployment option throughout the term of the contract."

32.    According to pre-IPO filings with the SEC, UiPath historically engaged in three types of contracts with customers: (1) annual contracts that would expire after one year; (2) multi-

-10-

year contracts where the total contract value is pre-paid up front; and (3) multi-year contracts that were paid annually—*i.e.,* the customer pays a portion of the total contract value at the beginning of each year.

33.    UiPath's key performance metric is annualized renewal run-rate, or "ARR," which reflects the ongoing revenue for a product projected over one year.  UiPath's Form 10-K, issued March 27, 2024, defines annualized renewal run-rate ("ARR") as follows:

> ARR is the key performance metric we use in managing our business because it illustrates our ability to acquire new subscription customers and to maintain and expand our relationships with existing subscription customers. We define ARR as annualized invoiced amounts per solution SKU from subscription licenses and maintenance and support obligations assuming no increases or reductions in customers' subscriptions. ARR does not include the costs we may incur to obtain such subscription licenses or provide such maintenance and support, and does not reflect any actual or anticipated reductions in invoiced value due to contract non-renewals or service cancellations other than for certain reserves, for example those for credit losses or disputed amounts.

34.    Incremental ARR is the term used by UiPath to describe the total year-over-year change in ARR.   ARR factors in both annual and multi-year contracts.

35.    For a multi-year deal, UiPath calculated ARR based on the amount to be invoiced in the final year of the contract without any adjustment for pricing or realization risk.

**B.    UiPath Goes Public and Immediately Faces Problems**

36.    UiPath went public on April 21, 2021, and immediately faced trouble.  In the year following UiPath's IPO, the Company's valuation began to plunge.  Revenue growth slowed, from a growth rate of 65% in the first quarter of FY 2022 (which began on February 1, 2021), to 32% in the first quarter of FY 2023 (which began on February 1, 2022).  Growth rates in the Company's key performance metric, annualized renewal run-rate, or "ARR," similarly slowed from 64% to 50% over the same time period.  Ultimately, the Company's valuation dropped from $35 billion

to under $10 billion, with the stock price falling from $90 per share on May 28, 2021, to an April 25, 2022, low of $17.66 per share.

### C. UiPath Tries to Right the Ship

#### a. UiPath Hires Enslin as CEO

37. Two days after UiPath's share price hit its then-all-time low, on April 27, 2022, UiPath announced the first pillar of its purported turnaround: the appointment of Defendant Enslin as co-CEO. In announcing the hiring, Dines touted Defendant Enslin's experience as President of Google Cloud, and underlined that Defendant Enslin would "focus on scaling our business." Defendant Enslin was brought in to oversee what one industry observer termed UiPath's "existential mission," specifically to "evolve [UiPath] from an RPA tool to [an] enterprise platform." At the time of Defendant Enslin's hiring and in the ensuing months, analysts and observers noted that Defendant Enslin would use his experience at Google Cloud and SAP to help UiPath scale its operations and redefine its market strategy. One industry commentator, the co-CEO of the industry publication *SiliconANGLE*, said Defendant Enslin would provide "adult supervision" at UiPath. Defendant Enslin's background, according to analysts, made him an important part in executing a shift in UiPath's strategy.

38. Faced with stagnating growth and declining demand for its RPA products, Defendant Enslin sought to move UiPath beyond its RPA roots. While UiPath offered some products with an AI-oriented approach, Defendant Enslin sought to expand UiPath's AI offerings. For example, in August 2022, UiPath acquired Re:infer, a London-based startup that provides natural language processing, or "NLP" tools for businesses.

#### b. Enslin Announces New "Go-to-Market" Strategy at Investor Day

39. Under Enslin's leadership, during UiPath's September 27, 2022 Investor Day conference call, the Company announced the primary component of the turnaround strategy: an

-12-

overhauled "go-to-market" strategy, or "GTM" strategy.  The new go-to-market sales strategy included adopting a new platform sales model that prioritized selling a large suite of the Company's products.  Under this new platform sales model, UiPath also announced a major shift in how its products would be offered to customers.  Previously, UiPath sold each of its products separately, in an *à la carte* fashion.  Now, the Company would offer its products as part of a "platform," composed of either a Standard tier or a more robust Enterprise tier.

40.    UiPath's go-to-market overhaul abruptly changed the nature of the contracts UiPath offered clients.  Prior to Enslin's arrival, the Company was offering so-called "ramped" deals to customers.  These were deal structures initially introduced by Defendant Gupta during UiPath's September 7, 2021 Q2 2022 Earnings Call.  Under a "ramped" deal, as Defendant Gupta explained, "***instead of buying simple annual contracts***, what we see a larger demand for is getting ***larger-term commitments from some of our customers***. But the way they look at that is ***instead of buying 10,000 robots today, they may buy 1,000 robots today, 5,000 next year, 10,000 in year 3***. And those -- the license deliveries would happen into those years as we go down."

41.    In essence, ramped deals helped UiPath execute the multi-year deals the Company prized.  Analysts responded favorably to the "annual ramping" concept.  For example, on September 7, 2021, Canaccord Genuity Capital Markets wrote: "Management noted that it sees an opportunity to move customers to deal structures with annual ramping, which will allow it to lower its overall discounts (yielding better margins) and create better ROI for its customers and better long-term engagement opportunities for its partners."  Similarly, on September 8, 2021, JP Morgan observed, "UiPath commented that it sees opportunity to move customers to deal structures with annual ramping. This will lower its overall discounts and should not constrain ARR growth."

-13-

42.    However, shortly after Enslin introduced the GTM strategy at the September 2022 Investor Day, Defendant Gupta secretly instructed that ramped deals could no longer be offered. UiPath began revising its commercial policy—and thus discouraging ramped deals—in 2023 and especially in 2024.  As a result, customers churned almost "immediately." (FE-4.)  (*See infra* Sec. IV.E.).

43.    Enslin's new GTM strategy also abandoned how the Company paired account executives to types of customers.  Previously, UiPath's sales model grouped customers into two categories: "Enterprise," representing the largest customers, and "Corporate/Mid-Market and Small and Medium Businesses," which represented all non-Enterprise customers.  Under this model, UiPath's customer coverage ratios included one account executive for every 50 accounts in the Enterprise category, and one account executive for every 150 accounts for all other customers.  With its go-to-market overhaul, UiPath went from two to three customer segments: Enterprise, Corporate/Mid-Market, and Small and Medium Businesses.  During the September 27, 2022, Investor Day, Defendant Enslin announced, "We're repositioning our go-to-market engine to better understand our customer base, *identify customers with a propensity to invest* and align our coverage model[.]"  Defendant Enslin elaborated, "The team we are assembling *has executed before*.  This is a standard enterprise playbook we have run.  And we know from experience, it works."

44.    UiPath's Chief Business Officer Chris Weber echoed Defendant Enslin, and said the new sales strategy would rely on "the go-to-market organization to accelerate growth," by "focus[ing] a higher density of resources" on Enterprise customers "who represent the highest propensity" to drive sales growth, including by focusing sales efforts on companies' C-suites.

Weber further explained the role of the "go-to-market organization," noting, "It's focus on the right segmentation and customers. It's focus on the right go-to-market motions."

45.    Defendant Gupta, referencing "the repositioning that Chris [Weber] and the team are doing from a segmentation standpoint," added, "The opportunity is there in our longer-term model, which we feel we can execute to."

46.    Thus, UiPath revised its sales coverage ratios, placing one account executive on every 10 accounts in the Enterprise category and one account executive on every 70 accounts in the Corporate/Mid-Market category.

47.    In touting its turnaround strategy, Defendants included a presentation by Takeda Pharmaceuticals, which claimed to be using "roughly 760 live bots doing a myriad of tasks," saving "roughly 1 million hours" and "on track to reach over 2 million hours in savings."

48.    Analysts and observers viewed these announcements as a pivotal moment for UiPath.  In a September 28, 2022, report, BofA Securities called it a "model reset."  That same day, BMO issued a report that described these announcements as representing UiPath's "maturing from an RPA company to an automation company," and noted that "[m]ost of the analyst event focused on expanding the portfolio and improving the go to market." BMO focused on "Significant GTM Changes," assessing that the "number of changes in the go-to-market strategy" will "add growth potential longer term," even if they "take some time to implement and ramp."  BMO added that, "Given that enterprise accounts with large numbers of employees tend to be the ones with the greatest propensity to spend, we think this focus can improve growth by increasing upsell."

49.    Other analysts likewise highlighted the significance of UiPath's new strategy.  On September 28, 2022, Barclays declared that "management did well in detailing its new go-to-market motion," explaining that, "UiPath is looking to better position sales conversations to the c-

suite level, from selling to COE's or lines of businesses, and ramping its sales force to sell the platform and business outcomes vs. products in more an a-la-carte fashion." Analysts at SMBC underscored Weber's comments, including that UiPath "needs to (1) focus on the right segments, customers (i.e. with propensity to spend), and go-to-market motions[.]"

50. On September 29, 2022, the industry publication *SiliconANGLE*, quoting an industry analyst, reported that UiPath was on an "existential mission" to "[e]volve from [an] RPA tool to [an] enterprise platform." That report quoted one industry analyst as saying, to get to the next level, UiPath must focus on "platform, platform, platform."

51. On July 10, 2023, UiPath announced that, effective January 31, 2024, Dines would resign as co-CEO, leaving Enslin as the sole CEO while Dines assumed a newly-created role as Chief Innovation Officer ("CIO"). Dines would continue to serve as Executive Chairman of UiPath's Board of Directors.

### D. Defendants Tout the Success of their Turnaround Strategy

52. Investors patiently awaited news that the acclaimed new go-to-market strategy was working. Between the announcement of the GTM strategy and November 30, 2023, UiPath's share price traded in a narrow band averaging $15.28 (Figure 1). After the market closed, on November 30, 2023 (the day before the start of the Class Period), UiPath issued a press release announcing strong financial results for the third quarter of FY 2024 (the period ending October 31, 2023), including revenue of $326 million, a 24% year-over-year increase, which the Company attributed to the successful execution of its turnaround strategy. In the press release, Defendant Enslin touted "***the team's execution and the transformational results we deliver***":

> I am pleased with our strong third quarter results with ARR growing 24 percent year-over-year to $1.378 billion, driven by the team's execution and the transformational results we deliver.

53.     In the same press release, Defendant Gupta stated that "[g]iven the strength of our business model we expect to balance growth and profitability, while investing in the business to position UiPath for long-term success."

54.     The press release also quoted Dines as stating, "[o]ur unwavering commitment to understanding the needs of our customers is key to our success.  In our most recent platform release, 2023.10, we delivered scores of new capabilities that seamlessly translate the potential of AI into tangible action, accelerate productivity, spark innovation, and drive business outcomes for our customers."

55.     Also on November 30, 2023, after the close of trading, UiPath held its Earnings Call to discuss its third quarter of FY 2024 financial results.  On that call, Defendant Enslin further touted the success of the turnaround strategy, and emphasized the new GTM strategy's success, stating:

> Our third quarter results underscore the compelling value our end-to-end automation platform delivers for our customers and the strength of our business model . . . As many of you know, at the beginning of this fiscal year, we pivoted our **go-to-market resources towards organizations that have a meaningful runway to invest in enterprise automation over the long term**.  This investment has significantly increased our presence in the C-suite and helped raise our profile with partners of all sizes.

56.     Defendant Gupta elaborated that "our strategy is on customers with a higher propensity to buy" and "[w]e feel like we're executing against that strategy, and **we're seeing that [sic] results in the deal quality and the customer quality in the quarter**."

57.     Defendant Gupta also tied the Company's purported success to its investments in its sales team.  On the November 30, 2023, Earnings Call, Defendant Gupta told investors that UiPath's investments in its turnaround strategy, particularly in its "sales team" and "sales

capacity," were delivering the "right returns" and that the Company was closely tracking those investments:

> And so *we have been investing, whether that is within our product team as well as our sales team*. I mentioned earlier, *we're investing in our frontline sales team and our sales capacity*, and we'll continue to invest in areas where *we see the right returns and the right investments*. And Rob [Enslin] and the team looks at that on an ongoing basis and we do as a leadership team.

58.    UiPath's perceived execution of its new strategy was important to investors. Analysts repeatedly seized on Defendants' claims of a successfully executed strategy and Defendant Enslin's role in that strategy.  For example, on November 30, 2023, analysts at JP Morgan stated that the upward shift in its price target for UiPath's stock reflected, in part, "continued *execution by UiPath*."  That same day, analysts at Truist supported a "Buy" rating on UiPath stock by citing the "GTM [go-to-market] transformation work being driven by co-CEO Rob Enslin."  TD Cowen's analyst emphasized, "PATH *continues to execute well* on its revised go-to-market strategy…and it cites a more strategic conversation with the C suite in existing & prospective clients."  D.A. Davidson's analyst zeroed in on the perception that, "*Execution is strong* across all parts of the business, driving GTM progress."  RBC reported, "We like that the changes over the last year around a reworked GTM" and "focus on customers with the largest potential to buy."

59.    Analysts were also impressed by UiPath's 3Q FY 2024 results, which they attributed to UiPath's perceived success in executing contracts.  For example, Macquarie analyst Frederick Havemeyer titled his December 1, 2023, report, "FQ3/24: When a turnaround turns out well," while D.A. Davidson analyst Gil Luria titled his December 1, 2023 report, "Enterprise Alignment Bearing Fruit," writing UiPath's "strategic bet, almost a year old, on driving value for

big clients with the longest/broadest automation journeys is paying off." Several analysts, including Canaccord Genuity, RBC, Barclays, and J.P. Morgan, raised their price targets.

60. In response to the Company's positive representations and analyst reactions, UiPath's stock price jumped nearly 27% in one day, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023. *See* Figure 1.

61. On January 10, 2024, UiPath announced that Defendant Enslin would join the Company's Board of Directors and become sole CEO of UiPath effective February 1, 2024. Dines, meanwhile, shifted to the newly-created role of Chief Innovation Officer and served as UiPath's Executive Chairman of the Board. This announcement confirmed the Company's previous announcement seven months earlier, on July 10, 2023, that Dines would resign as co-CEO, leaving Enslin as the sole CEO while Dines assumed the CIO role.

62. Defendants continued to tout the Company's purported success, and the claim that UiPath was executing its new strategy successfully, in the next fiscal quarter. On March 13, 2024, UiPath issued a press release announcing its fourth quarter and FY 2024 financial results, for the three-month period ending January 31, 2024. In the press release, the Company reported "Record quarterly revenue of $405 million," an increase of 31% year-over-year, and that it achieved its "first quarter of GAAP profitability as a public company." On the Earnings Call held that day, Defendant Enslin represented that UiPath's successful turnaround strategy had experienced "continued momentum" and laid the foundation for future growth:

> [W]e delivered a strong close to the year, demonstrating the continued momentum of our AI-powered business automation platform. We're transforming industries and revolutionizing the way businesses operate. And as we look to 2025, I believe ***our strategic investments in innovations and our go-to-market ecosystem position us well for continued momentum***.

63. Defendant Gupta likewise touted UiPath's execution:

"***The team executed well in the fourth quarter*** and I am particularly pleased with our significant year-over-year increase in operating margins, including our first quarter of GAAP profitability as a public company, and record cash flow."

64. Finally, Defendant Enslin unequivocally declared the turnaround strategy a success:

"***[T]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution***. And we also wanted to make certain that the platform was relevant for C-level executives. And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way."

65. Once again, analysts were impressed by UiPath's results and seized on Defendants' statements in issuing their positive reports. For example, Barclays analyst Raimo Lenschow favorably cited "***improving execution***," writing in a March 14, 2024, report, "UiPath continues to show ***better execution*** in a stable but dynamic macro environment." Oppenheimer analyst Brian Schwartz similarly wrote in a March 14, 2024, report, "***Management is executing well*** on its large customer growth and improving efficiency strategy, and the business is delivering better consistency in the quarterly results."

66. Meanwhile, analysts at William Blair cheered, "UiPath continues to execute well as the combination of AI and automation is resonating with customers and is helping elevate UiPath's platform conversation into the C-suite." Barclays applauded the results, reasoning that falling "customer add[itions]…should not persist going forward" because of the Company's "strategy of targeting larger customers with a higher propensity to invest." Likewise, BMO raved that UiPath "continues to execute deals with large customers."

E. **UiPath's Strategy Backfires**

67. A core component of UiPath's turnaround strategy—striking multi-year deals with larger customers—began to unravel even before the Class Period. Throughout 2023 and into 2024,

as reported by several former employees, UiPath suffered significant customer churn, as customers either reduced the size of their contracts, both as to dollar value and duration, or declined to renew their contracts altogether.

68.    For example, one former employee confirmed that UiPath experienced a "churn headwind" beginning in 2023. (FE-4.) UiPath's large enterprise customers, which had been the focus of Defendants' turnaround strategy, were "significantly decreasing contract size" upon renewal. (FE-4.) UiPath executives "absolutely knew" this was happening; according to this former employee, Defendants Enslin and Gupta saw "the writing was on the wall. They saw the contracts. They saw the deal structures. They saw the amount of churn." (FE-4.) Churn was also discussed "all the time," including during weekly Americas forecast calls attended by Defendant Enslin and, at times, by Defendant Gupta. (FE-4.)

69.    This increased churn had several causes. First, multiple former employees reported that churn increased after UiPath began to disincentivize ramped deals, starting in 2023. In 2023, when UiPath first changed its policies to prohibit ramped contracts, customers refused to renew their contracts at previous values. Thus, according to one former employee, the seeming success that UiPath had portrayed began to unravel with massive churn events in 2023 and 2024. (FE-4.)

70.    UiPath also changed its commercial policy and sales compensation structure, resulting in fewer multi-year deals. Specifically, in 2023, UiPath began structuring incentive compensation around "paid annual" deals, instead of multi-year deals. (FE-1.) This directive from Defendant Gupta had the effect of further disincentivizing salespeople from pursuing multi-year deals. In fact, one former employee explained that, in mid-2023, Defendant Gupta killed a proposed ramped deal, and as a result the customer wound up with a 12-month deal instead. (FE-1.)

71.    Another former employee conducted an Excel analysis of the new commercial policy's impacts on UiPath's sales. (FE-4.) According to this former employee, the analysis showed that if the Americas business was going to close $100 million in ARR based on the prior policy, it would only close $70 million once the new policy was applied. (FE-4.) This former employee indicated that this analysis was shown to Defendants Enslin and Gupta no later than February 2024. (FE-4.) Multiple former employees reported that the impacts of the commercial policy and compensation changes were evident in both "Win Room" meetings and in the databases regularly available to Defendants in Salesforce and Clari. (FE-1; FE-2; FE-4; FE-5; FE-6.)

72.    UiPath's new commercial policy, according to one former employee, made multi-year deals harder to execute and negatively impacted incremental revenue. (FE-4.) It got "progressively more difficult" to execute multi-year transactions because of "more stringent commercial policy guidelines that were put in place." (FE-4.)

73.    At the same time, beginning in 2023, many customers who were forced on to the "Flex Offerings" platform opted to only agree to 12-month deals rather than multi-year deals, and during those 12 months contemplated how to move away from UiPath entirely. (FE-1.) One former employee reported "a lot of contentious conversations" with customers who "got pissed" and said, "If you are going to do this, I am going to do a short-term, 12-month deal and look for alternatives." (FE-1.)

**F.    UiPath Begins to Reveal the Truth**

74.    On May 29, 2024, UiPath finally was forced to reveal the truth: that it was in fact failing to execute contracts, particularly on the large deals with high-propensity spenders that had been the prized focus of its new strategy. These deals were multi-year in nature, precisely the kind that "ramping" had facilitated. And one admitted cause was the change to sales compensation—

which, according to multiple former employees, was due to changes in UiPath's commercial policy.  (FE-1; FE-4.)

75.     Specifically, UiPath founder Dines lamented "*inconsistent execution*, which included *contract execution challenges on large deals* and *certain sales compensation changes*, which we are working to rectify."  Dines added that "execution is something we can control" and "we recognize that we need to improve predictability on *large multiyear deals*."

76.     Defendant Gupta, asked about UiPath's troubles closing deals, explained that it was "broad-based" from "a *multiyear deal* perspective."

77.     Analysts were stunned by UiPath's revelations.  TD Cowen downgraded UiPath stock, describing a "*sea change in tone & outlook* that materialized versus just 2 months ago with its 4Q24 results," and specifically attributed the collapse to "*execution issues*."  Macquarie also downgraded UiPath stock, observing that, based on the Company's prior statements, "[w]e *thought going into FQ1 that UiPath had executed on its turnaround* story and stabilized growth. With the sudden departure of CEO Rob Enslin, a guidance cut, and management acknowledging that the company's go-to-market strategy has underperformed its expectations, *we see our prior view was incorrect*."  Similarly, Morgan Stanley lowered its price target from $25 to $15 per share, and zeroed in on how "prior sales strategy changes over-rotated the company towards more C-suite engagement, while also lowering incentives for multi-year deals, leading to down-sizing and slippage in large deals during the quarter."

78.     In response, UiPath stock declined $6.23 per share, or over 34%, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.

## V.    FORMER EMPLOYEE ALLEGATIONS

79.    Together with the allegations attributed to the former employees ("FEs") of UiPath herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.[2]

80.    The information in this section was obtained during Lead Plaintiff's investigation. During the course of that investigation, Lead Plaintiff's counsel received indications from at least one former employee that persons affiliated with UiPath had contacted former employees and discouraged them from speaking about their time at the Company.

### A.    FE-1

81.    FE-1 worked at UiPath as an Enterprise account executive from February 2022 to October 2024. FE-1 was assigned to the "strategic portfolio" Enterprise group.  The strategic portfolio Enterprise customers typically included high-tech, airline, communication, media, and "telco" companies.

82.    <u>UiPath Engaged in "Ramped" Deals</u>.  Leading up to FY 2024 (which began on February 1, 2023), UiPath had been engaged in so-called "ramped" deals with customers. According to FE-1, account executives put bundles of licenses in the last quarter of the last year of a contract, typically the third year of a contract.  When customers questioned why they needed the additional licenses, account executives responded that this was "how we can get you the best discount, if we add these licenses to the last quarter of the last year of the agreement."

a.    FE-1 provided an example of a three-year, ramped deal.  Such a deal, hypothetically, had 1,000 licenses in the first year, 2,000 licenses in the second

---

[2] Former UiPath employees are referred to herein as "FEs."

year, and 5,000 licenses in the third year, with "a bunch of licenses in the last quarter in the last year."

b.  According to FE-1, these ramped deals were permitted by executives before 2023, allowing sales representatives to "put licenses in the last quarter of the last year of a commercial agreement."   FE-1 explained that this had the effect of "hockey sticking the exit value of the contract, which made the deal look bigger."

83.   UiPath Begins to Change its Policy, Disincentivizing Ramped Deals.  Fiscal Year 2024—*i.e.*, calendar year 2023—marked a shift in how UiPath permitted ramped deals.  According to FE-1, in early to mid-2023, FE-1 had a deal with a potential customer, which FE-1 was trying to structure as a ramped deal.  Defendant Gupta told FE-1 that he did not want to do the deal because he did not want to pay FE-1 commission on the deal and because the proposed deal was structured as a ramped transaction that "we do not want to do."  As a result, the would-be customer got upset and did a 12-month deal instead, according to FE-1.

84.   In 2024, Additional Changes to Sales Incentives and UiPath's Commercial Policy Result In Fewer Multi-Year Deals.  According to FE-1, UiPath also changed the commercial policy and accompanying compensation plan again at the beginning of fiscal year 2025 (in early calendar 2024).  FE-1 described that UiPath "tightened the screws" on the changes made the year prior.

a.  According to FE-1, UiPath executives decided to tighten the screws on, and further remove incentives for, paid-up-front deals in 2024 beginning no later than February 2024, building on changes in 2023.   Instead, UiPath structured the incentive compensation around "paid annual" deals.  Following internal calls in which the new compensation structure for fiscal year 2025 was revealed and discussed, the account executives left those calls saying they were just going to do 12-month deals

because the compensation is the same or more than if they did three-year deals paid annually.

b. FE-1 pointed out that Defendant Gupta had changed the commission policy and plan which angered account executives and disincentivized them from seeking multi-year deals.

85.    <u>UiPath Forced Customers on to its Flex Platform, Further Disincentivizing Multi-Year Deals</u>.  According to FE-1, UiPath began forcing customers on to its Flex platform in 2023. This happened when a contract came up for renewal, and UiPath forced customers to adopt the Flex platform and charged them a 30 percent increase, despite most customers saying they did not want the new Flex option and were happy staying with the on-premises option.

a. As a result, FE-1 reported, many customers who were forced on to the Flex platform opted to only agree to 12-month deals rather than multi-year deals.  Moreover, customers used those 12 months to contemplate how to move away from UiPath entirely.

b. FE-1 reported "a lot of contentious conversations" with customers who "got pissed" and said, "If you are going to do this, I am going to do a short-term, 12-month deal and look for alternatives."

c. FE-1 further reported that, had account executives been able to do more ramped deals, they likely could have been "more creative on contractual terms" to make the move to the Flex platform more attractive to customers.

86.    <u>Defendants Enslin and Gupta Were Active in "Win Room" Meetings</u>.    FE-1 reported that Defendants Enslin and Gupta were active in "Win Room" meetings.  These were

meetings where Company executives met with sales personnel to discuss the details of proposed deals and decisions were made about whether to pursue deals and how to structure them.

a.  For example, FE-1 participated in a January 2023 "Win Room" meeting, which was also attended by Defendant Gupta. Defendant Gupta was "very active" in the January 2023 meeting, FE-1 recalled. During this meeting, Defendant Gupta rejected a potential deal because it was ramped.

b.  FE-1 reported that Gupta was the "ultimate decision maker on whether they were going to approve or deny the deal, deal structure, and details of it."

c.  According to FE-1, Defendant Enslin participated in these meetings as well.

d.  Executives provided feedback on how they wanted to structure deals and ultimately approved or denied deals during meetings.

e.  FE-1 reported that the impacts of changes in the commercial policy and compensation changes were evident in both "Win Room" meetings as well as in Salesforce and Clari forecasts.

f.  FE-1 also reported that Win Room meetings were scheduled and documented with an Outlook calendar notice and/or invite. The events were named "Win Room meeting," which was a "big deal review," FE-1 confirmed.

g.  These "Win Room" meetings included an accompanying Word document that was two pages in length, which was completed by the sales representative ahead of the meeting. The information included in the Word document was: 1) name of the customer; 2) current footprint of the account; 3) what the customer currently spends; 4) who the executives are; 5) who the account executive is talking to at the customer; 6) what is the opportunity; 7) what is the deal structure; 8) how big is the

deal; 9) next steps; 10) what the account executive needs internally or externally; and, 11) what is the plan to close the deal.

h.   On the topic of what was needed to close the deal, the account executives provided information about discounts, as well as the structure and ramping the deal.

i.   The Word documents were shared to and stored in a SharePoint file.  FE-1 said there was a Win Room SharePoint link, with Win Room meeting attendees directed to put their relevant documents in a specific SharePoint file because "this is where we are going to run the meeting from."  Gupta was on the emails and had access to the SharePoint link, as did Enslin.

87.   Defendant Enslin Lamented Execution Failures on Internal Calls.  According to FE-1, Defendant Enslin chided attendees on quarterly "all-hands" calls that "We need to do better on execution."  According to FE-1, everyone knew that this meant UiPath "was not executing, was not closing big, strategic deals."  FE-1 reported that Enslin made these statements about needing to execute better in October 2023.

88.   Executives Knew About Declining Deal Quality.  According to FE-1, UiPath executives Enslin, Dines, and Gupta were looking at the deal numbers in the pipeline through the Clari platform.  FE-1's manager informed him in a one-on-one call that Defendant Gupta was looking at the pipeline and making layoff decisions about "who has things to work on and who does not."

a.   According to FE-1, the Clari system, among other things, tracked emails and activities with customers, and customer opportunities.  The Clari system had functionality that "confirmed or denied" what the account executive was saying was his or her forecast for the upcoming period. In other words, if for example a

sales representative said he or she was going to bring in $500,000 in the upcoming quarter, Clari had built-in processes to check whether the recent activity of the account executive was sufficient to support that projection.

b.  FE-1 confirmed that account executives were required to update their Clari forecast weekly, and thus FE-1 and other account executives had weekly calendar reminders to update their forecasts.  FE-1 reported that these regular, frequent updates to the Clari forecasts afforded the executives insight into whether the account executives were "on top of these deals and opportunities," and "if not, what do we need to do to fix it."

89.  Enslin's Desperation.  According to FE-1, Defendant Enslin became desperate in the summer of 2023 to execute contracts—six to nine months prior to his departure from UiPath. This included Enslin making "unprofessional" comments during all-hands calls that FE-1 attended. FE-1 was also on calls where Enslin berated sales personnel, "got aggressive," cursed, and "hit his desk with his fist."  According to FE-1, "You could tell he [Enslin] was frustrated" due to UiPath's inability to execute deals.

**B.    FE-2**

90.  FE-2 worked at UiPath from February 2021 to early December 2023. FE-2 joined the Company through the Cloud Elements acquisition. FE-2 initially worked for UiPath as a commercial account manager from February to November 2021. In this capacity, FE-2 supported legacy Cloud Element clients. In November 2021, FE-2 was promoted to the role of emerging account executive.

91.  UiPath Engaged in "Ramped" Deals.  When FE-2 joined the Emerging Enterprise sales group in November 2021 and throughout 2022, UiPath was encouraging FE-2 and FE-2's colleagues to sell larger deals in a ramp structure.  FE-2 defined a contract that had a ramp structure

as one that had built-in growth in the last years of the agreement term. For instance, a ramp-structured deal might have had a three-year term, and had 25 percent growth built into the second year and again in the third year.

a. In addition to being ramped, these deals were also prorated. According to FE-2, a ramp-structured, prorated deal was arranged in the following manner: an account executive sold a three-year contract with a ramp structure, and put a certain dollars' worth of licenses in the last month of the contract, typically by tacking-on product bundles in the last months of a contract. The customer only paid for the use of those licenses during the months they were tacked on, meaning the licenses did not show up as a huge expense to the customer.

b. However, according to FE-2, when a three-year deal renewed, the tacked-on licenses that had been prorated were not prorated anymore. As a result, the previous agreement was less expensive for the customer in comparison: whereas in the renewed agreement the customer had to pay for the units throughout the contract, in the previous ramp-structured, prorated deal, the licenses kicked in and related costs were incurred in the latter years of the deal.

c. FE-2 also reported that, during this time, account executives were paid a commission based on the value of the last year of the contract (called the "out-year"). According to FE-2, this incentivized account executives to seek multi-year deals with bundles tacked on to the out-years—*i.e.*, the end of contracts.

92.    <u>UiPath Begins Changing the Ramped Deal Practice</u>. According to FE-2, at some point before early 2023, the Company realized that account executives were structuring the deals with bundles tacked on in the last months of contracts. By the early 2023 timeframe, FE-2 recalled

that sales personnel were told that they could no longer prorate licenses within the last six months of a contract.

    a.  FE-2 recalled an all-hands Emerging Enterprise group call in early calendar 2023, during which FE-2 and others were informed that the way that the Company had prorated deals was now considered bad practice with the ramp deals. The account executives were informed that UiPath was changing the way contracts were structured, and that account executives could no longer ramp licenses in the last six months of deal.

    b.  FE-2 said account executives stopped prorating deals after this directive in the beginning of 2023, because such deals would no longer be approved.

93.    <u>Departure from Ramped, Prorated Deals Leads to Fewer Customer Contracts</u>.  FE-2 reported to Regional Vice President Ben Bade, who wanted his team to close larger, multi-year deals because shorter-duration contracts lead to existing customers either not renewing their contracts or reducing the number of products they licensed.  FE-2 said this was referred to as customer "churn."

    a.  The deals UiPath began executing in 2023 could no longer be prorated in the last six months of the contract. These deals were consequentially more expensive for customers.  If a customer had previously signed a ramp-structured, prorated deal prior to 2023, the customer had likely only paid licenses for certain bundled products in the last several months of the contract.  Upon renewal in 2023, that same customer may have been charged for licenses for 11 months or more.  The result was that customers felt like they did not want to add in more products because doing so was more expensive.

b. Furthermore, FE-2 reported, UiPath was no longer permitting account executives to provide the types of significant discounts that helped secure multi-year deals. Without those discounts, customers—who wanted to spend the same amount they previously had—often opted to either leave UiPath or reduce the size of their contracts.

c. In summer 2023, Area Vice President Alexandra Milne called out this issue and told FE-2 and others, that for every deal UiPath brought on, one or two other customers either left UiPath or reduced the size of their contracts.

d. FE-2 understood "deal quality" and "customer quality" to be a matter of retention—*i.e.*, not selling deals that were going to churn.

94.    In Response to the Issues Caused by UiPath's New Ramping Policies, Emerging Enterprise is Restructured.  FE-2 explained that halfway through 2023, the Emerging Enterprise team was restructured in an attempt to reduce the loss of customers or customers reducing the size of their contracts.  FE-2 was told this by Senior Vice President of Global Commercial Sales Sean Kay ("Kay").  However, as of at least December 2023, the Emerging Enterprise group was not meeting its new sales goals and there remained a lot of customers who were either leaving UiPath or reducing the size of their contracts.

95.    Customer Success Issues Contribute to Lost or Reduced Contracts.  Another reason customers left UiPath or reduced the size of their contracts was that the Company's customer success function was markedly deficient.

a. FE-2 said that the customer success team worked with the customers to understand why they purchased UiPath's products and periodically met with the customers to

-32-

ensure that the customer was satisfied with the software and to address any issues that the customers had.

b. FE-2 explained that there was not a strong customer success team to grow and stay with the customers. FE-2 identified one specific customer that left UiPath in or around March 2023 because it had been oversold licenses and no one from UiPath ever followed up with them after they purchased the licenses.

96. <u>Enslin Raised Issues with Emerging Enterprise</u>. FE-2 participated in a call with CEO Robert Enslin on December 5, 2023, just five days after UiPath's November 30, 2023, earnings release. The call lasted approximately 15 minutes and was held via Zoom at 7 a.m. MT. The call was not typical because Enslin did not usually participate in the sales calls. There were roughly 40 attendees, which included the entire Emerging Enterprise team, managers, and directors.

a. Enslin announced that Emerging Enterprise was not doing well, meaning it was not closing deals. As a result of the poor performance, Enslin publicly demoted a Senior Vice President of Global Commercial Sales on the call.

b. FE-2 explained that Enslin had involved himself with the Emerging Enterprise group's deals prior to the December 2023 call because Emerging Enterprise was not doing well.

c. On the call, Enslin also said that Enterprise and Emerging Enterprise were going to operate as one sales team and that Enslin was going to oversee it.

97. <u>Account Executives Used the Clari System to Provide Deal Updates</u>. UiPath account executives used the Salesforce information system as the customer relationship management tool and the Clari system for forecasting the value of deals and when they would be

executed. For instance, they made notes in the Salesforce system about discussions they had with prospects and documented their pipeline in that tool. They used the Clari system to weigh the likelihood that deals in their pipeline would materialize in the near term. Clari also integrated seamlessly into Salesforce, so that one could look at Salesforce to discern what was forecasted.

    a. Every week, each account executive reviewed the deals he or she had in the pipeline and, using Clari, forecasted when they anticipated those contracts to be signed and what the value of the deals was anticipated to be.

    b. Account executives reviewed their assessments with their direct manager.

    c. Anyone, including Defendant Enslin, that wanted to look at these inputs could have access to look at them.

    d. According to FE-2, the majority of Emerging Enterprise sales representatives were not meeting their sales targets.

    e. Prior to Defendant Gupta's November 30, 2023, statements, FE-2 indicated that the Clari system showed a significant gap between the sales teams' targets and their actual results. FE-2 indicated that it was standard that Defendants Gupta and Enslin had access to the data showing those gaps.

    f. FE-2 further reported that sales representatives were expected to put churn events into the Salesforce and Clari systems if they anticipated customers not renewing or renewing below the value of existing contracts, so that the impact of churn was "absolutely" included in data accessible to leadership.

98.     <u>Defendant Enslin's Meetings to Discuss Business Forecasts</u>. FE-2 was aware that Defendant Enslin met with Senior Vice President for Global Commercial Sales Sean Kay to

discuss the forecast for potential customer contracts. Forecasts were rolled up from the account executive level to Enslin in the following manner:

    a. Account executives were directed to update their forecasts in Clari. Those forecasts were collected by an Area Vice President, who met with the Senior Vice President for Global Commercial Sales one on one to discuss what was happening in their respective books of business. FE-2 said the Senior Vice President for Global Commercial Sales then reported to Defendant Enslin and they talked about the forecast, according to FE-2.

    b. FE-2's boss regularly asked FE-2 to update the forecast data in Clari because her boss met with Defendant Enslin to discuss it.

**C.    FE-3**

99.    FE-3 worked at UiPath from November 2021 through January 2024. FE-3 was initially an Emerging Enterprise account executive for State, Local, and Education ("SLED") customers for the Pacific Northwest region until February 2023. FE-3 said that the SLED team was disbanded without explanation in February 2023. Then, from February 2023 until FE-3 left the Company on January 31, 2024, FE-3 was a mid-market global account manager. In this latter role, FE-3 was responsible for managing small to medium-sized customers in Latin America and Canada.

    a. SLED represented the "state, local, and education public sector." As a SLED account executive, FE-3 covered sales to state universities and agencies, and to Native American authorities in the states of Alaska, Washington, Idaho, Montana, Wyoming, and Oregon. FE-3 added that each state was set up differently, but the SLED coverage included state agencies such as Health and Human Services,

SNAP, and DMV in different states. The SLED accounts varied dramatically in size.

b. In FE-3's second role as a global account manager, FE-3 only focused on Latin America. In this role, FE-3 was tasked with managing accounts, including renewals.

100. No Customer Success Support. FE-3 reported that, when FE-3 was mid-market global account manager covering Latin America, there was no customer success support for FE-3's Latin America customers, even though some of those customers spent upwards of $400,000 annually with UiPath. FE-3 also reported that UiPath under-hired customer success support, and added that the lack of adequate customer support was frequently discussed in team meetings. FE-3 added that UiPath lost deals and experienced deal delays because of the failure to provide sufficient or effective customer support.

a. FE-3 added that FE-3 was very vocal with management about customer success and management knew that the customer success function "was trash and everyone complained." FE-3 reported that the customer success situation never improved during FE-3's employment.

101. Cancellations Surged as UiPath Forced Customers on to Flex Platform. FE-3 confirmed that UiPath was forcing customers onto the Flex Platform, which FE-3 said was $8,000 to $10,000 more expensive annually than the previous on-prem platform customers used. Upon contract renewal, customers were told there was no option, but to upgrade to the new, more expensive platform. A good portion of FE-3's job as an account manager for Latin America was handling contract renewals. FE-3 said cancellations were a big issue in the region FE-3 covered, with as many as 30 percent of customers cancelling, in lieu of being forced onto the new Flex

platform. FE-3 reported that UiPath customers began to be forced onto the Flex Platform by April or May 2023.

102.    UiPath Experienced Significant "Churn" in 2023 and 2024.

a.    Throughout 2023, FE-3's division was "not doing well" and seeing many customers declining to renew their contracts. FE-3 reported that this churn was fueled, in part, by UiPath "marking up all renewals by 30" percent prior to December 2023. For example, if a customer's contract was previously $100,000, the value upon renewal would be automatically increased to $130,000. As a result, many of these customers were unhappy and either declined to renew or reduced the value of their renewals.

b.    FE-3 also explained that thousands of customers terminated contracts in January 2024. For example, Ingram Micro was a partner that sold UiPath software to customers in Latin America. In late January 2024, Ingram Micro dropped all of their accounts that represented $25K or less in annual revenue due to customer disdain over the forced move to the Flex Platform. FE-3 said that this translated to thousands of customers with contracts of $25K or less immediately terminating or not renewing their accounts when they came up for renewal.

103.    Enslin Participated in Quarterly Business Reviews, Which Discussed Customer Success and Churn. According to FE-3, Defendant Enslin frequently participated and spoke during Quarterly Business Reviews. FE-3 reported that Defendant Enslin participated in an October 2023 Quarterly Business Review, during which the issues of customer support and churn were addressed. FE-3 said that UiPath's lack of customer support was discussed while Defendant Enslin was present at this October 2023 meeting, which was an hour-long call conducted via Zoom. FE-

3 reported that Kay made a presentation during this meeting, which included a visual that described churn and the region. Churn was discussed and FE-3 recalled Enslin making comments during Kay's presentation. According to FE-3, "there was pressure" as a result of churn.

104. Flex Was Also Discussed During These Quarterly Business Reviews. FE-3 also reported that, during the same October 2023 Quarterly Business Review, attendees discussed the issue of forcing customers onto UiPath's Flex platform. This included a discussion of customers cancelling or not renewing contracts because they were being forced onto the Flex platform. Defendant Enslin was on the call during this discussion, according to FE-3.

105. Enslin Regularly Attended Emerging Enterprise Meetings. FE-3 reported that Defendant Enslin regularly attended meetings of the Emerging Enterprise team. For example, FE-3 attended a December 2023 call—as discussed by FE-2—during which Defendant Enslin said that Emerging Enterprise was not performing well. FE-3 described "a lot of talk about internal changes" during the meeting, and said it was "not a great call." FE-3 confirmed that Kay was publicly demoted during this call.

106. Enslin and Gupta Had Access to Contract Renewal Data, Which Were Tracked in Salesforce and Clari. FE-3 reported that account renewals would be entered into the Salesforce system, and auto-populated into Clari. FE-3 entered contract values, specifying how much the contract would renew for, whether the renewal was at risk, why the account was at risk of renewal, what the next steps were to close the renewal, and whether UiPath was going to "win the renewal." Ahead of forecasting meetings with FE-3's manager, FE-3 entered similar notes into Clari. According to FE-3, Enslin and Gupta had access to this information and was "sure" Enslin brought it up.

**D.    FE-4**

107.    FE-4 worked at UiPath in GTM Strategy and Operations from December 2018 to October 2024.  From December 2018 to March 2020, FE-4 was the manager for GTM Strategy and Operations.  FE-4 was promoted to director for GTM Strategy and Operations in March 2020, and held that position until January 2023, when FE-4 became senior director for GTM Strategy and Operations.

108.    <u>Departure From Ramped Deals Leads to Higher Churn</u>.  FE-4 confirmed that, once UiPath wound down ramped deals, churn increased almost "immediately."  In particular, large enterprise customers were "significantly decreasing contract size."  This churn took place among the "Global 2000" customers at UiPath, which were those with the "higher propensity to buy." FE-4 explained:

    a.    Among those customers that churned in early 2024 were Takeda Pharmaceuticals, the customer that UiPath had featured when it revealed its turnaround strategy to investors in September 2022.

    b.    VMWare also churned around this time, as did New York state and local government entities in 2023 and early 2024.

    c.    UiPath experienced a "churn headwind" beginning in 2023, and confirmed that a "detailed historical pipeline report" in Salesforce would show the amount of churn UiPath was experiencing.

    d.    UiPath's large enterprise customers were "significantly decreasing contract size" upon renewal, citing churn events of $500,000, $1 million, or more with customers such as Takeda Pharmaceuticals and VMWare.

e. UiPath executives "absolutely knew" this was happening, and that shareholders would have wanted to know that there was a "big churn headwind" because of the way UiPath previously structured deals.

f. Enslin and Gupta saw "the writing was on the wall. They saw the contracts. They saw the deal structures. They saw the amount of churn," but rather than informing investors of these problems, Enslin and Gupta attempted to "save face with the Street as much as they could."

109.    <u>FE-4 Attended Weekly Forecasting Calls Led By Enslin and Often Joined By Gupta</u>. FE-4 was involved in weekly, monthly, and quarterly pipeline reviews and forecasting reviews—what FE-4 described as "calling a number up to" the chief revenue officer or chief executive officer "so they could forecast to the Street and the Board." This included weekly forecasting meetings for the Americas region, led by Enslin and which FE-4 attended. Gupta also joined these calls, according to FE-4.

a. FE-4 reported that these weekly forecasting calls were conducted via Zoom, and lasted roughly 30 to 45 minutes. Attendees received Microsoft Outlook calendar invitations, labeled "AMER Forecast Call" or "AMER FC," either from Enslin or Enslin's chief of staff. Other attendees included Vice President for the Americas, Ryan Mac Ban ("Mac Ban"), Rachel Grandovic, and VP for GTM Strategy and Operations, Alberto Benitez.

b. Churn was discussed "all the time" during the weekly Americas forecast calls in 2023 and 2024. This was the GTM team's "biggest focus – how to minimize the leaky bucket." According to FE-4, the "leaky bucket" was a term used during

weekly forecast calls, as well as global all-hands meetings and theater-level all-hands calls to refer to churn.

c.  FE-4 shared that the forecast updates were "primarily driven out of Clari."

d.  FE-4 reported that, during the weekly forecast calls in November 2023 and even several months before November 2023, Gupta regularly instructed Mac Ban to have all one-year deals in the pipeline "switched" to three-year deals "this week." This instruction would repeat, usually at week seven or eight in a given quarter. According to FE-4, Gupta prefaced his directive with, "We really need revenue, so we need higher total contract value deals."  FE-4 noted that repositioning one-year deals as three-year deals was not easy to do, "just because Ashim [Gupta] had a revenue problem," and that it was a frustrating change for the sales team. Ultimately, sales representatives were forced to give extensive discounts of around 15 percent, lowering the contract value, just to secure longer-term deals.

e.  FE-4 recalled that, beginning in 2023, UiPath was not hitting its internal sales goals for the Americas.  FE-4 also recalled reviewing the "roll up" for UiPath's Americas, EMEA, and Asia-Pacific theaters.  These sales figures would prompt FE-4 and Mac Ban to have side conversations about "how real was" the ARR number.  FE-4 observed that discovery into Clari snapshots will show "back in history and what the cadence forecast call was for everyone in a given week," with a "date stamp," and will provide evidence that Enslin and Gupta knew the Company was experiencing increasing churn and that UiPath was failing to hit internal sales goals in 2023 and 2024.

110.    <u>FE-4 Performed Analysis of Commercial Policy's Negative Impacts</u>.  In late 2023, FE-4 performed an analysis in Excel "around the specific impact that changes in the commercial policy would have," and found that it "was in the tens of millions of dollars."  By way of example, if the analysis showed that UiPath's Americas business closed $100 million in ARR in the prior period, the business was only going to close $70 million in ARR once the changes to the commercial policy were applied.  FE-4 further explained:

    a.  FE-4's analysis was also accompanied by PowerPoint slides with "illustrative examples" of the impact of the new commercial policy.  FE-4 recalled evaluating 20 or 25 transactions as part of the analysis, including identifying deals that "would have triggered a violation" of the new commercial policy.

    b.  FE-4 recalled that, during a closed-door session of UiPath's Sales Kickoff event in January or February 2024, at the Wynn Hotel in Las Vegas, Mac Ban brought out the analysis on the new commercial policy, and a contentious discussion among Enslin, Gupta, Mac Ban, and other theater-level leaders ensued.

111.    <u>UiPath's New Commercial Policy Made Multi-Year Deals Harder to Execute and Negatively Impacted Incremental Revenue</u>.  According to FE-4, it got "progressively more difficult" to execute multi-year transactions because of "more stringent commercial policy guidelines that were put in place."

112.    <u>Executives Had Insights Into Declining Deal Quality</u>.  FE-4 confirmed that deal pipeline data were readily available at Enslin and Gupta's fingertips.  FE-4 explained that Clari was set up with different tabs for different metrics.  Through Clari, Enslin saw sales forecasts for the Americas, Europe/Middle East/Africa ("EMEA"), and Asia-Pacific regions.

a. According to FE-4, Enslin could also review "forecast categories." These categories allowed Enslin to see how many deals were forecast and the total deal amount that were forecast in the "commit," "upside," and "qualified upside" categories. FE-4 reported that, if there was a $20 million forecast call, Enslin might see that the various forecast categories did not add up to $20 million, and would ask, "How are you getting to $20 million?"

b. FE-4 explained that Clari included another "view" called the "opportunity grid." Through the opportunity grid, Enslin and other Clari users could "drill in at the representative level and deal-specific level," to understand, for example, "this is a renewal deal, with this customer, this is the sales stage, the amount, and the date" the transaction will close. FE-4 added that there were also "opportunity details" that included how many emails the sales representative had with the customer.

113.    <u>FE-4 Attended "Win Room" Meetings with Enslin and Gupta</u>. FE-4 confirmed that Enslin and Gupta would on occasion attend Win Room meetings via Zoom. Through these meetings, Enslin and Gupta gained insights into deal structure and deal quality, according to FE-4. FE-4 further explained:

a. Any deal with "over $1,000,000 in impact or $500,000 in churn was discussed in a Win Room setting." These meetings were documented in a Word-based agenda and PowerPoint slides regarding the details of the deals, and the latter were prepared by the GTM team, the sales representatives, or the commercial desk.

b. Churning of customers, such as Takeda Pharmaceuticals and VMWare, was discussed during Win Room meetings.

-43-

c.  During Win Room meetings, there were specific discussions about deal structuring. For instance, following changes to UiPath's commercial policy, sales representatives and leaders sought approval to violate the policy and explained the reasons why they needed to violate it.  To violate the commercial policy, written approval had to come from Gupta or Senior Vice President of Finance, Rachel Grandovic.

E.      FE-5

114.    FE-5 worked at UiPath from July 2023 to February 2025.  From July 2023 to February 2024, FE-5 was a global account director, whose responsibility included the Deloitte account.  In February 2024, FE-5 was promoted to regional vice president, overseeing a team of sales representatives who were selling to U.S.-headquartered global systems integrators, including Deloitte, PwC, Accenture, IBM, Cognizant, and more.

115.    UiPath Departs From Ramped Deals and Experiences Increasing Churn.  In 2023, according to FE-5, UiPath changed its policies such that sales representatives were no longer incentivized to offer "ramped" contracts.  At the same time, customers were no longer renewing their contracts at the previous values.  Thus, FE-5 stated, UiPath's issues with customer churn increased significantly throughout 2023 and 2024.

116.    Gupta Was Aware of Churn in 2023 and 2024.  FE-5 recalls that Gupta "absolutely knew" that UiPath was "looking at major churn when all the renewals came up," which UiPath "started seeing" in greater numbers in 2023 and 2024.

a.  FE-5 added that Gupta "saw reports" on churn from the Clari system.  Gupta "lived in Clari" and regularly used it to monitor sales, forecasting, and churn.  FE-5 said the Clari data to which Gupta had access and used, showed that before November

-44-

30, 2023, UiPath was experiencing significant churn and failing to execute large, multi-year deals.

b. FE-5 was on calls with Gupta about Deloitte's own low-utilization of its licenses with UiPath. FE-5 also reported that Gupta had "calls with sales leadership weekly about renewals," and thus Gupta knew all this churn was happening. FE-5 explained that Gupta "knew" of the churn also "because of the way the contracts were set up and that he approved and incented the sales reps to do."

c. As FE-5 put it, "With 100 percent certainty, Ashim Gupta knew everything," including that before the Class Period UiPath was forecasting and experiencing significant churn among customers, and that there was low utilization among customers.

### F.  FE-6

117. FE-6 worked at UiPath from June 2021 to October 2024. From June 2021 to July 2022, FE-6 was a Worldwide GSI Partner Development Manager. FE-6 was AMER Sales Leader and Enablement Manager from July 2022 to October 2024.

118. <u>UiPath Used Gainsight to Track Customer Health and Understand Churn</u>. FE-6 explained that UiPath used the Gainsight system to view data on the "health of the account." Gainsight provides, among other things, information on churn, which was markedly increasing in 2023 and 2024.

a. FE-6 added that, based on FE-6's experience in the industry, "There was no way" that Defendant Enslin or Defendant Gupta "did not know the churn rate." Defendant Enslin and Defendant Gupta had to know their customer acquisition costs, their churn rate, and other metrics.

119.    <u>Sales Representative Productivity Was Plummeting in 2023 and 2024</u>.  FE-6's sales enablement role, from July 2022 to October 2024, put FE-6 in a position to "establish best practices to drive productivity per [sales] rep."  According to FE-6, the industry standard for making quota was a 70-72 percent attainment rate (i.e., 70-72 percent of sales representatives reaching their sales quota).  FE-6 reported that UiPath's high-water mark for this attainment rate was in the low-60 percent range in 2022, but that this attainment rate was around 40 percent at the beginning of 2023 and into 2024.

    a.  According to FE-6, the lingering 40% attainment rate indicated that UiPath's execution strategy was not working and that UiPath was not closing larger, strategic deals at the pace required to mark successful execution of the strategy.

    b.  According to FE-6, Defendant Enslin and Defendant Gupta "absolutely knew" that just 40 percent of sales representatives were attaining quota at the beginning of 2023 and into 2024, because the attainment rate was a key performance indicator. Defendants Enslin and Gupta would have seen this key performance metric at that time.

120.    <u>After Ramped Deals, Customers Began to Churn</u>.  FE-6 confirmed that customers that had been previously sold ramped deals with a high exit value began to down-renew or churn. FE-6 reported that:

    a.  UiPath set up a team, led by David Kao, by the fall of 2023 to fight churn, following customer complaints that they were not getting the return on investment that was modeled for them at the time they made their original purchases.

121.    <u>Departure From Ramped Deals Resulted in Fewer Multi-Year Deals</u>.  FE-6 further confirmed that UiPath's shift away from ramped deals, plus the changes in its commercial policy, led to fewer multi-year deals and more one-year deals.  FE-6 explained:

a.    More multi-year deals meant UiPath did "not have to worry about churn," whereas there was more concern about losing business with annual deals.  For example, multi-year deals gave UiPath time to drive adoption.

122.    <u>October 2023 Quarterly Business Review Meeting</u>.  FE-6 reported that FE-6 regularly attended the Quarterly Business Review meetings.  FE-6 said Enslin also attended these meetings.  FE-6 attended the Quarterly Business Review meeting in October 2023, which pertained to "execution on larger deals and trying to be more strategic," and during which churn was identified as a concern.

**G.    FE-7**

123.    FE-7 worked at UiPath from September 2018 until January 2024.  FE-7 was director of Customer Success from September 2018 to September 2020, and was product and program leader for "A Robot for Every Person" from September 2020 to December 2022.  FE-7's last role at UiPath was as product leader for Solution Accelerators, from December 2022 to January 2024.

124.    <u>UiPath Used Gainsight to Track Churn Risk</u>.  FE-7 confirmed that Gainsight was used to inform the Customer Success team, as well as senior executives, about the status of existing customers and, in particular, whether they posed a churn risk.

a.    According to FE-7, Gainsight applied a "customer health score," which was expressed as a percentage, "a value out of 100, based on five different criteria."

b. Utilization was an important component of the customer health score, according to FE-7. For example, it was unacceptable within UiPath if a customer was only utilizing 20 percent of their licenses after an extended period of time.

125. <u>Defendant Gupta Used Gainsight</u>. FE-7 said that Defendant Gupta "certainly did" review the Gainsight tool when they worked together in Customer Success. In fact, FE-7 had meetings "specifically where" Gupta saw risk related to churn and wanted to know what the remediation plan was.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS

126. Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions. The specific statements and omissions alleged to be false and misleading are set forth below.

### A.    False and Misleading Statements Regarding Execution and Deal Quality

127. During UiPath's 3Q FY 2024 Earnings Call on November 30, 2023, after the close of trading, Defendant Gupta touted the purported success of UiPath's turnaround strategy:

> "But overall, our strategy is on *customers with a higher propensity to buy*. We feel like *we're executing against that strategy*, and we're *seeing that [sic] results in the deal quality and the customer quality* in the quarter."

128. In UiPath's 4Q FY 2024 Earnings Call on March 13, 2024, Defendant Enslin unequivocally declared the turnaround strategy a success:

> "*[T]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution*. And we also wanted to make certain that the platform was relevant for C-level executives. And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way."

129. The foregoing statements in ¶¶ 127-128 were false and misleading because while Defendants claimed that their business model was resulting in "better execution" and "deal quality," the opposite was true. Before and during the Class Period, UiPath experienced increasing

customer churn, meaning that UiPath's customers were either not renewing their contracts or renewing at significantly lower values. This was in direct conflict with the stated GTM strategy against which Defendants told investors UiPath was "executing." That strategy had called for focusing on executing large deals with large customers. But that was not happening. Instead, as Defendants discussed internally in meetings in 2023 and 2024, UiPath was failing to execute large deals at a sustained and increasing rate. This included with respect to large enterprise customers, the focus of UiPath's GTM strategy, which, according to FE-4, were significantly decreasing contract size upon renewal throughout 2023. UiPath's data systems, such as Clari, Salesforce, and Gainsight, further showed Defendants that in 2023 and 2024, UiPath was not executing large deals and was suffering from increased churn. In addition, UiPath's sales representatives were falling short of their quota attainment rate, which hovered around 40 percent—twenty points lower than UiPath's 2022 high-water mark, and thirty points below the industry standard—which further indicated that UiPath was not executing against its strategy. In fact, UiPath ultimately admitted to "*inconsistent execution*, which included *contract execution challenges on large deals*" and difficulty predicting "*large multiyear deals*." And analysts confirmed that this admission was a "*sea change in tone & outlook*" as compared to Defendants' statements in November 2023 and March 2024.

130. The foregoing statements in ¶¶127-128 were also false and misleading because having chosen to speak about UiPath's deal quality and execution, Defendants omitted and concealed the truth that customer churn was increasing in 2023 and 2024 and UiPath was not executing large, multi-year deals with larger customers.

**B.**    **Misstatements and Omissions Presenting Risks As Mere Hypothetical Possibilities When They Had Already Materialized**

131.    On March 27, 2024, UiPath filed a Form 10-K for FY 2024 that was signed by Defendants Enslin and Gupta.  This Form-10-K included materially misleading statements presenting risks to the Company's sales growth as mere hypothetical or theoretical possibilities when those risks had already materialized.  For example, the 10-K stated:

> Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners. ***Declines or significant delays in renewals or purchases*** of additional licenses and products by our customers ***could harm*** our future operating results.
>
> *    *    *
>
> ***If*** our customers ***do not purchase additional licenses and products*** from us or our customers ***fail to renew their licenses***, our revenue may decline and our ***business, financial condition, and results of operations may be harmed***.

132.    UiPath's FY 2024 10-K also stated, "***If*** we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected."

133.    These misleading risk statements were also contained in UiPath's FY 2023 10-K, which was incorporated by reference in UiPath's 3Q FY 2024 10-Q, filed with the SEC on December 4, 2023, and signed by Defendants Enslin and Gupta.

134.    These statements were materially false and misleading because, at the time of the 10-K, the risks that Defendants presented as mere hypothetical and theoretical possibilities had, in fact, materialized.  Specifically, as of March 27, 2024, "[d]eclines or significant delays in renewals or purchases" were not something that "could harm" UiPath, and there was no "if" as to whether customers were not purchasing UiPath's licenses and products.  Rather, by that time, Defendants' internal meetings and internal data indicated to them that throughout 2023 and into 2024, UiPath was experiencing significant churn—exhibited by declining or delayed renewals—resulting in customers (including larger enterprise customers) not renewing their contracts at all, or renewing

them at significantly lower values.  As a result, "[d]eclines or significant delays in renewals or purchases" were already negatively impacting UiPath's operations at the time of Defendants' statements.  Thus, the risks described in the above statements had already materialized and were adversely affecting the Company's business and financial results.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

135.    As set forth herein, the Defendants knew or were reckless in not knowing that the statements identified in Section VI above were materially false and misleading when made.  What follows are additional particularized allegations of Defendants' scienter, which when taken together with all the allegations set forth herein support a strong inference of scienter.

### A.    Enslin and Gupta Knew From Internal Meetings That Shifts Away from Ramping Deals and Changes to Sales Compensation Were Undermining Multi-Year Deals, Deal Quality, and Execution of UiPath's Transformation

136.    As recounted in detail by several former employees, at the time of their false and misleading statements, the Defendants attended numerous meetings where UiPath's declining multi-year deals, deal value, and deal quality and UiPath's undisclosed churn were discussed.

137.    ***Weekly Forecasting Calls.***  During the Class Period, Enslin, and often Gupta, attended weekly, monthly, and quarterly pipeline reviews and forecasting reviews, which FE-4 described as "calling a number up to" the chief revenue officer or chief executive officer "so they could forecast to the Street and the Board."  (FE-4.) This included weekly forecasting calls where the issues surrounding churn in 2023 and 2024 were discussed.  (FE-4.)  Defendant Enslin led the weekly forecasting meetings for the Americas region, which FE-4 attended.  These weekly forecasting calls were one of several ways in which Defendant Enslin and Defendant Gupta were apprised of churn, which FE-4 reported was discussed "all the time" during those weekly calls.  Minimizing churn, or "the leaky bucket" (a term used in weekly forecast calls and global and theater-level all-hands meetings), was the GTM team's "biggest focus" at these calls.  (FE-4.)

During some weekly forecast calls, Defendant Gupta even instructed that one-year deals in the pipeline be switched to three-year deals, because "[w]e really need the revenue."  (FE-4.)

138.    ***"Win Room" Meetings.***  Defendants also attended "Win Room" meetings during which they learned about the challenges UiPath faced in securing quality deals. FE-4 confirmed that Enslin and Gupta attended Win Room meetings via Zoom, and that these meetings informed Enslin and Gupta of deal structure and deal quality.  FE-4 confirmed that at the time of Defendants' false statements, the churning of customers, such as Takeda Pharmaceuticals (which Defendants had touted during the announcement of the GTM strategy) and VMWare, was discussed during Win Room meetings that Enslin and Gupta attended.  FE-1 further reported that the impacts of changes in the commercial policy and compensation changes before and during the Class Period were evident in "Win Room" meetings in 2023 and 2024.

139.    During "Win Room" meetings, account executives provided information about discounts, the structure of the deal, and information about ramping the deal.  (FE-1.)  According to FE-1, Gupta was the "ultimate decision maker on whether they were going to approve or deny the deal, deal structure, and details of it."  FE-1 also reported that Defendant Enslin participated in Win Room meetings.

140.    Specifically, FE-1 recalled a January 2023 "Win Room" meeting that Defendant Gupta attended.  Defendant Gupta was a "very active" participant in the meeting.  During these meetings, executives provided feedback on "how they want to structure" deals, and ultimately approved or denied deals in these meetings.

141.    Attendees of the Win Room meetings received in advance a Word document that was two pages in length, which was completed by the sales representative ahead of the meeting. The information included in the Word document was: 1) name of the customer; 2) current footprint

of the account; 3) what the customer currently spends; 4) who the executives are; 5) who the account executive is talking to at the customer; 6) what is the opportunity; 6) what is the deal structure; 7) how big is the deal; 8) next steps; 9) what the account executive needs internally or externally; and, 10) what is the plan to close the deal.  Additionally, FE-4 confirmed, PowerPoint slides containing the details of deals—prepared by the GTM team, sales representatives, or the commercial desk—were also distributed.

142.    Defendant Gupta was on emails circulating this Win Room Word document, and both Defendants Enslin and Gupta had access to a SharePoint link for the document, according to FE-1.

143.    ***Weekly Calls With Sales Leadership.***  FE-5 was on calls with Defendant Gupta about specific customers that were under-utilizing licenses, and reported that Defendant Gupta was on "calls with sales leadership weekly about renewals" and thus "knew all this churn was happening."  Defendant Gupta also had insight into, and knew about, churn "because of the way the contracts were set up and that he approved and incented the sales reps to do." (FE-5.)  As FE-5 put it, "With 100 percent certainty, Ashim Gupta knew everything," including that UiPath was forecasting and experiencing significant customer churn.

144.    ***All Hands Calls.***  Defendant Enslin participated in all hands calls during which UiPath's struggles before and during the Class Period were discussed.  FE-1 recounted an all hands call in the summer of 2023, during which Defendant Enslin began to exhibit "desperation" due to UiPath's inability to execute customer contracts.  This included making "unprofessional" comments during all-hands calls, including where Enslin berated sales personnel, "got aggressive," hit his desk with his fist, and demonstrated frustration.

145.    Defendant Enslin attended another all hands call in October 2023 during which he chided attendees about the need to do better "on execution." FE-1 reported that this meant UiPath was not closing big, strategic deals.

146.    *Quarterly Business Review.*  FE-3 reported that Defendant Enslin participated in an October 2023 Quarterly Business Review, during which UiPath's increasing churn numbers and inability to secure large, multi-year deals were addressed.  FE-3 reported that Kay made a presentation during this meeting, which included a visual that described the issues surrounding churn and the region.  Churn was specifically discussed and FE-3 recalled Enslin making comments during Kay's presentation.  FE-6 also attended the October 2023 Quarterly Business Review meeting with Enslin and corroborated that UiPath's increasing churn was identified during the meeting as a concern.

147.    *December 2023 Meeting*.  Defendant Enslin also regularly attended Emerging Enterprise meetings, including leading a sales team call on December 5, 2023, in which he declared that the Emerging Enterprise group was not doing well, meaning it was not closing deals, and in which he publicly demoted the Senior Vice President for Global Commercial Sales.  Enslin also determined that Emerging Enterprise and Enterprise would operate as one sales team, which Enslin would oversee.  (FE-2; FE-3.)

### B.    Enslin and Gupta Had Continuous Access to Information Showing Their Statements Were False

148.    Defendants Enslin and Gupta both had continuous access to the Salesforce and Clari platforms, which forecast the value of deals and when they would be executed.

149.    According to multiple FEs, Clari was an important platform for forecasting deals. (FE-1; FE-2; FE-3; FE-4; FE-5.)  FE-2 reported that Clari was used to weigh the likelihood that deals in the pipeline would materialize in the near term.  FE-1 reported that the negative impacts

of changes in the commercial policy and compensation changes before and during the Class Period were evident in the Salesforce and Clari forecasts upon which Defendants Enslin and Gupta relied. FE-2 also reported that prior to Defendant Gupta's November 30, 2023, statements, the Clari system showed a significant gap between the sales teams' targets and their actual results. FE-2 indicated that it was standard that Defendants Gupta and Enslin had access to the data showing those gaps.

150. FE-5 reported that Gupta "saw reports" on churn from the Clari system. Gupta "lived in Clari" and regularly used it to monitor sales, forecasting, and churn. FE-5 said the Clari data to which Gupta had access and used showed that before November 30, 2023, UiPath was experiencing significant churn and failing to execute large, multi-year deals.

151. According to FE-2, Defendant Enslin regularly met with Senior Vice President for Global Commercial Sales Kay to discuss business forecast data. Those forecasts were input into Clari by account executives and were subsequently collected by Area Vice Presidents who met with the Senior Vice President for Global Commercial Sales to discuss what was happening in their respective book of business. Following those meetings, the Senior Vice President for Global Commercial Sales reported to Defendant Enslin to discuss the forecast, according to FE-2.

152. FE-2 reported that FE-2's boss regularly requested that FE-2 update next steps in Clari, specifically because Defendant Enslin and Senior Vice President for Global Commercial Sales Kay were going to meet to discuss it. FE-2 received messages from FE-2's boss explaining that Defendant Enslin was going to talk with the Senior Vice President for Global Commercial Sales about the forecast.

153. Defendants also had access to and used the Gainsight system, which before and during the Class Period, provided, among other things, information on churn and how it was

markedly increasing in 2023 and 2024.  FE-7 confirmed that Defendant Gupta routinely used the Gainsight system to track sales statistics.  Gupta even confirmed during the November 30, 2023, earnings call that "Rob [Enslin] and the team looks at [sales team returns] on an ongoing basis and we do as a leadership team."

154.    Defendant Gupta's own statements further corroborate that UiPath and its executives had access to real-time information.  For instance, at the June 12, 2024, Mizuho Technology Conference, Defendant Gupta explained:

> [W]e really look at three things as we evaluate our pipeline. ***The first is when we have field input, sales signals. We know the major renewals.*** That's not a mystery, that doesn't need something that's there. So we are very deeply connected with the field in our customer base.
>
> ***Second, data science.*** A good chunk of our business is statistical, and ***you can see trends ahead of time***, right? In terms of just the flow and where we are on the run rate. So we're able to look at that and then make appropriate adjustments on the factors that we said. And the ***third is our traditional FP&A forecast. Really, starting with where we are, pipeline, conversion rates and those types of things***.

155.    In addition, according to FE-4, at a meeting in January or February 2024 at the Wynn Hotel in Las Vegas, Vice President for the Americas Mac Ban brought out an analysis documenting the negative impacts of UiPath's commercial policy.  Defendant Enslin and Defendant Gupta attended that meeting, during which there was a contentious discussion among Defendant Enslin, Defendant Gupta, Mac Ban, and others.  The analysis showed that, if UiPath's Americas business closed $100 million in ARR, it would only close $70 million once the changes in the commercial policy were applied. This Excel analysis was accompanied by PowerPoint slides, evaluating 20-25 transactions and identifying deals that would have "triggered a violation" of the new commercial policy.

156.    FE-4 also reported that, in 2023, UiPath was not hitting its internal sales goals, and this was discussed internally.  FE-4 noted that the date-stamped Clari reports would provide

evidence that Enslin and Gupta knew of churn and the failure to hit internal sales goals in 2023 and 2024.

**C.    The Close Temporal Proximity Between the False and Misleading Statements and the Corrective Disclosures Further Supports Scienter**

157.    The close temporal proximity of only two and a half months between Defendants' false and misleading statements and their corrective disclosures further supports a strong inference that Defendants knew or were deliberately reckless in not knowing that their statements were false. On November 30, 2023, and March 13, 2024, Defendants made false and misleading statements that they were seeing "results in the deal quality" and that "[t]here's no doubt there's better execution[.]"   In reality, Defendants were suffering declining contract execution and had significantly cut their investments in the sales and customer success teams.  They were forced to admit this only two and half months after their last false statement, on May 29, 2024, when they admitted that they were suffering from "inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes" and that "the investments we have made to reaccelerate growth have fallen short of our expectations."  The quick turnaround between Defendants making the false statements and finally admitting the truth supports a strong inference that they knew or were reckless in not knowing the falsity of their statements at the time.

**D.    Enslin's Departure Was Announced at the Same Time as the Corrective Disclosures**

158.    On May 29, 2024, the same date on which UiPath announced the corrective disclosures, the Company also announced the departure of Defendant Enslin, effective June 1, 2024.  The departure occurred only months after Enslin became the sole CEO and a member of UiPath's Board of Directors in February 2024.  The departure also became effective three days after the end of the Class Period, when Defendants disclosed the full extent of the truth as UiPath revealed that they were suffering from "inconsistent execution, which included contract execution

challenges on large deals and certain sales compensation changes" and that "the investments we have made to reaccelerate growth have fallen short of our expectations."

159.    That day, the industry publication *SiliconANGLE* said the "surprise leadership change" had "shocked investors" and wrote that the plan to have Enslin take the company forward "seems to have failed."  That same article added that, "On a conference call with analysts, Dines was quite open about the problems faced by the company, *which likely contributed to Enslin's decision to quit*."

160.    *SiliconANGLE,* citing Constellation Research analyst Holger Mueller, also reported "that something is clearly amiss when a board of directors turns on a CEO it had hired just two years prior," adding that Mueller "pointed out that Enslin was enlisted for his commercial acumen and there was an expectation that he would help the company to grow much faster, yet he failed to deliver on that."

161.    Subsequent analyst reports echoed the market's shock.  In a May 30, 2024, report, BofA Securities called Defendant Enslin's departure "abrupt."  That day, William Blair called it a "sudden change," while a Macquarie Equity Research report the following day described it as a "sudden departure."

162.    The proximity of Defendant Enslin's departure, combined with analyst and industry observer reactions tying the resignation to the corrective disclosures, suggests that Defendant Enslin's departure was associated with the misconduct described in the Complaint.

**E.    Defendants' False and Misleading Statements Concerned Core Operations Central to UiPath's Business**

163.    The core operations doctrine further supports a strong inference of scienter for two reasons.  First, the Individual Defendants had detailed involvement in the minutia of UiPath's

operations, including the execution of the strategy announced in September 2022, the execution and monitoring of deals, and policies regarding ramping contracts and sales compensation.

164.    Second, Defendants made false and misleading statements and omitted material information concerning UiPath's execution of its turnaround GTM strategy, which Defendants repeatedly touted as a key pillar of UiPath's success and upon which analysts repeatedly focused. Indeed, Defendants repeatedly touted that the Company was "executing," including claiming that there was "no doubt" that execution had been improved. Defendants similarly made false and misleading statements and omitted material information concerning UiPath's deal quality and customer quality, something that the Company had repeatedly touted to investors. And analysts were focused on the Company's reassurances, as discussed herein, including highlighting the "continued execution by UiPath," the "focus on customers with the largest potential to buy," and the sense that UiPath was "improving execution."

### F.    Corporate Scienter

165.    As alleged above, Defendants Enslin and Gupta, both of whom acted with scienter, had actual and apparent authority over UiPath and acted within the scope of their apparent authority in making the misstatements at issue. Their scienter is imputed to the Company.

## VIII.  LOSS CAUSATION

166.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of UiPath stock, distorted the value of UiPath options, and operated as a fraud or deceit on the Class. Later, when the truth and risk that Defendants' prior misrepresentations and omissions concealed, and their fraudulent conduct were revealed to the market on May 29, 2024, as alleged herein, the price of UiPath stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of UiPath stock and call

options, as well as sale of put options, during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

167.   After the close of trading on May 29, 2024, UiPath issued a press release announcing the resignation of Defendant Enslin as CEO effective June 1, 2024, and the reappointment of Dines as CEO.  Also on May 29, 2024, UiPath issued a separate press release announcing disappointing financial results for the first quarter of FY 2025 and a significant cut in its revenue guidance for fiscal year 2025.  Specifically, UiPath lowered its FY 2025 revenue guidance by approximately 10%, or $150 million, from a range of $1.555 billion to $1.560 billion, to a range of $1.405 billion to $1.410 billion.

168.   UiPath also held a conference call on May 29, 2024, to discuss the first quarter of FY 2025 financial results and guidance.  While UiPath partially attributed the poor results and reduced guidance to delays closing large multi-year deals in the quarter, Dines admitted that the Company's failed turnaround strategy, execution challenges, and sales compensation changes were a factor.  According to Dines:

> *[W]e saw inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes*, which we are working to rectify.  While customer behavior is often a function of the broader macroeconomic environment, *execution is something we can control*.  And we recognize that we need to improve predictability on large multiyear deals.

169.   Dines also lamented "a change in customer behavior, particularly with large multiyear deals."

170.   Dines also blamed the poor results and reduced guidance on the Company's inability to scale "our growth products such as IDP [intelligent document processing]," acknowledging that "there is a *need to have a deeper execution strategy* to scale these products to reach their full potential."

171.    Dines also acknowledged that UiPath's effort to focus on its customers' C-suites had not been effective:

> I think we went to a distance to go and pitch our business to C-level, which is actually great.  But the reality is that we have to increase our adoption by taking care of our traditional line of business customers within the CIO suite, which I think, will benefit a lot more for a new reinvigorated customer-centric approach.

172.    Significantly, Gupta admitted UiPath had trouble closing multi-year deals with all types of customers.  For instance, when TD Cowen analyst Bryan C. Bergin asked, "as far as the deal scrutiny goes, the smaller deal sizes, the postponements, is that broad-based across the business," Gupta replied, "Bryan, it's broad-based.  I don't think – it's not that we're zoned in on one particular area.  *So from a multiyear deal perspective, that's broad*."

173.    Finally, because UiPath's go-to-market strategy had failed, Dines told investors that the Company would have to implement yet another new strategy:

> As we look to the future, we are laser focused on enhancing our execution including improved sales linearity and deal scrutiny, driving higher efficiency across sales and the broader organization and driving a deeper and more execution-oriented strategy for our growth products.  We are also shifting the way we engage with customers to reinvigorate our line of business engagement with an industry tailored approach.
>
> Lastly, we plan to go back to our roots, building a truly customer-centric organization, where co-innovating with our customers and partners is at the heart of everything we do.

174.    On this news, the price of UiPath stock declined $6.23 per share, or over 34%, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024.  This steep drop was precipitated by unusually high trading volume of 86.6 million shares on May 30, 2024 (as compared to 26.4 million shares on May 29, 2024, and 10.5 million shares on May 28, 2024).

175.    The reaction of investment analysts was highly negative.  It focused on UiPath's execution failures, and conveyed a sense that the Company had deceived them.  For example, on

May 30, 2024, TD Cowen downgraded UiPath stock, describing a "*sea change in tone & outlook* that materialized versus just 2 months ago with its 4Q24 results." TD Cowen specifically attributed "*execution issues*" to the collapse.

176.    Similarly, on May 31, 2024, Macquarie downgraded UiPath stock, and observed that, based on the Company's prior statements, "[w]e *thought going into FQ1 that UiPath had executed on its turnaround* story and stabilized growth. With the sudden departure of CEO Rob Enslin, a guidance cut, and management acknowledging that the company's go-to-market strategy has underperformed its expectations, *we see our prior view was incorrect*." Morgan Stanley lowered its price target from $25 to $15 per share, observing that "prior sales strategy changes over-rotated the company towards more C-suite engagement, while also lowering incentives for multi-year deals, leading to down-sizing and slippage in large deals during the quarter."

177.    UiPath's share price has never recovered, with an average share price since May 29, 2024 of $12.41. (*See* Figure 1, Green Section.)

## IX.    CLASS ACTION ALLEGATIONS

178.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf all persons and entities who purchased or acquired UiPath securities, including stock and call options, as well as those that sold put options on UiPath stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of UiPath and their families and affiliates.

179.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 30, 2024, there were more than 490 million shares of UiPath Class A common stock, owned by at least thousands of investors. As of September 4, 2025, there

were more than 450 million shares of UiPath Class A common stock, owned by at least thousands of investors.

180.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether Defendants violated the Exchange Act;

    b.    Whether Defendants omitted and/or misrepresented material facts;

    c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    e.    Whether the price of UiPath securities was artificially inflated or otherwise distorted;

    f.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

    g.    The extent of damage sustained by Class members and the appropriate measure of damages.

181.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

182.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

183. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

184. UiPath's purported "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability. The statements alleged to be false and misleading above relate to then-existing facts and conditions.

185. To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

186. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of UiPath who knew that the statement was false.

## XI.    PRESUMPTION OF RELIANCE

187. At all relevant times, the market for UiPath securities was an efficient market for the following reasons, among others:

    a.  The Company's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b.  As a regulated issuer, UiPath filed periodic public reports with the SEC;

    c.  UiPath regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. UiPath was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

188. As a result of the foregoing, the market for UiPath securities promptly digested current information regarding UiPath from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of UiPath stock and call options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and the presumption of reliance applies. Likewise, all sellers of the Company's put options during the Class Period suffered similar injury through their transactions at prices that were distorted by the artificially inflated price of UiPath stock, and the presumption of reliance applies.

189. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## XII. CLAIMS FOR RELIEF

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

190. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

191.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase UiPath securities at artificially inflated prices.

192.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UiPath securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

193.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about UiPath's business and revenue prospects, as specified herein.

194.    During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

195.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business and revenue prospects, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

196.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UiPath stock and call options.  Plaintiffs and the Class would not have purchased the Company's stock and call options at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.  Similarly, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they sold the Company's put options at prices that were distorted by the artificially inflated price of UiPath stock.  Plaintiffs and the Class would not have sold the Company's put options at the prices they sold them, or at all, had they been aware that the market prices had been distorted by the artificially inflated price of UiPath stock.

197.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock and call options, and sales of put options during the Class Period.

198.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

199.   Plaintiffs repeat, incorporate, and re-allege each and every allegation set forth above as if fully set forth herein.

200.   The Individual Defendants acted as controlling persons of UiPath within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about UiPath, the Individual Defendants had the

-67-

power and ability to control the actions of UiPath and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

201.  **WHEREFORE**, Plaintiffs pray for judgment as follows:

a.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.  Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

202.  Plaintiffs demand a jury trial.

Dated: September 12, 2025

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

   _/s/ Joseph A. Fonti_

Joseph A. Fonti
George N. Bauer
Ross Shikowitz
William Freeland
300 Park Avenue, Suite 1301
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com

gbauer@bfalaw.com
rshikowitz@bfalaw.com
wfreeland@bfalaw.com

-and-

Adam C. McCall (appearing *pro hac vice*)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
amccall@bfalaw.com

*Counsel for Lead Plaintiff Simone Brunozzi and Named Plaintiff Scott Cheslowitz and Lead Counsel for the Putative Class*

-69-

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

*/s/   Joseph A. Fonti*
Joseph A. Fonti

# EXHIBIT A

## CERTIFICATION

I, Simone Brunozzi, hereby certify as follows:

1.    I have reviewed the Second Amended Class Action Complaint against UiPath, Inc. ("UiPath") and others alleging violations of the federal securities laws and authorize its filing.

2.    I did not purchase or sell securities of UiPath that are the subject of the Complaint at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.    My transactions in the UiPath securities that are the subject of the Complaint during the Class Period are reflected in Schedule A, attached hereto.

5.    Other than in the instant action, I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.    Beyond my *pro rata* share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct on ____9/11/2025____.

Signed by:

*Simone Brunozzi*
472E8BAA5166467...
Simone Brunozzi

1

## SCHEDULE A
### TRANSACTIONS IN
### UIPATH INC

#### COMMON STOCK

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/01/2024 | 100,000.00 | 19.03 | ($1,903,398.00) |
| Sale | 05/23/2024 | -9,424.00 | 19.27 | $181,581.82 |

#### PATH 02/16/2024 $25.00 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 12/08/2023 | -1,000.00 | 1.60 | $160,000.00 |

#### PATH 01/17/2025 $22.50 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/01/2024 | 3,000.00 | 2.36 | ($707,589.00) |
| Purchase | 05/23/2024 | 2,000.00 | 2.36 | ($472,296.00) |
| Purchase | 05/24/2024 | 1,000.00 | 2.34 | ($234,061.00) |

#### PATH 01/17/2025 $30.00 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/01/2024 | -3,000.00 | 0.81 | $242,079.00 |

#### PATH 01/17/2025 $35.00 CALLS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 03/14/2024 | 2,000.00 | 1.81 | ($362,344.00) |

#### PATH 01/17/2025 $15.00 PUTS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/01/2024 | -3,000.00 | 1.25 | $376,320.00 |

#### PATH 01/17/2025 $17.50 PUTS

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 03/14/2024 | -2,000.00 | 1.74 | $347,770.00 |
| Sale | 05/23/2024 | -2,000.00 | 1.99 | $397,086.00 |
| Sale | 05/24/2024 | -1,000.00 | 2.15 | $215,354.00 |

2

# EXHIBIT B

2

## CERTIFICATION

I, Scott Cheslowitz, hereby certify as follows:

1.      I have reviewed the Second Amended Class Action Complaint against UiPath, Inc. ("UiPath") and others alleging violations of the federal securities laws and authorize its filing.

2.      I did not purchase or sell securities of UiPath that are the subject of the Complaint at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in the UiPath securities that are the subject of the Complaint during the Class Period are reflected in Schedule A, attached hereto.

5.      Other than in the instant action, I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.      Beyond my *pro rata* share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct on ___9/11/2025___.

DocuSigned by:

*Scott Cheslowitz*

BB0678CBC9E9442...

Scott Cheslowitz

1

**SCHEDULE A**
TRANSACTIONS IN
UIPATH INC

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 01/22/2024 | 3,200.00 | 23.54 | ($75,325.76) |
| Purchase | 01/22/2024 | 800.00 | 23.61 | ($18,885.28) |
| Purchase | 01/24/2024 | 100.00 | 23.37 | ($2,336.86) |
| Purchase | 01/25/2024 | 750.00 | 23.14 | ($17,353.88) |
| Purchase | 01/25/2024 | 100.00 | 23.14 | ($2,314.00) |
| Purchase | 02/07/2024 | 1,050.00 | 23.07 | ($24,218.25) |
| Purchase | 02/08/2024 | 1,000.00 | 23.50 | ($23,500.00) |
| Sale | 03/12/2024 | -1,000.00 | 24.79 | $24,790.00 |
| Purchase | 03/18/2024 | 1,000.00 | 23.07 | ($23,069.80) |
| Purchase | 03/21/2024 | 1,000.00 | 23.67 | ($23,669.90) |
| Sale | 03/28/2024 | -1,000.00 | 22.72 | $22,720.20 |
| Purchase | 04/11/2024 | 1,000.00 | 21.37 | ($21,369.70) |
| Purchase | 04/11/2024 | 2,000.00 | 21.40 | ($42,793.20) |
| Purchase | 04/11/2024 | 479.00 | 21.40 | ($10,248.54) |
| Purchase | 04/11/2024 | 1,000.00 | 21.39 | ($21,385.30) |
| Sale | 04/15/2024 | -2,000.00 | 20.00 | $40,000.00 |
| Purchase | 05/13/2024 | 2,000.00 | 19.81 | ($39,619.80) |
| Purchase | 05/20/2024 | 2,500.00 | 20.31 | ($50,767.00) |
| Purchase | 05/22/2024 | 2,500.00 | 19.96 | ($49,896.40) |