**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE UIPATH SECURITIES LITIGATION | Case No. 1:24-cv-04702<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ........................................................................................1

II.  STATEMENT OF FACTS ...........................................................................................5

    A.  Analysts Applaud as UiPath Announces a New Turnaround Strategy and Hires Enslin...........................................................................................5

    B.  Defendants Falsely Assure Investors of the Turnaround Strategy's Success. ...................................................................................................6

    C.  UiPath's Execution Failures Were Well-Known to the Defendants.......................7

    D.  The Truth Emerges ...............................................................................8

III.  LEGAL STANDARD.................................................................................................9

IV.  PLAINTIFFS ADEQUATELY ALLEGE FALSE AND MISLEADING STATEMENTS.........................................................................................................10

    A.  Defendants' Execution Statements Were False and Misleading ...........................10

        a.  Defendants' Execution Statements Were Neither Puffery Nor Opinions ................................................................................13

        b.  Defendants' Improper Counterfactual Does Not Change the Analysis................................................................................17

        c.  Defendants' Generic Risk Warnings Do Not Shield Them ........................18

    B.  Defendants' Risk Disclosures Were False and Misleading ..................................18

V.  PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER..............................20

    A.  The Complaint Alleges a Strong Inference of Conscious or Reckless Misbehavior ........................................................................................20

    B.  Plaintiffs' Allegations are Sufficiently Credible...................................................26

    C.  Additional Evidence Further Supports the Strong Inference of Scienter ..............28

    D.  Enslin and Gupta Had Motive and Opportunity to Commit Fraud.......................29

    E.  UiPath's Scienter ................................................................................29

VI.  PLAINTIFFS' CONTROL PERSON CLAIMS............................................................29

VII.  CONCLUSION........................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*In re AnnTaylor Stores Sec. Litig.*,
807 F. Supp. 990 (S.D.N.Y. 1992) ...................................................................................... 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................... 9

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)........................................................................ 26

*In re Block, Inc. Sec. Litig.*,
2025 WL 2607890 (S.D.N.Y. Sep. 9, 2025)........................................................................... 13

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ................................................................................. 13

*Chapman v. Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) ............................................................................ 19, 28

*City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*,
153 F.4th 288 (2d Cir. 2025) ............................................................................................ 19

*City of Pontiac Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ........................................................................ 15, 26, 29

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ............................................................................................. 16

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ........................................................................ 13

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................................................ 18

*Diabat v. Credit Suisse Grp. AG*,
2024 WL 4252502 (S.D.N.Y. Sep. 19, 2024)................................................................. 3, 10, 12

*Diehl v. Omega Protein Corp.*,
339 F. Supp. 3d 153 (S.D.N.Y. 2018) ................................................................................. 13

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................ 4

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ............................................................................................. 17

*In re Estée Lauder Co., Inc. Sec. Litig.*,
    2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ...................................................................... 23, 24

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................................. 23

*Galestan v. OneMain Holdings, Inc*.,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...................................................................... 12, 14, 25

*Gimpel v. The Hain Celestial Grp., Inc.*,
    156 F.4th 121 (2d Cir. 2025) .............................................................................................. 24

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.,*
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) ................................................................................ 16

*Lozada v. TaskUs, Inc.*,
    710 F. Supp. 3d 283 (S.D.N.Y. 2024) .......................................................................... 26, 27

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)............................................................................................................ 12

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ........................................................................................ 27, 29

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ............................................................................................... 13

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................................................... 4, 24

*In re Noah Educ. Holdings, Ltd. Sec. Litig.,*
    2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ....... ………………………………………..20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................................................. 9, 14, 20, 26

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................................................. 28

*Oklahoma Firefighters Pension and Retirement System v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018) ................................................................................ 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................................ 16

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014) .................................................................................. 28

iii

*In re Perion Network Ltd. Sec. Litig.*,
   2025 WL 1785224 (S.D.N.Y. June 27, 2025) ........................................................ 13

*In re Perrigo Co. PLC Sec. Litig.*,
   435 F. Supp. 3d 571 (S.D.N.Y. 2020) ..................................................................... 9

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) .................................................................................. 16

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .................................................. 11, 14

*Police & Fire Retirement System of Detroit v. La Quinta Holdings Inc.*,
   2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017).......................................................... 18

*Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*,
   751 F. Supp. 3d 330 (S.D.N.Y. Sep. 30, 2024) .................................................. 9, 12

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ......................................................... 20

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024) .................................................................... 24

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)......................................................................................24

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021) ..................................................................................... 20

*Shemian v. Rsch. In Motion Ltd.*,
   2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013).......................................................... 28

*Shenk v. Karmazin*,
   867 F. Supp. 2d 379 (S.D.N.Y. 2011) .................................................................... 28

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)......................................................... 14

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)............................................................. 19

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008) ................................................................................... 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................ 20

iv

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022) ............................................................................. 14, 25

*U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*,
   318 F. Supp. 3d 680 (S.D.N.Y. 2018) ..................................................................................... 27

*Woolgar v. Kingstone Cos., Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ..................................................................................... 27

## I.    PRELIMINARY STATEMENT[1]

The Second Amended Complaint alleges a simple, classic fraud.  In 2022, Defendant UiPath hired a new CEO, Defendant Enslin, to usher in a critical turnaround strategy, the stated goal of which was to execute valuable, multi-year contracts with UiPath's larger customers.  At the start of the Class Period, Enslin and Defendant CFO Ashim Gupta claimed UiPath was "executing against that strategy," "seeing [the] results in the deal quality and the customer quality," and "no doubt" executing on these contracts—leading analysts to believe UiPath "continues to execute well on its revised go-to-market strategy."  ¶¶ 56, 58, 64.  UiPath's share price rose 27% that very day.  ¶12, Figure 1.

In truth, in 2023 and early 2024, UiPath's customers were either not renewing their contracts or materially reducing the size of their contracts (phenomena known as "churn").  In fact, by summer 2023, for every new deal, one or two customers left or reduced their contracts.  ¶93(c).  Defendants' failed execution imperiled, and ultimately defeated, UiPath's much-lauded turnaround, culminating in Enslin's resignation.  Analysts, who previously "thought . . . that UiPath had executed on its turnaround story," called out a "sea change in tone & outlook" declaring their "prior view … incorrect."  ¶¶175, 176.  UiPath's share price plummeted 34% in a single day.

The SAC alleges in detail how these execution challenges were widely known throughout UiPath in 2023 and early 2024, including through new allegations that cure the deficiencies the Court's July 23, 2025 order identified (the "Order").  The SAC now alleges "what was said during . . . particular meeting[s] . . . [and the] information conveyed during those meetings that

---

[1] Capitalized terms not defined herein have the meanings set forth in the Second Amended Complaint (the "SAC") (ECF No. 41.)  Citations to "¶__" are to the SAC.  References to Ex. __ refer to the exhibits to the Declaration of George N. Bauer, filed herewith.  Unless otherwise stated, all emphasis is added and internal citations omitted.  Citations to "Br. __" are to Defendants' motion to dismiss memorandum (ECF No. 43).

contradicted the substance of Enslin's and Gupta's Execution Statements." (Order at 28-29). Former UiPath employees (FEs) now report UiPath's execution issues were discussed "all the time" during weekly Americas forecast calls attended by Enslin and Gupta in 2023 and 2024, and that Enslin and Gupta's "biggest focus" was "how to minimize the leaky bucket," *i.e.*, churn. ¶109. Moreover, Enslin and Gupta attended Win Room meetings in 2023 and 2024, during which the churning of large customers was discussed—including Takeda Pharmaceuticals, which UiPath had previously touted in announcing its turnaround plan. ¶¶108, 138 (FE-4); ¶139 (FE-1).

FEs also identify specific meetings where Defendants discussed execution failures. During an October 2023 quarterly business review meeting, Enslin discussed the pressure resulting from churn. ¶¶103 (FE-3). During a November 2023 weekly forecast call—which both Enslin and Gupta generally attended in order to "forecast to the Street and Board," ¶109—Gupta directed salespeople to immediately restructure deals because "[w]e really need revenue, so we need higher total contract value deals." ¶109(d) (FE-4). Just five days after the first false statement, Enslin led a December 5, 2023 Emerging Enterprise call to berate the team for not closing deals, and publicly demote a Senior VP of Global Commercial Sales. ¶96 (FE-2). And Enslin and Gupta were confronted in early 2024 with FE-4's analysis demonstrating tens of millions of dollars in lost revenue from policy changes. ¶110 (FE-4).

The SAC also now alleges "with specificity what [UiPath's data] platform showed at any relevant time." (Order at 29.) The SAC confirms that Enslin and Gupta saw forecast updates primarily driven out of the Clari platform in 2023 showing significant gaps between sales team targets and actual results, as well as increasing churn and the failure to hit sales goals. ¶109(e) (FE-4); ¶97(d), 98 (FE-2). Indeed, as reflected in a "key performance metric" that Enslin and Gupta would have seen, just 40 percent of sales representatives were attaining sales quotas at the

2

beginning of 2023 and into 2024, as compared to an industry standard of up to 72%.  ¶119 (FE-6).

Indeed, Gupta "lived in Clari," where prior to the Class Period, he "saw reports" on and monitored

churn, sales, and forecasting.  ¶116 (FE-5); ¶154.  FEs also report that "[t]here was no way" that

Enslin or Gupta "did not know the churn rate," as they tracked customer health and contract

execution through the Gainsight system, which showed increasing churn in 2023 and 2024.  ¶118

(FE-6).  FE-7 personally had meetings with Gupta, during which Gupta saw risk related to churn

and discussed remediation plans.  ¶¶124-125 (FE-7).

Under applicable law, Defendants' motion must be denied.  Defendants' statements that

they were "executing against" their strategy," "seeing" those "results" in "deal quality" and

"customer quality," and that there was "no doubt there's better execution" claimed measurable

progress in implementing Enslin's concrete strategic turnaround, and led analysts to believe that

UiPath was achieving its stated objective of executing on larger, multi-year deals.  These

statements were "contradicted by the then-existing" failures at UiPath known to Defendants;

namely, that UiPath was failing to execute the lucrative multi-year deals with larger customers that

were at the center of its highly touted turnaround strategy.  *Diabat v. Credit Suisse Grp. AG*, 2024

WL 4252502, at *123 (S.D.N.Y. Sep. 19, 2024).

In the face of the well-pled facts, supported by seven former employees (four of whom are

new to the SAC), Defendants' arguments fail.  *First*, Defendants attempt to portray their statements

as too "judgment-laden" to be evaluated, but whether UiPath was executing on large customer

deals was something the Company spoke about and measured, and analysts were intensely focused

on.  Defendants' statements were about what "results" they were "seeing," and were relied upon

by analysts who used those statements to proclaim that UiPath was "executing well" on "large

3

customer growth."   Nor were Defendants' statements too "attenuated" from the concept of customer churn; churn is the exact opposite of deal quality and execution.

*Second*, Defendants improperly spin a counter-factual, but in doing so merely raise factual disputes that are improper on a motion to dismiss.  Even if those disputes were proper, the very facts Defendants raise can be interpreted multiple ways and do not explain the failure to execute large, multi-year contracts that UiPath was ultimately forced to disclose.

*Third*, Defendants' piecemeal attacks on scienter fail.  Prior to their statements, Enslin and Gupta had routine, repeated, and detailed meetings to discuss UiPath's failure to execute its strategy.  *E.g.*, ¶¶86-87, 96, 103, 105, 108-109, 112-113, 122.   Defendants were deeply involved in tracking and understanding customer retention, and had real-time access to data showing that UiPath was not executing against its strategy.  *E.g.*, ¶¶88, 97-98, 106, 109, 116, 118, 124-125. Indeed, after the Class Period, Gupta touted to investors how he personally tracked this information in real-time.  ¶154.  Under Second Circuit precedent, this is "sufficiently particular to permit the strong inference of scienter necessary for plaintiffs to sustain their burden on a motion to dismiss." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011).

*Finally*, Defendants do not (and cannot) dispute loss causation, or the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  UiPath's stock price jumped 27% on the day Defendants falsely told investors they were "executing against that strategy."   ¶12.   When UiPath admitted that it was in truth experiencing, "execution issues," UiPath's stock price collapsed by 34% and analysts acknowledged that their "prior view" that UiPath had executed was "incorrect."   ¶¶175, 176. Through 2024 and into 2025, UiPath's stock price remained well below its Class Period highs. *See* ¶12, Figure 1.

## II.    STATEMENT OF FACTS

### A.    Analysts Applaud as UiPath Announces a New Turnaround Strategy and Hires Enslin

UiPath, a seller of robotic process automation ("RPA") licenses to customers seeking to automate business tasks, saw its valuation plunge after its April 2021 IPO. ¶36. To turn things around, the Company announced a series of business initiatives designed to secure lucrative multi-year deals with larger customers. First, Gupta publicly introduced on September 7, 2021, the concept of "ramped" deals—*i.e.*, deal structures where, instead of buying annual contracts, customers would sign multi-year deals that would increase or, "ramp," the number of licenses contracted each year. ¶40. This policy allowed UiPath to better execute the multi-year deals that the Company, and analysts, prized. ¶41. Analysts believed the "opportunity to move customers to deal structures with annual ramping would "yield[] better margins" and "long-term engagement opportunities." ¶41.

Then, in 2022, UiPath announced an extensive strategic overhaul to be led by newly appointed CEO, Enslin. ¶37. On their so-called Investor Day in September 2022, Defendants announced that UiPath had overhauled its "go-to-market" strategy. ¶39. Investors were told that this new go-to-market strategy prioritized selling high-value, multi-year deals to UiPath's larger customers—those customers that the Company said had a "higher propensity to buy." ¶¶4, 56. Analysts recognized that this "existential mission" was critical to UiPath's success. ¶¶48-50.

Investors remained cautious. With no news on the turnaround strategy's results, UiPath's share price remained relatively flat, averaging $15.28 between September 2022 and the start of the Class Period. ¶12; Figure 1.

5

**B.    Defendants Falsely Assure Investors of the Turnaround Strategy's Success.**

After 14 months, Defendants gave investors what they were waiting for.  On UiPath's November 30, 2023 Earnings Call, Gupta stated "our strategy is on customers with a higher propensity to buy" and "[w]e feel like we're executing against that strategy, and we're seeing that [sic] results in the deal quality and the customer quality in the quarter."  ¶127.  Upon this announcement, UiPath shares soared 27% in one day.  ¶11.

Analysts received these statements as the long-awaited signal that UiPath's new strategy was working.  Following the November 30, 2023 Earnings Call, Macquarie titled its analyst report, "FQ3/24: When a turnaround turns out well," while D.A. Davidson wrote that UiPath's nearly year-old "strategic bet" was "paying off."  ¶59.  Among others, analysts at Truist supported a "Buy" rating based on the "GTM [go-to-market] transformation work being driven by co-CEO Rob Enslin," J.P. Morgan commended UiPath's "continued execution," and TD Cowen emphasized that "PATH continues to execute well on its revised go-to-market strategy."  ¶58.  RBC cheered the "focus on customers with the largest potential to buy."  *Id*

Enslin reaffirmed this on UiPath's March 13, 2024 Earnings Call, boasting, "[T]here's no doubt there's better execution," even referencing back to UiPath's recent emphasis on execution as part of its turnaround strategy, stating, "There's no doubt that's what we said we wanted to achieve better execution."  ¶128.

Analysts again lauded Defendants' statements.  Barclays wrote that "UiPath continues to show better execution," Oppenheimer reported that, "Management is executing well on its large customer growth and improving efficiency strategy," and William Blair underscored that UiPath "continues to execute well."  ¶¶65-66.

6

However, throughout 2023 and into 2024, UiPath suffered significant customer churn, with customers either reducing the dollar value of their contracts, reducing the duration of their contracts, or declining to renew their contracts altogether. ¶67. The causes included Gupta's secret decision to discourage ramped deals in 2023 in order to cut the commissions owed to the sales force, ¶¶42, 83, Defendants' attempts to force customers onto the unpopular "Flex Platform," ¶101, and UiPath "marking up all renewals [pricing] by 30" percent prior to December 2023, ¶102(a).

As a result of these new policies, the seeming success that UiPath had portrayed to investors was unraveling. Multiple former employees reported that, once UiPath began to discourage ramped deals, churn increased almost "immediately," resulting in fewer multi-year deals. *See, e.g.*, ¶¶106, 108, 115, 121. Throughout 2023, UiPath experienced a "churn headwind," particularly among those customers that were the focus of the Company's go-to-market strategy: large enterprise customers with a "higher propensity to buy" were "significantly decreasing contract size." ¶108. By summer 2023, for every new deal, one or two customers left or reduced their contracts. ¶93. In short, UiPath was not executing against its strategy to secure large multi-year deals with large customers.

### C. UiPath's Execution Failures Were Well-Known to the Defendants.

These issues were well-known to the Defendants. As FE-4 put it, UiPath executives "absolutely knew" churn was happening and that shareholders would have wanted to know that there was a "big churn headwind" because of the way UiPath previously structured deals. ¶108. In 2023 and 2024, Enslin led weekly forecasting calls—often joined by Gupta—during which churn was discussed "all the time." ¶109(b). The "biggest focus" of these calls was often "how to minimize the leaky bucket" of churn. *Id.* Enslin chided employees over execution failures in an October 2023 call, ¶¶87, 145, and on December 5, 2023, announced a major organizational

7

restructuring in response.  ¶96.  In late 2023, FE-4 performed an analysis that predicted tens of millions of dollars of churn that Gupta and Enslin saw no later than January or February 2024.  ¶¶110, 155.

UiPath's own internal data systems—Clari, Salesforce, and Gainsight—also revealed to Defendants in 2023 and 2024 that UiPath was not executing large deals and was suffering from increased churn.  ¶¶109, 116, 118, 124-125.  FE-5 reported that Gupta "lived in Clari," where he "saw reports" prior to November 30, 2023, showing significant churn and failure to execute large, multi-year deals.  ¶116 (FE-5).  By November 2023, Clari also showed a significant gap between UiPath's sales team's targets and their actual results.  ¶97.  FE-6, who was AMER Sales Leader and Enablement Manager, reported that "there was no way" that Enslin and Gupta "did not know the churn rate," and explained that UiPath even set up a team in the fall of 2023 to fight churn.  ¶120.   FE-6 and FE-7, a product leader for Solution Accelerators until January 2024, also confirmed that Gupta used the Gainsight tool, which showed increasing churn in 2023 and 2024.  ¶¶118, 124-25.

### D.    The Truth Emerges

Defendants' falsehoods began to emerge on May 29, 2024, when Enslin suddenly resigned and UiPath slashed revenue guidance by approximately 10 percent.  ¶¶167.  Founder Daniel Dines attributed this to the Company's "inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes" and admitted that UiPath "start[ed] to see some pressure, especially on the large multiyear deals."  ¶75.  Dines acknowledged "a need to have a deeper execution strategy," ¶170, and further admitted that a critical part of Enslin's strategy—a focus on customers' C-suites—failed.  ¶171.  Gupta added that "from a multiyear deal perspective," UiPath's failures were "broad-based" across the business.  ¶172.

Immediately, UiPath's stock price plunged over 34% in single day.  ¶174; Figure 1. Enslin's "sudden departure" had "shocked investors."  ¶¶159, 161.  Analysts recognized that their "prior view was incorrect," having been under the impression that "UiPath had executed on its turnaround strategy"; instead, "the company's go-to-market strategy has underperformed its expectations."  ¶176.  Another analyst noted the "sea change in tone & outlook" and specifically focused on "execution issues."  ¶175.  Analysts further observed that "something is clearly amiss when a board of directors turns on a CEO it had hired just two years prior."  ¶¶160-61.  Through 2024 and into 2025, UiPath's stock price remained well below its Class Period highs.  ¶12; Figure 1.

### III.    LEGAL STANDARD

To survive a motion to dismiss, a complaint need only "contain sufficient factual matter…to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 579 (S.D.N.Y. 2020).  The "PSLRA does not demand 'that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based[,]' … [n]or does Rule 9(b) 'require the pleading of detailed evidentiary matter in securities litigation.'" *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 345 (S.D.N.Y. Sep. 30, 2024) (Cronan, J.).  A plaintiff must simply plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak v. Kasaks*, 216 F.3d 300, 313-14 n.1 (2d Cir. 2000).  Plaintiffs meet this standard.

## IV.    PLAINTIFFS ADEQUATELY ALLEGE FALSE AND MISLEADING STATEMENTS

### A.    Defendants' Execution Statements Were False and Misleading

On November 30, 2023, Gupta told investors that "our strategy is on customers with a higher propensity to buy" and "[w]e feel like *we're executing against that strategy*, and *we're seeing* that [sic] results in the deal quality and the customer quality in the quarter." ¶127.  Enslin doubled down on these sentiments, telling investors on March 13, 2024, that "[t]here's no doubt there's better execution" and "[t]here's no doubt that's what we said we wanted to achieve better execution." ¶128.

Defendants' statements concerned the purported execution of UiPath's previously stated corporate objective of "repositioning our go-to-market engine" to "identify customers with a propensity to invest," ¶43, and analysts interpreted Defendants' statements as validation of UiPath's "strategic bet, almost a year old." ¶¶59, 65.  In truth, Enslin and Gupta's statements were "contradicted by the then-existing" execution failures at UiPath. *Diabat*, 2024 WL 4252502, at *123, *135.

Numerous FEs independently corroborate that by 2023, UiPath was in fact "not executing against that strategy."  For example, FE-3, FE-4, FE-5, and FE-6 (the latter three of whom are new to the SAC) confirm that by the time of Defendants' statements, UiPath's departure from ramped, prorated deals and other business initiatives had already led to customers either not renewing their contracts or reducing the number of products they licensed.  *See, e.g.*, ¶¶101, 102(a), 108, 115, 121.  FE-4 added that these execution challenges were felt "immediately" in late 2023 and early 2024, particularly among the very large enterprise customers around whom UiPath centered its strategy.  ¶108.  By late 2023 and early 2024, these customers were "significantly decreasing contract size."  *Id.*  FE-4 identified specific customers among the "Global 2000" with the "higher

10

propensity to buy who churned, such as Takeda Pharmaceuticals, VMWare, and New York state and local government entities.[2] *Id.* It became such a concern that senior management's "biggest focus" in 2023 and 2024 was to "minimize the leaky bucket" of customer churn. ¶109. FE-5 observed that UiPath's issues with customer churn "increased significantly throughout 2023 and 2024." ¶115. And FE-2 reported that by the Summer of 2023, every deal UiPath brought on was offset by one or two customers that either left or reduced their contract size—*i.e.*, they churned. ¶93. FE-6 reported that, beginning in 2023 and into 2024, UiPath's sales representatives were falling short of their quota attainment rate. ¶¶92, 119.

The issues were so evident that Defendants took steps to rectify them. FE-6 reports that by the Fall of 2023, Defendants set up a dedicated team, led by David Kao, to curb the increasing execution failures. ¶120. In an October 2023 all-hands call, Enslin urged the sales teams that "we need to do better on execution" which attendees understood to mean UiPath "was not closing big, strategic deals." ¶87 (FE-1). And just five days after the first false statement, Enslin led a December 5, 2023 Emerging Enterprise call in which he berated the team for not closing deals, and publicly demoted a Senior VP of Global Commercial Sales. ¶96 (FE-2).

Defendants' statements are thus plainly false. In *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020), without reference to specific figures or statistics, the Court found statements concerning "strong demand" false and misleading because Defendants received "internal red flags" and "Defendants' private statements and information available to them at the time showed that 'demand . . . was faltering[.]'" *Id*. at *3, *9. Additionally,

---

[2] Defendants incorrectly claim that the SAC does not allege the significance of Takeda or VMWare, Br. 26, but the SAC cites Takeda and VMWare in describing how "large enterprise customers" had churn events of $500,000, $1 million or more. ¶108. Takeda was specifically highlighted by UiPath in its September 2022 turnaround strategy presentation. ¶47.

Defendants' statements "tout[ing] their strategy" had failed to "tell the whole truth." *Id.* at *9. So too, here. Defendants' private statements (*e.g.*, Enslin declaring "we need to do better on execution") and the information available to them (*e.g.*, the droves of clients declining multi-year deals and the Clari reports on churn) showed that UiPath's public statements that it was "executing against" its turnaround strategy and seeing the "results in the deal quality and the customer quality" were false, misleading, and incomplete  ¶¶127-128; s*ee also Diabat*, 2024 WL 4252502, at *122-123 (statement that company was "executing on [its] transformation from a position of strength" was false and misleading because it was "contradicted by the then-existing financial distress"); *Galestan v. OneMain Holdings, Inc*., 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (falsity given "specific facts regarding the effects of" Defendants' decisions during the Class Period).

The statements are also false and misleading by omission. Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). "[O]nce Defendants chose to speak on the subject of [UiPath's purported execution], their failure to adequately inform investors regarding the true extent of [such execution] violated a clear duty to disclose." *Amgen*, 751 F. Supp. 3d at 354.

Here, Defendants boasted about execution while concealing what was known, discussed, and lamented internally: throughout 2023 and into 2024, UiPath faced increased churn and execution failures, as a result of, among other things, abandoning their ramping strategy. ¶87, 89. Far from being "different topic[s]" or "too attenuated," Br. 16, ramping was the key to long-term, multi-year deals with customers and was of the utmost importance to investors, as was any risk of increasing customer churn. ¶¶40-41 (one analyst noted how management touted the "opportunity to move customers to deal structures with annual ramping," which would "yield better margins"

12

and "better long-term engagement opportunities for its partners."). Meanwhile, UiPath's go-to-market strategy focused on large deals with large customers, yet multiple FEs reported that in 2023 and 2024 UiPath was losing these crucial large customers. ¶¶75, 86-87, 93, 108. Having publicly discussed UiPath's purported success executing against their strategy, Defendants were obligated to disclose the whole truth. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

Defendants' reliance on *In re Perion Network Ltd. Securities Litigation*, 2025 WL 1785224 (S.D.N.Y. June 27, 2025) is misplaced. There, the Court noted that the quality of "publishers" was too far afield from defendants' statement that search advertising revenue "increased by 3% due to a higher number of daily searches." *Id.* at \*4. By contrast, UiPath's customer churn was the exact opposite of "deal quality," "customer quality," and "executing" a strategy that depended on multi-year deals with large customers. Far from being "attenuated," the statements and omissions here are directly related.

Defendants' remaining cases are similarly off-base. *See, e.g.*, *In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at \*12 (S.D.N.Y. Sep. 9, 2025) (because defendants said nothing "implicitly or explicitly" about data security or potential data breaches, plaintiffs' theory was a "pure omission" theory); *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 163-64 (S.D.N.Y. 2018) (two wholly separate topics, unlike here, where ramping and incentives were inextricably linked to execution); *Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at \*5 (S.D.N.Y. Mar. 20, 2018) (upholding some omissions while rejecting omissions where the subjects were far afield).

### a.    Defendants' Execution Statements Were Neither Puffery Nor Opinions

Defendants' misstatements are not puffery. "In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution[,]" *Bricklayers & Masons Loc. Union No. 5*

*Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012), because "defendants may be liable for misrepresentations of existing facts" if they know "that the contrary was true." *Novak*, 216 F.3d at 315. A statement may "mean very little" in one context, but take on a greater, "entirely different" meaning in another context, such as when it's in response to a specific question. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022) (statement not puffery where it was "addressed to the particular concern of investors"). That is the case here.

First, Defendants' statements were not corporate optimism, but rather firm statements about "results" they were "seeing" about a stated corporate objective, *i.e.*, executing multi-year deals with larger customers. ¶127. Defendants repeatedly touted that corporate objective as the source of UiPath's success, *e.g.*, ¶¶43, 44, 52-57, and analysts were hyper focused on it, *e.g.,* ¶¶48-50, 58-59. The statements are therefore not puffery. *See Davis*, 2020 WL 1877821, at \*10 (statement that brand reputation was improving were not puffery where defendant touted company's "brand" as a source of success and "[r]easonable investors might have relied on those statements when choosing whether to invest"); *see also OneMain*, 348 F. Supp. 3d at 302-03 (statements that integration was going smoothly and defendants were "very confident" about financial prospects were neither puffery nor inactionable opinions).

Moreover, Defendants' execution statements were explicit responses to analyst questions during earnings calls. ¶¶127-128. Analysts at the time took note of these statements, commending UiPath's "continued" and "improv[ed]" execution," ¶¶58, 65. This underscores the statements' materiality. *See, e.g., In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at \*11-12 (S.D.N.Y. Nov. 26, 2018) (responses to analysts' questions, made to reassure investors, were not

14

puffery); *City of Pontiac Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (reaction of securities analysts supported an inference of materiality).

Defendants argue that the SAC does not plead how the execution statements can be understood to refer to "previously stated corporate objective[s]" or "internal performance indicators." Br. 12. Not so. Defendants repeatedly touted their strategy—their "stated corporate objective"—as focused on "customers with a higher propensity to buy." ¶127. Defendants added that, by "executing against [the] strategy," they were "seeing . . . that [sic] results in the deal quality and the customer quality in the quarter," which was understood to be a matter of customer retention and not selling deals that were going to churn. ¶¶93 (FE-2), 127. Gupta made clear that "we define quality as customers with a high propensity to buy," ECF 44-2 (Def. Ex. 2) at 17, and Enslin explained that UiPath's platform "enables us to close larger, more strategic deals." ECF 44-9 (Def. Ex. 9) at 5.

Unsurprisingly, investors and analysts understood that executing large deals with large customers was the measure by which UiPath's strategy was assessed. D.A. Davidson understood Defendants' statements as referring to the "strategic bet, almost a year old, on driving value for big clients with the longest/broadest automation journeys is paying off." ¶59. Oppenheimer declared, "***Management is executing well*** on its ***large customer growth*** and improving efficiency strategy[.]" ¶65. And when UiPath revealed that its strategy was not working, Morgan Stanley observed that the "prior sales strategy," which "lower[ed] incentives for multi-year deals," resulted in "down-sizing and slippage ***in large deals*** during the quarter." ¶176. Thus, contrary to Defendants' assertion, Br. 13, UiPath *did* provide a framework for itself and for investors to measure deal quality, customer quality, and execution.

15

Defendants' cases are unavailing. *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.* said statements that a strategic move has been "a success," or that "things are going well" are "typically*"* puffery "unless the statements addressed concrete and measurable areas of the [company's] performance." 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019). Here, the statements addressed concrete and measurable areas—*e.g.*, whether UiPath was executing multi-year deals with "high propensity to buy" customers —but were also specific that they were "seeing" the results of their execution. Defendants' remaining cases are inapposite. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) (unmeasurable, unverifiable statements that scientific studies were "rigorous," "very advanced," or "the best science"); *Oklahoma Firefighters Pension and Retirement System v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018) (statements were vague references to "success" and opinions about "progress," untethered from any measure of what defendants were actually "seeing," unlike here); *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 185-186 (2d Cir. 2014) ("open-ended and subjective" statements about whether risk diversification was "adequate").

Defendants also argue that Gupta's statement about deal quality and customer quality was an inactionable opinion. Br. 13. But the SAC, through multiple FEs, details how Gupta "did not hold the belief [he] professed" and "omitted [information that was] . . . necessary to make the statement[] … not misleading." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 181, 186 (2015). Specifically, Gupta was aware of undisclosed information contradicting the purely positive impression his statement gave investors, namely that UiPath was not executing against the strategy. ¶¶86, 88, 109-110, 116, 143.

16

### b.    Defendants' Improper Counterfactual Does Not Change the Analysis

Defendants improperly assert a counter-factual about UiPath's purported churn disclosures. Br. 16-18. But Defendants' ambiguous assertions merely raise factual questions and, if anything, underscore why their counterfactual "is entitled to little weight at this stage of litigation, when [the court] must accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).

Indeed, Defendants' purported narrative conflicts with the following:

- UiPath's definition of annualized renewal run-rate ("ARR") makes clear that it does not include the costs incurred to obtain licenses (such as discounts given), and ***does not*** reflect churn.  ¶33.

- Net retention rate ("NRR")—which Defendants acknowledge measures whether ARR from existing customers is churning—actually shows *growing* customer attrition because NRR *decreased* each quarter.  *Compare* ECF 44-8 (Def. Ex. 8) (9/7/23 10-Q) at 26, *with*  Ex. 1 (9/6/24 10-Q) at 29 (showing NRR of 121% in the quarter prior to the Class Period, and NRR of 115% for the quarter immediately after the end of the Class Period).

- In the final quarter of the Class Period, UiPath's customers with ARR greater than $1 million was *flat* compared to the prior quarter, at 288 customers.  *Compare* Ex. 2 (6/3/24 10-Q) at 23, *with* ECF 44-1 (Def. Ex. 1) (3/27/24 10-K) at 69.

- Incremental ARR as a percent of total ARR was in a steady decline, from 23% in Q4 2023 to 16% in Q2 2025.  *Compare* ECF 44-4 (Def. Ex. 4) (3/24/23 10-K) at 58, *with* Ex. 1 (9/6/24 10-Q) at 29. Similarly, UiPath's year-over-year ARR also

17

declined markedly, from 30% to 19% over the same period, further reflecting significant churn and signaling that UiPath's ability to attract new business, whether from new or existing customers, declined each quarter. *Compare* ECF 44-4 (Def. Ex. 4) (3/24/23 10-K) at 17, *with* Ex. 1 (9/6/24 10-Q) at 28.

### c.    Defendants' Generic Risk Warnings Do Not Shield Them

Defendants cite disclosures that generically warn that results have fluctuated in the past and "are expected to fluctuate in the future" depending on UiPath's ability to attract or retain customers, "customer expansion rates," pricing, and the number of licenses renewed.  Br. 17. These disclosures say nothing about customer churn, are contradicted by Defendants' earlier false statements, and are by themselves misleading because they "warn[] only that a risk may impact [UiPath's] business when that risk has already materialized." *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *11 (S.D.N.Y. Mar. 29, 2016).

Defendants cite *Police & Fire Retirement System of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *8 (S.D.N.Y. Aug. 24, 2017). There, Defendants' misstatements concerned the need to make hotel renovations, and the defendant had in fact disclosed that it needed to invest in renovations to remain profitable.  Here, no such on-topic warnings exist.  And Defendants' purported statements about churn do not shield them because those statements concerned "the lower end of the market," and thus are irrelevant to the larger customers who were churning in 2023 and 2024. *See* ¶176.

### B.    Defendants' Risk Disclosures Were False and Misleading

Defendants' risk disclosures were also false and misleading.  On March 27, 2024, Enslin and Gupta both signed a Form 10-K for FY 2024, whose risk disclosures presented then-existing damage to UiPath's sales growth as merely hypothetical possibilities: "[d]eclines or significant

delays in renewals or purchases of additional licenses and products by our customers ***could harm*** our future operating results;" "***If*** our customers do not purchase additional licenses and products from us or our customers fail to renew their licenses, our revenue ***may*** decline and our business, financial condition, and results of operations ***may*** be harmed;" and "***If*** we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected." ¶¶131-132.

At the time, each of these supposedly "hypothetical" risks had already materialized: UiPath's large customers were either not renewing contracts, or renewing contracts at reduced values, thus adversely affecting its business and results of operations. ¶¶101, 102(a), 108, 115, 121. And because those risks had materialized at the time of the statements, Defendants "ha[d] a duty to say so," *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024), and presenting the risks of such an occurrence as "merely hypothetical" was "potentially misleading." *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 301 (2d Cir. 2025).

Defendants' cases are unavailing. In *Chapman v. Mueller Water Products, Inc.*, the Court collected cases stating that "a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020). The Court said the disclosures in *Chapman* that new products "may have quality or other defects or deficiencies" did not necessarily mean that "every one of its newer technologies was defect-free or would not incur a warranty charge." *Id.* at 405-406. By contrast, UiPath's risk disclosures elided that the Company was in fact facing significant churn and represented the challenges to renewing licenses and attracting and retaining new customers as hypotheticals. A

19

reasonable investor would have therefore understood that those hypotheticals had not yet occurred, as the analysts confirmed upon UiPath's May 2024 revelations.[3]  ¶¶175-176.

## V.   PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

Scienter requires allegations of (i) "strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "motive and opportunity to commit fraud."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).   To determine whether scienter is adequately alleged, "courts must ... accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007).  Scienter allegations must be viewed holistically; the question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322-23.  The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences."  *Id.* at 324.  A complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference[.]"  *Id.*  In short: "the tie ... goes to the plaintiff."  *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

### A.   The Complaint Alleges a Strong Inference of Conscious or Reckless Misbehavior

Plaintiffs adequately allege scienter because Defendants "knew facts or had access to information" contradicting their public statements or "failed to check information they had a duty to monitor."  *Novak*, 216 F.3d at 308, 311.  Prior to their false and misleading statements, Defendants knew or were reckless in not knowing that UiPath customers were not renewing

---

[3] *In re Noah Educ. Holdings, Ltd. Securities Litigation* is inapposite because the risk disclosure alleged to be false there was boilerplate, not specific, and lay amidst "twenty-three pages [of] internal and external factors that might affect Noah's business." 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010).

contracts and/or materially reducing the size of their contracts (*i.e.*, they were "churning"), which directly undermined UiPath's strategy of executing multi-year deals with large customers.  ¶¶127, 135-165.

Defendants discussed UiPath's failure to "execute against that strategy" in numerous meetings.  The SAC "identif[ies] what was said during [] particular meeting[s]," and alleges the "information conveyed during those meetings that contradicted the substance of Enslin's and Gupta's Execution Statements."  (Order at 28-29.)  For example:

- Enslin led, and Gupta often joined, Weekly Forecasting Calls in 2023 and 2024, during which customer churn was discussed "all the time" and the executives' "biggest focus" was "how to minimize the leaky bucket," *i.e.*, UiPath's increasingly problematic execution challenges.  ¶109 (FE-4).

- In 2023 and 2024, Gupta was on "calls with sales leadership weekly about renewals" and thus "knew all this churn was happening," in part "because of the way the contracts were set up and that he approved" them.  ¶¶116, 143 (FE-5).

- By the fall of 2023, UiPath set up a team, led by David Kao, to fight churn.  ¶120 (FE-6).

- In an October 2023 all-hands call, Enslin chided attendees for poor strategy execution, saying "we need to do better on execution," which meant UiPath "was not executing" because the Company "was not closing big, strategic deals."  ¶87 (FE-1).

- The October 2023 QBR with Enslin specifically pertained to "execution on larger deals and trying to be more strategic," and churn was identified as a concern.  ¶122 (FE-6).

21

- Prior to and during the Weekly Forecast Calls in November 2023, Gupta regularly instructed Vice President for the Americas Ryan Mac Ban to have all one-year deals in the pipeline "switched" to three-year deals to rectify the execution issues caused by Defendants' commercial policy changes. ¶109 (FE-4). In connection, Gupta said "We really need revenue, so we need higher total contract value deals." *Id.*

- In early 2024, Enslin and Gupta were in Win Room meetings discussing how Takeda Pharmaceuticals—a customer that UiPath had touted in announcing its turnaround strategy (¶47)—and VMWare had either not renewed their contracts or materially reduced the size of their contracts, both with impacts of $500,000 or more. ¶¶108, 113 (FE-4).

Enslin and Gupta also had continuous access to data and reports that further contradicted their statements that UiPath was executing against its strategy of executing larger, multi-year deals. Specifically, the SAC "allege[s] with specificity what the platform showed at any relevant time." (Order at 29.) Specifically:

- Enslin and Gupta had continuous access to updated deal forecast information via the Clari platform, which executives updated weekly for the purpose of reporting to Enslin. ¶¶88 (FE-1), 97-98 (FE-2), 116 (FE-5), 148, 151 (FE-2).

- Prior to the November 30 statements, Clari showed a significant gap between the sales team's targets and their actual results, and Enslin and Gupta had access to the data showing those gaps. ¶97 (FE-2). Clari also showed Enslin and Gupta that UiPath was experiencing increasing churn and was failing to hit internal sales goals in 2023. ¶109 (FE-4).

22

- Key performance indicators that Enslin and Gupta would have seen showed that just 40 percent of sales representatives were attaining quota at the beginning of 2023, and sales representatives' productivity plummeted in 2023 and 2024.  ¶119 (FE-6).  The quota attainment rate stayed at around 40 percent through 2023 and into 2024, in comparison to the industry standard 70-72 percent.  *Id.*

- Enslin and Gupta tracked customer health and contract execution through Gainsight, thus there was "no way" that Enslin and Gupta "did not know the churn rate."  ¶118 (FE-6); ¶124 (FE-7).  Gupta discussed with FE-7 what Gainsight showed about churn and how UiPath would remediate churn.  ¶125.

- Gupta's public comments confirmed that UiPath had access to real-time information, including on renewals, such that "we are very deeply connected with the field in our customer base" and "you can see trends ahead of time."  ¶154.

- By February 2024, Enslin and Gupta saw a detailed analysis that demonstrated the impacts changes to UiPath's commercial policy would have.  ¶¶71, 110 (FE-4)

These "direct conversations with Individual Defendants [and] meetings at which Individual Defendants were present [that] demonstrate their access to and actual knowledge of facts which contradicted their public statements" establish Defendants' scienter.  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010); *see also In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at \*9 (S.D.N.Y. Mar. 31, 2025) (scienter where complaint alleged access to reports showing defendants' reliance on gray-market sales).

Defendants selectively, and inaccurately, quote the Order to suggest that Plaintiffs do not allege the information available to the Individual Defendants in sufficient detail.  For example, Defendants quote the Court as stating that a complaint must allege "the content of the reports or

23

data," Br. 21, when in reality the Court said plaintiffs must "allege[] any facts indicating that the content of the reports or data to which [the defendants] were privy was inconsistent with their statements." Order at 30. As noted above, Plaintiffs have done just that.

The Second Circuit's *Celestica* decision is instructive. The Second Circuit held that the plaintiff established scienter, not by identifying the content of specific reports, but by citing former employee accounts of the individual defendants' attendance at meetings discussing, among other things, "operational metrics" and "concern[ing] levels of obsolete inventory," and defendants' access to spreadsheets reflecting the extent of excess and obsolete inventory. 455 F. App'x at *13. Plaintiffs here have done the same. *See, e.g.,* ¶109 (Defendants' weekly attendance at meetings to discuss how to fight increasing churn); ¶¶97-98 (Defendants' access to Clari reports that showed increasing churn and failure to hit internal sales goals).

Defendants are wrong that Plaintiffs must allege the specific dates of the Clari reports, the specific amount of churn that they showed, or the specific amount of churn discussed at meetings. Br. 21. In the Second Circuit's words, the securities laws "do not require the pleading of detailed evidentiary matter in securities litigation," *Celestica*, 455 F. App'x at *15 (quoting *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001)). Courts in this District have consistently held that, even if "Plaintiffs don't identify the specific document containing the contradiction, they don't need to." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024). Plaintiffs must merely allege that a Defendant reviewed "information [that] would have contradicted their statements," as is the case here. *Id.*; *see also Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 147 (2d Cir. 2025) (individual defendants "received weekly reports on sales, inventory, and guidance targets," which "suggest[s] actual knowledge of the alleged unsustainable practices and improper revenue-recognition practice"); *Estée Lauder*,

24

2025 WL 965686, at *8-9 (complaint adequately "pointed to specific information" by alleging that the key information was contained in "sell-through reports from retail partners, [defendant's] pricing database, [and] briefings on pricing differentials"); *OneMain*, 348 F. Supp. 3d at 300-01 (scienter found where FEs "establish that the Individual Defendants participated in numerous meetings and conference calls during which the negative effects of integration-related activities were discussed," and crediting an "Excel report" that "'would have gone to any executive' . . . which presumably would have included the Individual Defendants").

Defendants were also directly involved in and responsible for the success of UiPath's turnaround strategy and the execution of customer contracts. Gupta helped launch the "annual ramping" approach, Enslin was brought on to execute the new turnaround strategy, and both were active in the "Win Room" meetings that were effectively a "big deal review," during which executives could and would veto deals. ¶¶37, 39-41, 50, 86. Gupta "lived in Clari," where he "saw reports" on and monitored churn, sales, and forecasting, and used Gainsight and discussed what it showed about churn. ¶¶116, 125. Defendants spoke publicly about the importance of tracking customer retention and churn, including how Enslin looks at sales team returns "on an ongoing basis," "[w]e know the major renewals," and "you can see trends ahead of time." ¶¶153-54. There is thus a strong inference that they knew or were reckless in not knowing the truth. *See In re Turquoise Hill*, 625 F. Supp. 3d at 244 (executive's significant involvement in overseeing project "bolsters the inference that [he] would have been aware of these delays and overruns"); *see also OneMain*, 348 F. Supp. 3d at 300.

These allegations are not mere "disagreements" with "business judgment." Br. 23. Enslin and Gupta were repeatedly told about churn, saw reports reflecting churn, and were told that changes to UiPath's commercial policy, among other measures, were undercutting UiPath's ability

to execute its strategy. *See, e.g.*, ¶¶115-116, 121-122. These facts contradicted Defendants' statements, and thus the inference of scienter is as compelling as any alternative.

### B.    Plaintiffs' Allegations are Sufficiently Credible

Unable to confront the substance of these allegations, Defendants deploy a number of piecemeal attacks on the FEs. But Defendants do not contest that the FEs are described "with sufficient particularity to support the probability that a person in the position occupied by [the FE] would possess the information alleged." *Novak*, 216 F.3d at 313-14. Nor do they contest that the FEs corroborate each other, underscoring their reliability. *See Lockheed Martin*, 875 F. Supp. 2d at 370-71.

Instead, Defendants claim that "most FEs . . . do not claim any direct contact with the Individual Defendants," including contact about "large deal execution." Br. 25. But unlike in the cases Defendants cite, multiple FE's were in meetings *with* Enslin, Gupta, or both, and corroborate what was shared in those meetings that contradicted Defendants' statements. *See, e.g.,* ¶87 (FE-1 attended meeting with Enslin in October 2023); ¶96 (FE-2 participated in meeting with Enslin in December 2023); ¶103 (FE-3 attended meeting with Enslin in October 2023); ¶109 (FE-4 attended Weekly Forecasting Calls with Enslin and Gupta). In any case, "[t]he notion that [former employees] cannot be believed because none had direct contact with any individual Defendant is contrary to law." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019); *see also Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 323-24 (S.D.N.Y. 2024) (Cronan, J.).

Defendants also try to dismiss as forward-looking FE-4's analysis that alerted Defendants to the fact that their commercial policy changes would drastically reduce UiPath's ability to generate revenue. Br. 22-23. But regardless of whether the analysis looked forward or backward, it was a red flag presented that Defendants contradicted their uniformly positive statements that UiPath was "no doubt" executing on deals. ¶110. Thus, Defendants were at least reckless in

26

falsely touting the success of their strategy, while knowing that their execution was ultimately doomed.[4]

Defendants argue that Enslin and Gupta simply must have disagreed with the analysis' conclusion, because the only alternative would be to pursue a "self-defeating strategy." Br. 23 & n.16. But, "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

Defendants' argument that Enslin and Gupta did not know about UiPath's attainment rates ignores key allegations. Br. 24. To start, Defendants' argument conflicts with Gupta's admission that UiPath executives have real-time access to "sales signals," "know the major renewals," "can see trends ahead of time," and can look at "where we are, pipeline, conversion rates." ¶154. Moreover, FE-6 was the Americas Sales Leader and Enablement Manager, and therefore knew that the sales quota attainment rate was a "key performance indicator," and thus tracked by Enslin and Gupta. ¶119. Defendants' sole case involved speculation by a Relator in a *qui tam* case whose conclusory allegations about defendants' conduct were based on "conversations with people at various law firms." *U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 694 (S.D.N.Y. 2018). By contrast, "specific information attributed to [FE-6,] combined with [FE-6's] position at the company, allows for the reasonable inference that" defendants "received and possessed knowledge of" the relevant data at issue. *TaskUs*, 710 F. Supp. 3d at 323-24.

Defendants' cases are inapposite. *See Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 220 (S.D.N.Y. 2020) (only one FE had contact with the individual defendants, and reported

---

[4] Defendants note that FE-4's analysis was based on a "limited sample" of 20-25 transactions, but offer no argument or explanation as to why that matters. Br. 23 n.15.

27

that the defendants dismissed his concerns, unlike here, where Enslin and Gupta's "biggest focus" was "how to minimize the leaky bucket," ¶109); *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *15, *18 (S.D.N.Y. Mar. 29, 2013) (FEs "*never mentioned*" the individual defendants; instead, defendants' knowledge was "*premised solely*" on "the centrality" of defendants' product to its operations); *Chapman*, 466 F. Supp. 3d at 399-400 (individual defendants were not at meetings with the FEs, and the FE allegations were "based on 'rumor or conjecture'").

### C. Additional Evidence Further Supports the Strong Inference of Scienter

***Core Operations.*** Under the core operations doctrine, scienter can be inferred where defendants' statements "contradicted reasonably available data" and "concerned major transactions or touched upon the heart of their companies' businesses." *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011). Defendants' turnaround strategy was at the core of UiPath's business, and Enslin was brought in to pursue this new, pivotal strategy. ¶37. Analysts called this strategy a "model reset," applauded its purported success. ¶¶58-59. The paramount importance of the turnaround strategy further supports a strong inference that Defendants knew the true state of affairs. *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("[T]he importance of [revenue source] to [defendant's] business moves the needle in Plaintiffs' favor.").

***CEO Enslin's Sudden Departure Supports a Strong Inference of Scienter.*** Enslin's departure—announced the day of the corrective disclosure—stunned analysts, who called it "shock[ing]," "sudden," "abrupt," and a sign that "something is clearly amiss." ¶¶159-161. Suspiciously timed departures of defendants support an inference of scienter. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (post-Class Period resignations on day facts related to fraud were revealed supported inference of scienter).

***Proximity to corrective disclosure supports a strong inference of scienter.*** Defendants do not deny that the two-and-a-half months between the final alleged misstatement and the corrective disclosure further supports the strong inference of scienter. Br. 24; *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1006 (S.D.N.Y. 1992). Contrary to Defendants' characterization, the Order simply stated that proximity requires "corroborative evidence." Order at 34. The SAC provides such corroboration. ¶¶86-88, 93, 96-98, 103-106.

### D.    Enslin and Gupta Had Motive and Opportunity to Commit Fraud

While Plaintiffs are not required to plead motive and opportunity to adequately meet the scienter standard, *Lockheed Martin*, 875 F. Supp. 2d at 371, courts have found motivation where the expected benefit to the officers lies in "concealing bad news in the hope that it will be overtaken by good news." *Makor Issues & Rights*, 513 F.3d at 710. Here, Enslin was fighting for his job, having been brought in to successfully turn UiPath around, and Gupta was responsible for UiPath's execution woes as a result of his decision to stop annual ramping, among other changes. They had every motive to conceal their errors in the hopes that good news would overtake any bad news. *Id.*

### E.    UiPath's Scienter

To plead corporate scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Typically, "the most straightforward way to raise such an inference for a corporate defendant" is "to plead it for an individual defendant." *Id.* Plaintiffs have done so here.

## VI.    PLAINTIFFS' CONTROL PERSON CLAIMS

Defendants only contest that Plaintiffs' control person claims fail because the SAC does

not plead a primary violation of Section 10(b).  Thus, because Plaintiffs allege a primary violation of Plaintiffs' Section 10(b) and Rule 10b-5, their Section 20(a) claim survives.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. Alternatively, Plaintiffs respectfully request leave to amend.

Dated: December 11, 2025

Respectfully submitted,

*/s/ Joseph A. Fonti*
Joseph A. Fonti
George N. Bauer
William E. Freeland
**BLEICHMAR FONTI & AULD LLP**
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
gbauer@bfalaw.com
wfreeland@bfalaw.com

-and-

Adam C. McCall (appearing *pro hac vice*)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
amccall@bfalaw.com

*Counsel for Lead Plaintiff Simone Brunozzi and Named Plaintiff Scott Cheslowitz and Lead Counsel for the Putative Class*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2025, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the court's CM/ECF system.

*/s/ Joseph A. Fonti*
Joseph A. Fonti

31

## WORD COUNT CERTIFICATION

I, Joseph A. Fonti, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c).  According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 8,742 words in the document.

_/s/ *Joseph A. Fonti*_
Joseph A. Fonti