UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE UIPATH, INC. SECURITIES LITIGATION | 24 Civ. 4702 (JPC)<br><br><u>OPINION AND ORDER</u> |

JOHN P. CRONAN, United States District Judge:

On behalf of a putative class of investors, Lead Plaintiff Simone Brunozzi and Named Plaintiff Scott Cheslowitz (collectively, "Plaintiffs") assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and under Section 20(a) of the Exchange Act against Defendant UiPath, Inc. ("UiPath" or the "Company") and two of its senior executives. In September 2022, facing performance struggles, UiPath announced that it would focus on selling high-value, multi-year deals to its larger customers. For a time, the new strategy seemed to be working, with UiPath reporting strong financial results in the second half of 2023 into early 2024. Defendants Robert Enslin and Ashim Gupta, the two senior executives, touted these results in calls to investors. But Plaintiffs allege that in 2023, UiPath began shifting deal structures in ways that drove away the customers the strategy was meant to win, and that Enslin and Gupta knew it. Then, on May 29, 2024, UiPath cut its full-year revenue forecast by approximately $150 million. The next day, UiPath's stock price fell by more than one third.

The Court dismissed an earlier version of these claims in *In re UiPath, Inc. Securities Litigation* ("*UiPath I*"), No. 24 Civ. 4702 (JPC), 2025 WL 2065093 (S.D.N.Y. July 23, 2025), but granted Plaintiffs leave to amend if they believed they could cure the identified pleading deficiencies. Plaintiffs responded by filing a Second Amended Complaint, which includes

allegations from four additional former employees and alleges that individual employees voiced their disagreement with Defendants' strategy and presented some unfavorable information about customers not renewing contracts or materially reducing the size of their contracts, referred to as churn. Defendants now move to dismiss the Second Amended Complaint.

For the reasons that follow, the new pleading too falls short. Defendants made no material misstatements or omissions in the Company's risk disclosures, as they never told investors that there was no customer churn, and "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Nor are Plaintiffs' "fundamental disagreements with Defendants' business judgments . . . actionable under Section 10(b) and Rule 10b-5." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010). And Plaintiffs still have not plausibly alleged that Defendants recklessly misled the market as to the Company's execution and deal quality. Because Plaintiffs fail to state any claims, the Court dismisses the Second Amended Complaint with prejudice.

## I. Background

### A. Facts

The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Second Amended Complaint and from the documents incorporated by reference therein. Dkt. 41 ("SAC"). *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that on a motion to dismiss, courts "may consider any written

instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

**1. The Parties**

UiPath is a New York-based enterprise software company that offers a suite of robotic process automation tools ("RPA") and artificial intelligence ("AI") capabilities that allow customers to automate tasks. SAC ¶ 29. Enslin served as UiPath's co-Chief Executive Officer ("CEO") beginning in May 2022 and its sole CEO from February 1, 2024 until May 31, 2024. *Id.* ¶ 25. Gupta has served as UiPath's Chief Financial Officer at all relevant times. *Id.* ¶ 26. Plaintiffs are investors who purchased and sold UiPath securities between December 1, 2023 and May 29, 2024 (the "Class Period"). *Id.* ¶¶ 22-23. They sue individually and on behalf of a putative class of persons and entities who purchased or acquired UiPath securities, as well as those who sold put options on UiPath stock, during the Class Period. *Id.* ¶ 178.

**2. UiPath's Business**

UiPath's software allows customers to automate routine tasks that would otherwise be performed by employees, such as extracting information from documents, completing forms, and updating databases. *Id.* ¶ 29. The Company derives revenue by selling software licenses, access to its products, and professional services. *Id.* ¶ 30. UiPath historically entered into three types of licensing contracts with customers: annual contracts that would expire after one year; multi-year contracts with the total contract value paid up front; and multi-year contracts that were paid annually. *Id.* ¶ 32. UiPath's principal performance metric is its annualized renewal run-rate ("ARR"), which reflects the ongoing revenue for a product projected over one year. *Id.* ¶ 33.

UiPath went public in April 2021 and immediately faced challenges. *Id.* ¶ 36. Revenue growth slowed from 65% in the first quarter of fiscal year 2022 to 32% in the first quarter of fiscal

year 2023, while ARR growth slowed from 64% to 50% over the same period. *Id.* The Company's valuation fell from roughly $35 billion to under $10 billion, and its stock price fell from $90 per share to a low of $17.66 per share. *Id.*

UiPath sought to address these challenges by implementing a new approach to structuring deals, deploying a new business model, and hiring new executive leadership. *Id.* ¶¶ 39, 43, 46. During the Company's September 27, 2022 Investor Day conference call, Enslin told investors that UiPath was repositioning its strategy to "identify customers with a propensity to invest," while UiPath's Chief Business Officer explained that the new sales strategy would focus resources on UiPath's largest customers "who represent the highest propensity" to drive sales growth. *Id.* ¶¶ 43-44. Analysts responded favorably, describing UiPath's new strategy as a "model reset" and a "maturing" moment for the Company. *Id.* ¶ 48.

Between the announcement of the Company's new strategy and November 30, 2023, UiPath's share price averaged $15.28. *Id.* ¶ 52. After the market closed on November 30, 2023, UiPath announced results for the third quarter of fiscal year 2024 (August through October 2023), including revenue of $326 million, which represented a 24% year-over-year increase. *Id.* In an earnings call with investors, Defendants touted UiPath's strong financial results, crediting UiPath's turnaround strategy and focus on large deals. Enslin told investors that the Company "closed a record number of third quarter deals over $1 million in ARR," and that "[c]ustomers with $1 million or more in ARR grew 31% to 264." Dkt. 44-2 ("Nov. 30, 2023 Earnings Tr.") at 3.[1] When an analyst observed that UiPath's total customer count had declined that quarter, Gupta responded

[1] "[I]n securities cases involving misrepresentation or misstatement claims, courts in the Second Circuit . . . take judicial notice of transcripts of companies' earnings calls" to determine what was stated during the call. *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

that macroeconomic variability "has had a more pronounced impact on the lower end of the market and that's where we see the majority of our churned customers." *Id.* at 17. UiPath, he explained, remained "focused on the quality of customers, and we define quality as customers with a high propensity to buy." *Id.* He continued:

> But overall, our strategy is on customers with a higher propensity to buy. We feel like we're executing against that strategy, and we're seeing that [sic] results in the deal quality and the customer quality in the quarter.

*Id.* at 18; *accord* SAC ¶ 127. Analysts reacted favorably, and UiPath's stock price rose nearly 27%, from $19.76 per share on November 30, 2023, to $25.04 per share on December 1, 2023. SAC ¶ 11.

Days later, on December 4, 2023, UiPath filed its quarterly report on a Form 10-Q with the SEC. This report, which was signed by Enslin and Gupta, incorporated UiPath's previously disclosed risk factors. *Id.* ¶ 133. These included warnings that:

> Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners. Declines or significant delays in renewals or purchases of additional licenses and products by our customers could harm our future operating results.

and,

> If our customers do not purchase additional licenses and products from us or our customers fail to renew their licenses, our revenue may decline and our business, financial condition, and results of operations may be harmed.

SAC ¶¶ 131, 133 (emphasis omitted).

A few months later, UiPath announced another successful quarter. On March 13, 2024, UiPath announced its quarterly results for the fourth quarter of fiscal year 2024 (November 2023 through January 2024). *Id.* ¶ 62. The Company reported $405 million in quarterly revenue, a 31% year-over-year increase, and that it achieved its "first quarter of [Generally Accepted Accounting Principles] profitability as a public company." *Id.* In an earnings call with investors, Gupta stated

that the team executed well in the fourth quarter, while Enslin said that he believed the Company was well situated for continued momentum. *Id.* ¶¶ 62-63. When asked by an analyst what was "giving [him] confidence," Enslin responded:

> [T]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution. And we also wanted to make certain that the platform was relevant for C-level executives. And there's no doubt that the whole AI movement that's happened in the past 12 months, all of those pieces together has helped UiPath move forward in a dramatically better way.

Dkt. 44-9 ("Mar. 13, 2024 Earnings Tr.") at 23-24; *accord* SAC ¶ 64. On March 27, 2024, the Company also filed a Form 10-K for fiscal year 2024, which included the same risk disclosures quoted above. SAC ¶¶ 131, 133.

**3. Execution Missteps**

The optimism did not last. On May 29, 2024, UiPath issued a press release announcing disappointing financial results for the first quarter of fiscal year 2025 (February 2024 through April 2024), and a reduction of its full-year revenue guidance by approximately 10%, or $150 million. *Id.* ¶ 167. In a separate press release, UiPath announced the resignation of Enslin as CEO effective June 1, 2024, and the reappointment of Daniel Dines, UiPath's founder and former co-CEO, as CEO. *Id.* Dines attributed the poor results to delays closing large multi-year deals in the quarter, as well as "inconsistent execution, which included contract execution challenges on large deals and certain sales compensation changes." *Id.* ¶ 168 (emphasis omitted). Gupta, for his part, was asked by an analyst whether "the smaller deal sizes, the postponements," were "broad-based across the business," and replied that "it's broad-based. . . . So from a multiyear deal perspective, that's broad." *Id.* ¶ 172 (emphasis omitted). On the news, the price of UiPath's stock dropped 34%, from $18.30 per share on May 29, 2024, to $12.07 per share on May 30, 2024. *Id.* ¶ 174. Investment analysts reacted negatively, describing a "sea change in tone [and] outlook" as

compared to the previous earnings report. *Id.* ¶ 175 (quoting statement from TD Cowen when downgrading UiPath's stock) (emphasis omitted).

Plaintiffs allege that the execution failures UiPath disclosed on May 29, 2024 had been developing for more than a year, and that Enslin and Gupta misled investors in the prior two quarters. Drawing on accounts attributed to seven former UiPath employees,[2] Plaintiffs allege that "[a] core component of UiPath's turnaround strategy—striking multi-year deals with larger customers—began to unravel even before the Class Period," as customers "either reduced the size of their contracts, both as to dollar value and duration, or declined to renew their contracts altogether." *Id.* ¶ 67. They attribute this to poor decisions UiPath made to the way it structured and compensated deals. First, UiPath decided to stop offering "ramped" contracts. Since at least 2021, UiPath had allowed deal structures where, instead of buying annual contracts, customers would sign multi-year deals that would increase the number of licenses each year. *Id.* ¶ 40. But Defendants began discouraging ramped deals in 2023 and 2024, which made multi-year deals harder to execute. *Id.* ¶¶ 42, 72. Second, UiPath also changed its commercial policy and sales

[2] The Second Amended Complaint's allegations concerning UiPath's internal information rest principally on accounts attributed to seven former employees, who are identified as FE-1, FE-2, FE-3, FE-4, FE-5, FE-6, and FE-7. SAC ¶¶ 79-125. FE-1 was an Enterprise account executive, assigned to the "strategic portfolio" Enterprise group, from February 2022 to October 2024. *Id.* ¶ 81. FE-2 worked at UiPath from February 2021 to early December 2023, most recently as an account executive in UiPath's Emerging Enterprise segment. *Id.* ¶¶ 90-91. FE-3 worked at UiPath from November 2021 through January 31, 2024, first as an Emerging Enterprise account executive until February 2023, and thereafter as a mid-market global account manager responsible for small and medium-sized customers in Latin America and Canada. *Id.* ¶ 99. FE-4 worked at UiPath from December 2018 to October 2024 and, beginning in January 2023, served as Senior Director of GTM (go-to-market) Strategy and Operations. *Id.* ¶ 107. FE-5 worked at UiPath from July 2023 to February 2025, serving as a global account director responsible for the Deloitte account until February 2024, when FE-5 was promoted to regional vice president. *Id.* ¶ 114. FE-6 worked at UiPath from June 2021 to October 2024, as a Worldwide GSI Partner Development Manager until July 2022 and as AMER Sales Leader and Enablement Manager thereafter. *Id.* ¶ 117. FE-7 worked at UiPath from September 2018 until January 2024, most recently as product leader for Solution Accelerators from December 2022 to January 2024. *Id.* ¶ 123.

compensation structure to structure employee compensation around "paid annual" deals instead of multi-year deals. *Id.* ¶ 70. This change disincentivized account executives from seeking multi-year deals because their compensation for a one-year deal would be the same as if they did a three-year deal paid annually. *Id.* ¶ 84(a). The result was fewer multi-year deals. *Id.* ¶ 70. Third, in 2023 UiPath began to force customers onto its "Flex" platform. *Id.* ¶¶ 85, 101. This platform was $8,000 to $10,000 more expensive annually than the previous platform, and many customers did not want to adopt it. *Id.* ¶ 101.

The consequence, Plaintiffs allege, was customer churn—that is, existing customers declining to renew, reducing their commitments, or terminating their contracts. *Id.* ¶ 93. Instead of entering into more costly contracts, many customers refused to renew their contracts, or renewed only at reduced values. *Id.* ¶ 7. Churn was reported in Clari, Gainsight, and Salesforce—UiPath's data systems—and UiPath used these systems to track and understand customer churn. *Id.* ¶¶ 118, 125, 149-150. Churn was also discussed internally "all the time," and in the fall of 2023, UiPath set up a team to fight churn following customer complaints. *Id.* ¶¶ 68, 120(a).

**B. Procedural History**

On November 22, 2024, Plaintiffs filed an Amended Complaint. Dkt. 30. Defendants moved to dismiss, and on July 23, 2025, the Court granted that motion. *UiPath I*, 2025 WL 2065093. As relevant here, *UiPath I* held that Plaintiffs failed to plead scienter as to two statements regarding the Company's execution and deal quality that remain at issue in the Second Amended Complaint.[3] In reaching that conclusion, the Court explained that "[w]ithout any

[3] The Court in *UiPath I* also dismissed Plaintiffs' claims based on several other challenged statements regarding UiPath's execution of contracts and its investments in its sales team and customer success function. 2025 WL 2065093, at *10-11, *17-21. Although some of these remarks remain in the Second Amended Complaint, SAC ¶¶ 57, 62, Plaintiffs no longer plead that they were actionable, *see id.* ¶¶ 126-134.

allegations as to what information was contained in Clari or revealed during the meetings or how that information contradicted Defendants' public statements, the Amended Complaint's allegations concerning that information fail to raise a strong inference of scienter with respect to the Execution Statements." *UiPath I*, 2025 WL 2065093, at *16 (internal quotation marks omitted and alterations adopted). And Plaintiffs' additional pieces of circumstantial evidence were "too thin a reed to support the requisite strong inference of scienter." *Id.* The Court granted leave to amend, but "emphasize[d] that Plaintiffs should only file a second amended complaint if they are able to remedy the pleading deficiencies identified herein." *Id.* at *21.

Plaintiffs subsequently filed their Second Amended Complaint on September 12, 2025. Dkt. 41. Like the Amended Complaint, the Second Amended Complaint pleads two counts. In Count I, Plaintiffs allege that Defendants made materially false and misleading statements in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5. SAC ¶¶ 190-198; *see id.* ¶¶ 126-134 (listing the allegedly materially false and misleading statements). In Count II, Plaintiffs allege that by virtue of those alleged material misstatements and omissions, and due to their control over UiPath, Enslin and Gupta violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). SAC ¶¶ 199-200. On October 27, 2025, Defendants again moved to dismiss. Dkts. 42, 43 ("Motion"), 44. Plaintiffs filed their opposition on December 11, 2025, Dkts. 45 ("Opposition"), 46, and Defendants replied on January 22, 2026, Dkt. 48.

## II. Legal Standard[4]

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b). *ATSI Commc'ns*, 493 F.3d at 99. A plaintiff alleging fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Conclusory allegations or allegations unsupported by factual assertions are insufficient. *See ATSI Commc'ns*, 493 F.3d at 99.

[4] The legal standards governing Defendants' motion are the same as those set out in the Court's prior Opinion and Order in *UiPath I*, 2025 WL 2065093, at *7-8. The Court restates them here for clarity and ease of reference.

Securities fraud claims under Section 10(b) must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007). The PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *accord Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 551 U.S. at 321. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (alterations adopted and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

## III. Discussion

### A. Section 10(b) and Rule 10b-5 (Count I)

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted). Defendants argue that Plaintiffs have failed to plead a material misrepresentation or omission, as well as scienter.

#### 1. Material Misstatements and Omissions

To survive a motion to dismiss, "a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Although "[t]he Supreme Court has instructed that 'silence, absent a duty to disclose, is not misleading under Rule 10b-5,'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (alterations adopted) (quoting *Basic*, 485 U.S. at 239 n.17), Rule 10b-5's prohibition on misleading omissions "requires disclosure of information necessary to ensure that statements already made are clear and complete," *Macquarie*

*Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). This means that, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). That said, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Time Warner Inc. Sec. Litig.*, 9 F.3d at 267. In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, courts must look at the "context and manner of presentation." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (internal quotation marks omitted). "The ultimate question, however, remains whether a 'reasonable investor could have been misled to believe something in contradiction to the omitted facts.'" *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347 (S.D.N.Y. 2024) (alteration adopted) (quoting *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011)).

Materiality, in turn, is "satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted); *see also Basic*, 485 U.S. at 231 ("[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."). This inquiry is "fact-specific" and "necessarily depends on all relevant circumstances." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.* ("*ECA*"), 553 F.3d 187, 197 (2d Cir. 2009); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d

Cir. 2016) ("The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." (internal quotation marks omitted)). The Supreme Court has been "careful not to set too low a standard of materiality," *Matrixx Initiatives*, 563 U.S. at 38 (internal quotation marks omitted), instead ensuring that the "materiality hurdle" remains a "meaningful pleading obstacle," *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). At the motion-to-dismiss stage, however, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (alteration adopted; internal quotation marks omitted).

Plaintiffs challenge two categories of purportedly false and misleading statements. First, they challenge Defendants' statements warning about risks to the Company's sales growth without disclosing that those risks had materialized (the "Risk Disclosure Statements"). Second, Plaintiffs challenge two of Defendants' statements relating to execution and deal quality (the "Execution Statements"). The Court dismisses the Risk Disclosure Statements at the first step, because read in context they would not have misled a reasonable investor into believing that the risks they described had not materialized. With respect to the Execution Statements, as in its previous Opinion and Order, the Court need not decide whether the statements are actionable misstatements or omissions. Even accepting Plaintiffs' reading of the Execution Statements, the Second Amended Complaint fails to plead facts giving rise to a strong inference of scienter as to either one.

**i. Risk Disclosure Statements**

The Second Amended Complaint newly alleges that on March 27, 2024, UiPath filed a Form 10-K that was signed by Enslin and Gupta. SAC ¶ 131. The Form 10-K stated that "[d]eclines or significant delays in renewals or purchases of additional licenses and products by our customers could harm our future operating results," and that "[i]f our customers do not purchase additional licenses and products from us or our customers fail to renew their licenses, our revenue may decline and our business, financial condition, and results of operations may be harmed." *Id.* (emphasis omitted).[5] Plaintiffs assert that "[t]hese statements were materially false and misleading because, at the time of the 10-K, the risks that Defendants presented as mere hypothetical and theoretical possibilities had, in fact, materialized." *Id.* ¶ 134. Specifically, they argue that at the time of these risk disclosures, "each of these supposedly 'hypothetical' risks had already materialized" because "UiPath's large customers were either not renewing contracts, or renewing contracts at reduced values, thus adversely affecting its business and results of operations." Opposition at 19.

"Though ubiquitous in securities filings, cautionary statements of potential risk have only rarely been found to be actionable by themselves." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008) (internal citation omitted). To be sure, in some circumstances, a risk disclosure "can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020); *see also City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 301 (2d Cir. 2025) (concluding that Form 10-K risk disclosures "were plausibly false or

---

[5] The same statements were incorporated by reference in UiPath's December 4, 2023 Form 10-Q, also signed by Enslin and Gupta. SAC ¶ 133.

misleading" where the plaintiffs plausibly alleged that "the specific financial consequences described in [those] disclosures were not merely hypothetical but had already materialized and resulted in significant disruption to Peloton's business" (alteration adopted and internal quotation marks omitted)). But the Second Circuit has rejected the argument "that a risk disclosure is actionable whenever a company fails to disclose that the risk already materialized in some way." *Smith v. Gap, Inc.*, 177 F.4th 405, 410 (2d Cir. 2026). Instead, the test for "[w]hether a warning about a future risk is misleading when it fails to disclose that the risk already materialized depends on how a reasonable investor would understand the statements taken together and in context." *Id.* (internal quotation marks omitted).

UiPath's disclosures regarding the risk of declines or delays in renewals or purchases were not plausibly misleading under this standard. To start, the challenged risk disclosures "concern[] ubiquitous risks in the industry, as opposed to more discrete, context-dependent, or event-driven risks." *Id.* at 411. After all, a software company that sells licenses on a subscription basis depends on its customers renewing and expanding those licenses. And the challenged disclosures here used "generic" language and made no reference to UiPath's go-to-market strategy, its enterprise customers, or any particular customer segment. *Chapman*, 466 F. Supp. 3d at 406; *cf. In re Mylan N.V. Sec. Litig.*, No. 16 Civ. 7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) (explaining that "the more specific the caution, the more likely it is to mislead a reasonable investor"). Nor did UiPath present these risks "as merely hypothetical." *Peloton Interactive*, 153 F.4th at 301. In the same financial statements, UiPath disclosed that "results of operations have fluctuated in the past and are expected to fluctuate in the future," due to "fluctuations in demand for or usage of our platform and products." Dkt. 44-1 ("2024 Form 10-K") at 19; Dkt. 44-4 (2023 Form 10-K) at 28; *see Smith*, 177 F.4th at 411 (explaining that Gap's "admission that the risks

were not merely hypothetical but had materialized in the past and would reoccur" suggested that its risk disclosure statements "would not have misled a reasonable investor about the nature of the risks disclosed"). Accordingly, UiPath's Risk Disclosure Statements were not materially false or misleading.

**ii. Execution Statements**

On the other hand, Plaintiffs raise a closer question as to whether the Execution Statements are actionable. They challenge two Execution Statements: (1) Gupta's statement during the November 30, 2023 earnings call that "our strategy is on customers with a higher propensity to buy" and "[w]e feel like we're executing against that strategy, and we're seeing that [sic] results in the deal quality and the customer quality in the quarter," SAC ¶ 127 (alterations in original and emphasis omitted); and (2) Enslin's statement during the March 13, 2024 earnings call that "[t]here's no doubt there's better execution, right? There's no doubt that's what we said we wanted to achieve better execution," *id.* ¶ 128 (emphasis omitted).

Expressions of puffery and corporate optimism do not give rise to securities violations because they "are too general to cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206. "[T]here is no canonical test for how vague a statement must be to qualify as puffery," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), but a central inquiry is whether the statement is "a determinate, verifiable statement," *Omnicare*, 575 U.S. at 184, and whether there is "any objective, black-and-white standard by which to verify" the statement, *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023).

Terms like "deal quality," "customer quality," and "better execution" are vague and somewhat subjective on their own. "Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices" are regularly held to be inactionable

puffery. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (affirming dismissal of "stable asset quality" as puffery). But "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). A "term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts," but not if the surrounding context gives it "a plausible objective meaning for investors." *Baxter v. MongoDB, Inc.*, 832 F. Supp. 3d 214, 264-65 (S.D.N.Y. 2026) (quoting *Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014)).

In context, Plaintiffs have a reasonable argument that "investors and analysts understood that executing large deals with large customers was the measure by which UiPath's strategy was assessed." Opposition at 15. In the November 2023 earnings call, Gupta told investors that the Company's strategy focused on "customers with a higher propensity to buy." SAC ¶ 127; Nov. 30, 2023 Earnings Tr. at 18. And he contrasted those customers with "the lower end of the market with smaller businesses." Nov. 30, 2023 Earnings Tr. at 17. Enslin's remark about "better execution" was similarly made in response to an analyst's question asking about how many of UiPath's "strategic discussions are with larger customers." Mar. 13, 2024 Earnings Tr. at 23-24; *see In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023) (treating the fact that statements "were made in response to a question from an interview" as context supporting the conclusion that they were not puffery).[6]

That said, Plaintiffs' reading does not entirely solve the problem. Even accepting that the Execution Statements referred to UiPath's strategy of focusing on customers with a higher propensity to buy, neither statement identified the benchmark against which "deal quality,"

[6] On the other hand, Plaintiffs point to nothing from which an investor would infer that "quality" or "better execution" related to "customer retention and not selling deals that were going to churn." Opposition at 15.

"customer quality," or "better execution" could be tested. Plaintiffs do not dispute the accuracy of Defendants' public filings, and the parties' disagreement over whether the figures contained therein reflect "better execution" underscores that the Execution Statements could refer to any number of internal performance indicators. *Compare* Motion at 14-15, *with* Opposition at 17-18. Whether the same undisputed data reflect strong execution, weak execution, or something in between thus depends on which metric one picks. The Execution Statements gave an investor no basis for choosing, suggesting that they may not be "determinate, verifiable statement[s]." *Omnicare*, 575 U.S. at 184.

Ultimately, as in *UiPath I*, the Court need not resolve this dispute. *See UiPath I*, 2025 WL 2065093, at *12. Even accepting that the Execution Statements described UiPath "executing large deals with large customers," Opposition at 15, these statements are not actionable because, as explained below, Plaintiffs have not adequately pleaded scienter for either one.

**2. Scienter**

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To qualify as "strong," "'[a]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 51 (2d Cir. 2025) (quoting *Tellabs*, 551 U.S. at 324). And the "requisite state of mind, or scienter[,] that the plaintiff must allege is an intent to deceive, manipulate or defraud." *Id.* (alteration adopted and internal quotation marks omitted). A plaintiff may make such a showing by alleging facts that demonstrate either: (1) "a 'motive and opportunity to commit the fraud'" or (2) "'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99).

Plaintiffs have not demonstrated motive and opportunity. To properly allege motive, Plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 307-08). Plaintiffs argue that Enslin and Gupta "had every motive to conceal their errors in the hopes that good news would overtake any bad news." Opposition at 29. This is the same supposed motive that this Court previously found insufficient. *See UiPath I*, 2025 WL 2065093, at *12 (rejecting Plaintiffs' argument that "Enslin's and Gupta's motive was to keep their errors out of the limelight in the hopes that good news would overtake any bad news" (internal quotation marks omitted)). Plaintiffs hypothesize that "Enslin was fighting for his job" and "Gupta was responsible for UiPath's execution woes," Opposition at 29, but the desire of corporate officers "to protect their executive positions and compensation" is "common to all corporate executives and, thus, too generalized to demonstrate scienter," *Kalnit*, 264 F.3d at 139. Plaintiffs' failure to plead motive is not necessarily fatal. "[I]f Plaintiffs cannot make the 'motive' showing, then they could raise a strong inference of scienter under the 'strong circumstantial evidence' prong, though the strength of [UiPath's] circumstantial allegations must be correspondingly greater if there is no motive." *ECA*, 553 F.3d at 198-99 (internal quotation marks omitted).

Turning to the second prong, Plaintiffs have not met their burden to plead "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. A showing of "conscious recklessness" entails "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106 (internal quotation marks omitted). Recklessness has also been defined as, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant

must have been aware of it." *ECA*, 553 F.3d at 203 (quoting *Novak*, 216 F.3d at 308). The assessment of whether conscious misbehavior or recklessness has been adequately pleaded "is a highly fact-based inquiry," *Kalnit*, 264 F.3d at 142, and courts must "analyz[e] scienter holistically," *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020); *accord Tellabs*, 551 U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

Plaintiffs primarily seek to establish recklessness by alleging that "Defendants 'knew facts or had access to information contradicting their public statements' or 'failed to check information they had a duty to monitor.'" Opposition at 20 (quoting *Novak*, 216 F.3d at 308, 311). They also replead several additional pieces of circumstantial evidence, which they contend support a finding of scienter. *Id.* at 28-29. In *UiPath I*, the Court concluded that the Amended Complaint failed to plead scienter because, although Plaintiffs "gesture[d] broadly at internal financial data that could either have supported or contradicted Defendants' statements," the pleading lacked "any allegations as to what information was contained in [UiPath's internal sales system] or revealed during the meetings or how that information contradicted Defendants' public statements." *UiPath I*, 2025 WL 2065093, at *16 (citation modified). The Second Amended Complaint includes more detail about what information was available to Defendants, but little about how that information contradicted their public statements. Thus, and for the reasons more fully described below, Plaintiffs have again failed to plead scienter as to the Execution Statements.

**i. Access to Contrary Information**

Plaintiffs argue that "[p]rior to their false and misleading statements, Defendants knew or were reckless in not knowing that UiPath customers were not renewing contracts and/or [were] materially reducing the size of their contracts . . . , which directly undermined UiPath's strategy of

executing multi-year deals with large customers." Opposition at 20-21. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (alteration adopted) (quoting *Novak*, 216 F.3d at 309). "To meet this standard, a plaintiff must plead facts supporting the inference that defendants had access to specific contradictory information at the time they made their misleading statements." *Shemian v. Rsch. In Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013) (alteration adopted; internal quotation marks omitted), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

Plaintiffs reassert, in substantially the form the Court has already reviewed, that Defendants had access to information about UiPath's performance. As before, they allege that Enslin and Gupta had continuous access to the Clari platform, which UiPath used to forecast deal values and predict whether deals would materialize. *See, e.g.*, SAC ¶¶ 88, 97, 106, 112, 148-149. The Second Amended Complaint adds additional information about the platform's architecture. Clari contains tabs and forecast categories such as "commit," "upside," and "qualified upside," as well as an "opportunity grid" listing data about individual deals. *Id.* ¶ 112. As before, Plaintiffs allege that UiPath convened "Win Room" meetings to review significant transactions, that Enslin and Gupta had access to prepared documents about the meetings, and that Gupta was the "ultimate decision maker" on whether to approve or deny a deal. *Id.* ¶¶ 138-139. And, as before, Plaintiffs allege that Enslin and Gupta participated in weekly calls, all hands calls, and other meetings including an October 2023 quarterly business review and a December 2023 sales team call. *Id.* ¶¶ 143-147.

**a. Churn Allegations**

Plaintiffs chiefly argue that Defendants had access to information about customer churn. The Second Amended Complaint alleges that churn grew during 2023 and 2024 and that Enslin

and Gupta were repeatedly exposed to it on the Clari platform and in meetings and calls. These allegations include considerably more detail than those the Court reviewed in *UiPath I*. But showing that Defendants knew or had access to information about churn does not establish scienter "absent a specific statement from Defendants that churn was low." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 532 (S.D.N.Y. 2020), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-cv, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order). This is because, to plead scienter under an access-to-information theory, a plaintiff must allege "defendants' knowledge of facts or access to information *contradicting their public statements*." *Setzer*, 968 F.3d at 215 (emphasis added) (quoting *Novak*, 216 F.3d at 308). And Defendants never told investors that there was no customer churn or that the Company's churn rate was low. On the contrary, during the November 30, 2023 earnings call, Gupta acknowledged churn, telling investors that "we see the majority of our churned customers" "on the lower end of the market with smaller businesses." Nov. 30, 2023 Earnings Tr. at 17. And he reiterated during the March 13, 2024 earnings call that there was "customer attrition," but that the vast majority of attrition "continues to be in smaller customers which, in aggregate, represent an immaterial portion of our overall business." Mar. 13, 2024 Earnings Tr. at 8. Allegations that Defendants knew about customer churn demonstrate at most that Defendants were aware of information that was *consistent* with their public statements that UiPath was experiencing churn "on the lower end of the market with smaller businesses," and do not suggest any inference of scienter.

Many of Plaintiffs' churn allegations, including their most detailed ones, are thus immaterial to the scienter analysis. Plaintiffs' most specific allegations expressly relate to churn among smaller customers. The Second Amended Complaint draws its most specific churn allegations from FE-3, "a mid-market global account manager . . . responsible for managing small

to medium-sized customers in Latin America and Canada." SAC ¶ 99. That account manager reported that "as many as 30 percent of customers cancel[ed]" in that territory. *Id.* ¶ 101. For example, one of UiPath's partners that sold UiPath's software to customers in Latin America "dropped all of their accounts that represented $25K or less in annual revenue." *Id.* ¶ 102. But even if Defendants knew about this churn, these allegations are consistent with their representations that the majority of churn was among smaller accounts, and thus do not suggest scienter.

By contrast, Plaintiffs' allegations about churn among the large customers, on whom UiPath's strategy focused, are largely anecdotal and lack particularity. At a general level, Plaintiffs allege that "large enterprise customers were 'significantly decreasing contract size,'" including "the 'Global 2000' customers at UiPath, which were those with the 'higher propensity to buy.'" *Id.* ¶ 108. Somewhat more specifically, they allege that Enslin participated in an October 2023 meeting "during which UiPath's increasing churn numbers and inability to secure large, multi-year deals were addressed," *id.* ¶ 146, and that any deal with over "$500,000 in churn was discussed in a Win Room setting" which "Enslin and Gupta would on occasion attend," *id.* ¶ 113(a). And most concretely, they allege "churn events of $500,000, $1 million, or more with customers such as Takeda Pharmaceuticals and VMWare." *Id.* ¶ 108(d).

Perhaps this suffices to allege that Defendants had access to information showing that *some* large customers were churning. But that is not the same as alleging information contradicting what Defendants said publicly. Takeda and VMWare are two of the hundreds of large accounts UiPath served. *See* 2024 Form 10-K at 69 (reporting that the Company had 229 customers with $1 million or more in ARR in January 2023, and 288 such customers in January 2024). The Second Amended Complaint never alleges what share of that base was churning, or how it compared to the new

business UiPath was winning during the same period. Enslin's and Gupta's knowledge, as alleged, that two large customers had reduced their commitments, during a period in which UiPath's large-customer count grew, does not contradict their public statements. Nor does the Second Amended Complaint specify what information about UiPath's purported inability to secure large multi-year deals was made available to either Defendant, or when. And absent some indication of what that information showed, there is no basis to conclude that it contradicted Defendants' assessments of the Company's execution. After all, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309.

Plaintiffs' remaining churn allegations give no indication of the magnitude of large-customer churn, much less that Defendants were aware of it. Plaintiffs allege that Defendants participated in "weekly forecasting calls where the issues surrounding churn in 2023 and 2024 were discussed," SAC ¶ 137, "attended 'Win Room' meetings during which they learned about the challenges UiPath faced in securing quality deals," *id.* ¶ 138, and "had access to and used the Gainsight system" which "provided, among other things, information on churn and how it was markedly increasing in 2023 and 2024," *id.* ¶ 153. They also allege that Gupta "had insight into, and knew about, churn 'because of the way the contracts were set up,'" *id.* ¶ 143, and "'saw reports' on churn from the Clari system" because he "'lived in Clari' and regularly used it to monitor sales, forecasting, and churn," *id.* ¶ 150. And Plaintiffs allege that Enslin "regularly met with Senior Vice President for Global Commercial Sales Kay to discuss business forecast data." *Id.* ¶ 151. These allegations give no indication that Defendants were confronted with information showing that churn was increasing among larger clients rather than—as Defendants told

investors—that churn was concentrated "on the lower end of the market," Nov. 30, 2023 Earnings Tr. at 17.

Plaintiffs may be right that the PSLRA does not require them to identify "the specific amount of churn" shown in reports or discussed at meetings. Opposition at 24; *see San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024) (finding scienter sufficiently alleged where "Defendants said they reviewed internal information" and "Plaintiffs allege (with support) that, at the time of Defendants' review, that information would have contradicted their statements"). But it does "require[] pleading particularized facts that show the defendants had 'knowledge of facts or access to information *contradicting* their public statements.'" *In re Miniso Grp. Holding Ltd. Sec. Litig.*, No. 22 Civ. 864 (ER), 2026 WL 879334, at *20 (S.D.N.Y. Mar. 31, 2026) (emphasis added) (quoting *Kalnit*, 264 F.3d at 142). Plaintiffs have not done that with respect to their churn allegations.

**b. Internal Forecasts and Sales Targets**

Plaintiffs supplement their churn allegations with allegations that UiPath's internal forecasts and sales targets showed that Defendants' policies were failing. Allegations that Defendants received "internal red flags" can support an inference of scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 16 Civ. 3591 (GHW), 2020 WL 1877821, at *3 (S.D.N.Y. Apr. 14, 2020). But the allegations here do not describe red flags of that kind.

First, Plaintiffs allege that "in January or February 2024," Enslin and Gupta attended a meeting during which they were presented with an analysis showing "that, if UiPath's Americas business closed $100 million in ARR, it would only close $70 million once the changes in the commercial policy were applied." SAC ¶ 155. As a threshold matter, that meeting postdated Gupta's November 30, 2023 statement by months and can bear only on Enslin's statement in March 2024. *See May v. Barclays PLC*, No. 23 Civ. 2583 (LJL), 2025 WL 887300, at *27

(S.D.N.Y. Mar. 21, 2025) ("Scienter is measured as of the time of the statement alleged to be false."). Moreover, the analysis did not purport to describe events that had already occurred, but instead predicted "the specific impact that changes in the commercial policy would have." SAC ¶ 110. The Second Amended Complaint does not explain how this conclusion was reached beyond that it involved "evaluating 20 or 25 transactions" in a single region. *Id.* And, critically, the Second Amended Complaint does not reflect that Enslin or Gupta agreed with the analysis. On the contrary, it describes the meeting as "contentious," suggesting that there may have been discord. *Id.* Without more, there is no basis from which to conclude whether Enslin or Gupta agreed with this analysis or were reckless in not doing so, and an allegation "that there was uncertainty and disagreement[] within [a company]" does not create a strong inference of scienter, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014). At most, then, Plaintiffs allege that Defendants were presented with a forecast they declined to adopt. But "[a]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.

Second, Plaintiffs allege that UiPath was not meeting its internal sales goals. They allege that "the industry standard for making quota was a 70-72 percent attainment rate," but that for UiPath, "this attainment rate was around 40 percent at the beginning of 2023 and into 2024." SAC ¶¶ 119, 156. But Plaintiffs never allege that either Enslin or Gupta was shown this figure, and the conclusory allegation that Gupta "absolutely knew" about the attainment rate, *id.* ¶ 119(b), does not "identify the reports or statements containing this information," *Novak*, 216 F.3d at 309. Moreover, nothing about this figure indicates that the low attainment rate reflected poor sales among the larger customers "with a higher propensity to buy." As with Plaintiffs' churn allegation,

this at most might show that Defendants were aware of an unfavorable internal fact without alleging that it conflicts with what Defendants told the market.

**c. Defendants' Efforts to Improve Execution**

The Second Amended Complaint also alleges that on occasion, Enslin or Gupta acknowledged internally that UiPath's sales were underperforming. In October 2023, before the Class Period began, Enslin attended a meeting about "execution on larger deals and trying to be more strategic," appeared frustrated, and "chided" employees about needing to do better "on execution." SAC ¶¶ 122, 144-145; *see also* Opposition at 21. Next, during forecast calls in November 2023 and for several months before, Gupta told employees to convert one-year deals in the pipeline to three-year deals, prefacing the instruction by telling them that "[w]e really need revenue, so we need higher total contract value deals." SAC ¶ 109(d). And on December 5, 2023, Enslin attended an "Emerging Enterprise" meeting, at which he demoted the Senior Vice President for Global Commercial Sales and determined that he would oversee the team. *Id.* ¶ 147.

First, allegations that Enslin may have been a demanding or hands-on manager do not establish scienter. As this Court previously observed, "[t]here are myriad reasons why management might pressure employees to perform better, and a mere allegation that 'executive defendants are "closely involved" in running their business is not enough to show that they had access to contrary information.'" *UiPath I*, 2025 WL 2065093, at *15 (quoting *N. Mia. Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19 Civ. 10825 (JPO), 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021)).

Second, none of these internal statements conflicts with what Defendants told the market. Enslin's October 2023 statement about the need to do better "on execution," SAC ¶ 145, is not inconsistent with his statement five months later that "there's no doubt there's better execution," *id.* ¶ 128. As to Gupta, Plaintiffs allege that a "core component" of UiPath's strategy involved

"striking multi-year deals with larger customers." *Id.* ¶ 67. That Gupta, consistent with this strategy, urged employees to convert one-year deals to multi-year deals and wanted "higher total contract value" with those deals, *id.* ¶ 109(d), does not suggest that Gupta knew UiPath was failing to execute that strategy or that he knew his description of the Company's "deal quality" and "customer quality" to be false. It suggests the opposite: that Gupta was directing sales representatives to implement the deals that the strategy called for.

* * *

In sum, Plaintiffs' access-to-information allegations show at most that Defendants were presented with some unfavorable data about churn and sales quotas, and that some of UiPath's employees disagreed with their policy changes. This does not show that Defendants had "knowledge of facts or access to information contradicting their public statements," and falls short of showing that Defendants had "a state of mind 'approximating actual intent.'" *Novak*, 216 F.3d at 308, 312.

**ii. Additional Pieces of Circumstantial Evidence**

Plaintiffs identify three additional pieces of circumstantial evidence, which they contend support a strong inference of scienter: (1) the fact that "Defendants' turnaround strategy was at the core of UiPath's business, and Enslin was brought in to pursue this new, pivotal strategy," Opposition at 28; *see* SAC ¶¶ 163-164; (2) the timing of Enslin's departure, Opposition at 28; *see* SAC ¶¶ 159-161; and (3) "the two-and-a-half months between the final alleged misstatement and the corrective disclosure," Opposition at 29; *see* SAC ¶ 157.

First, the core operations doctrine does not establish scienter. That doctrine "posits that scienter may be imputed to key officers who should have known facts relating to the 'core operations' of their company," *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 148 n.19

(2d Cir. 2025) (internal quotation marks omitted). The Second Circuit "h[as] not clearly affirmed the validity of the core-operations doctrine following the passage of the PSLRA, although [it] h[as] suggested that the doctrine can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently." *Smith*, 177 F.4th at 413-14 (quoting *Gimpel*, 156 F.4th at 148 n.19). Where, as here, "Plaintiff[s'] other allegations fall short of supporting a compelling inference of scienter, allegations that a misstatement affected a core operation generally cannot fill the gap." *May*, 2025 WL 887300, at *26 (collecting cases).

Second, the timing of Enslin's departure also fails to support Plaintiffs' scienter allegation. Plaintiffs contend that it is "suspicious" that Enslin's departure was announced the day of the corrective disclosure. Opposition at 28. But as this Court previously observed, "it is hardly suspicious in isolation for a company's CEO to depart upon the company's announcement of disappointing financial results," so "[i]n the absence of allegations linking Enslin's departure to the alleged fraud, the timing of Enslin's departure does not give rise to a strong inference of scienter." *UiPath I*, 2025 WL 2065093, at *16. The Second Amended Complaint, like the First, lacks any "[a]dditional factual allegations linking the termination or resignation to the alleged fraud." *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132 (LAP), 2023 WL 2632258, at *22 (S.D.N.Y. Mar. 24, 2023).

Finally, the temporal proximity between Enslin's challenged statement in the March 13, 2024 earnings call and the May 29, 2024 corrective disclosure, does not support a strong inference of scienter here. Although "temporal proximity between an allegedly false statement and a later corrective or inconsistent statement can be relevant to the question of scienter[,] . . . proximity alone, without corroborative evidence, is insufficient to give rise to a strong inference of scienter." *Bettis v. Aixtron SE*, No. 16 Civ. 25 (CM), 2016 WL 7468194, at *16 (S.D.N.Y. Dec. 20, 2016).

Plaintiffs point to no new corroborating allegations beyond the deficient allegations about Defendants' access to information, and the more plausible inference to be drawn from the temporal proximity remains "that UiPath believed its turnaround strategy was proving successful—especially given the strong financial reporting for the second half of fiscal year 2024—and promptly revised its guidance once additional information revealed otherwise," *UiPath I*, 2025 WL 2065093, at *16.

**iii. Corporate Scienter**

Finally, Plaintiffs' corporate scienter claim fails because their allegations as to the individual defendants, Enslin and Gupta, fail. A plaintiff may establish corporate scienter "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted). Plaintiffs pursue only the first route, Opposition at 29; *see* SAC ¶ 165, but for the reasons discussed above, they have failed to plausibly allege that any individual acted with the requisite scienter.

* * *

The Second Amended Complaint, like the prior Amended Complaint, has "failed to plead facts giving rise to an inference of scienter 'at least as compelling' as the more obvious, and less sinister, conclusion—that Defendants simply miscalculated and poorly executed on [a corporate strategy] in a fast-moving and highly competitive industry." *Shemian*, 2013 WL 1285779, at *19. Accordingly, the Court grants Defendants' motion to dismiss Count I.

**B. Section 20(a) (Count II)**

Because the Court has dismissed Plaintiffs' Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims likewise fail for lack of a primary violation. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations). The Court therefore also dismisses Count II of the Second Amended Complaint.

**C. Leave to Amend**

Finally, Plaintiffs have requested leave to amend if the Court grants Defendants' motion. Opposition at 30. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although leave to amend should be liberally granted, it "may properly be denied for . . . repeated failure to cure deficiencies by amendments previously allowed . . . [or] futility of amendment." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted). The Court previously allowed Plaintiffs to replead after dismissing the First Amended Complaint, but "emphasize[d] that Plaintiffs should only file a second amended complaint if they are able to remedy the pleading deficiencies identified herein." *UiPath I*, 2025 WL 2065093, at *21. The Second Amended Complaint repleads many of the same deficient allegations, and its new material does not resolve the prior Complaint's deficiencies. Furthermore, Plaintiffs "have identified no additional facts or legal theories . . . they might assert if given leave to amend." *UBS AG*, 752 F.3d at 188. Plaintiffs' request to file a third amended complaint is thus denied.

## IV. Conclusion

Defendants' motion to dismiss is granted, and the Second Amended Complaint is dismissed with prejudice. Because the Court is able to resolve Defendants' motion without the need for oral argument, Plaintiffs' request for argument is denied as moot. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated: September 28, 2026
New York, New York

JOHN P. CRONAN
United States District Judge